**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL BUEHNER,**<br>c/o Friedman, Gilbert + Gerhardstein<br>50 Public Square, Suite 1900<br>Cleveland, OH 44113,<br><br>        Plaintiff,<br><br>-vs-<br><br>**THE CITY OF CLEVELAND,**<br>**SAHIR HASAN,**<br>**MICHAEL BEAMAN, AND**<br>**JOSEPH PETKAC,**<br>c/o City of Cleveland Law Department<br>601 Lakeside Avenue, Room 106<br>Cleveland, Ohio 44114,<br><br>and<br><br>**CUYAHOGA COUNTY,**<br>**RICHARD BOMBIK, AND**<br>**CHRISTOPHER KEIM**<br>c/o Cuyahoga County Prosecutor's Office<br>The Justice Center, Courts Tower<br>1200 Ontario Street, 8th Floor<br>Cleveland, Ohio 44113,<br><br>        Defendants. | Case No.<br><br>Judge<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.     With this Complaint, Plaintiff Michael Buehner brings federal and state civil rights claims for damages against Cleveland and Cuyahoga County and their officers who caused his decades-long wrongful imprisonment. On May 24, 2001, someone who was not Michael Buehner shot and killed young Jerry Saunders during a drug deal on East 93rd and Marah. Cleveland homicide detectives, following Cleveland police policy, conducted a recklessly

deficient investigation and could not figure out the culprit, so they framed Michael Buehner instead. They did so by suppressing and destroying now-discovered evidence and fabricating and coercing now-recanted witness testimony. Cuyahoga County prosecutors, following County policy, continued to investigate and ultimately prosecuted Michael without probable cause. They did so while continuing to suppress and failing to preserve exculpatory evidence. Defendants' misconduct caused Michael Buehner to lose over 20 years of his life to the Ohio prison system and deprived Jerry Saunders's family of justice against the real killer. Michael Buehner brings this action under 42 U.S.C. §1983 and state law seeking compensation for Defendants' violations of his rights and theft of his liberty.

## Jurisdiction and Venue

2.    This Court has subject matter jurisdiction over this federal question case under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). The Court has supplemental jurisdiction over the pendant state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

3.    Venue in the Northern District of Ohio is proper under 28 U.S.C. § 1391(b). This is the district in which the Defendants reside and in which the events giving rise to the claims occurred.

## Parties

4.    Plaintiff **Michael Buehner** is a 47-year-old man living in Lorain, Ohio. He suffered the civil rights abuses set forth in this Complaint.

5.    Defendants former Cleveland Police Officers **Sahir Hasan** and **Michael Beaman** and **Joseph Petkac** (the **Officer Defendants**) were, at all times relevant to these allegations, duly appointed police officers employed by the City of Cleveland, acting within the scope of their employment and under the color of law. They are sued in their individual capacities.

6.      Defendant **City of Cleveland** is an Ohio municipal corporation that operates the Cleveland Division of Police. The City is a unit of local government duly organized under the laws of the State of Ohio. The City is a "person" that acts under color of law under 42 U.S.C. § 1983. The City was the employer and principal of the **Officer Defendants** at all times relevant to these allegations. The City is also responsible for the policies, practices, and customs of the Cleveland Division of Police.

7.      Defendants former Cuyahoga County Prosecutors **Richard Bombik** and **Christopher Keim** (the **Prosecutor Defendants**) were, at all times relevant to these allegations, assistant prosecutors employed by the Cuyahoga County Prosecutor's Office. They were, at all times relevant, acting in their investigatory or prosecutorial capacities for Cuyahoga County and acting within the scope of their employment and under color of law. They are sued in their individual capacities.

8.      Defendant **Cuyahoga County** is a government entity in the State of Ohio, duly organized under the laws of the State of Ohio. The County is a "person" acting under the color of law under 42 U.S.C. § 1983. The County was, at all times relevant to these allegations, the employer and principal of the **Prosecutor Defendants**. The County is also responsible for the local policies, practices, and customs of the County and its Prosecutor's Office.

## Facts

***Allegations setting forth the deficient investigation and malicious prosecution that violated Michael Buehner's civil rights***

**Michael Buehner was not involved in the murder of Jerry Saunders; no evidence connected him to the shooting.**

9.      On May 24, 2001, one of three men in a small black pickup truck shot and killed Jerry Saunders during a drug deal on East 93rd and Marah Avenue in Cleveland.

10.     Michael Buehner was not there.

3

11.     Late at night on May 23, 2001, young Jerry Saunders was outside in the street with his friend Lawone Edwards. The young men were trying to sell drugs to earn money. A small black pickup truck pulled down the street near them and they ran up to it to try to make a sale. They jumped into the open truck bed. One of the people from the truck shot Saunders twice, killing him. The truck drove away and Lawone ran.

12.     By the time the Cleveland Police arrived at the murder scene in the early morning, they found Jerry Saunders's body and pieces of bullets, and not much else.

13.     The lead investigating homicide detective that morning was Defendant Sahir Hasan.

14.     Hasan, along with other CDP officers acting at his direction, cursorily processed the crime scene and interviewed just three potential witnesses in the neighborhood.

15.     The officers did not fully canvas the area for witnesses or physical or trace evidence. They did not make a thorough catalogue of who was there nor of what they found.

16.     The officers did not even obtain statements from people living on the street who were present during the initial investigation.

17.     For example, the officers rejected at least one such witness, Deborah Powell's voluntary request to provide a statement.

18.     Similarly, the officers took the name of another such witness, Katrina Mustin, who was on the scene and administering CPR to Saunders when officers arrived. However, nobody took her statement that morning, and upon information and belief Hasan and Beaman never obtained any evidence from her, showed her a lineup, or followed up with her in any way.

19.     Of the original three witness statements officers did record, two people purported to have seen who was in the truck. Tierra Edwards said the driver, a white man, was the shooter;

the middle passenger, she didn't see; and the third passenger was a black man. Gail Jenkins said the driver, a white man, was the shooter and the other two passengers were black men.

20. Hasan and the other CDP officers performed no more meaningful investigatory work that morning. They collected little physical or forensic evidence besides photos, a bullet casing and pellets, the victim's body and clothes, and a jacket that Lawone had dropped when he ran away. There was no murder weapon there. The truck was gone. Neither Michael Buehner's name, nor any description matching him, ever came up.

21. Because of the lack of physical or forensic evidence, witness identification was critical in the investigation, and ultimately at trial. This included witness reports identifying the small black truck as well as the race and appearance of its passengers.

22. At the time of the shooting, Michael Buehner was a 23-year-old white man with brown hair and no face tattoos.

23. Hasan and his partner Defendant Michael Beaman directed the investigation as the lead detectives. Over the next several months, they steered the investigation towards the wrongful arrest and prosecution of Michael Buehner.

24. Defendant Joseph Petkac was the Lieutenant over Hasan and Beaman who approved and signed off on their reports of the investigation. Upon information and belief Petkac knew about and approved all of Hasan and Beaman's misconduct described in this Complaint.

**The Officer Defendants, acting pursuant to City policy, breached their duty to investigate the murder and instead used fabrication, suppression, and coercion to frame Buehner.**

25. From the beginning of the investigation, Brenda Dennis, the victim's sister, was devoted to finding information about her brother's murder. Just a couple of days after the murder she spoke to Lawone and learned that he had been there. Lawone told her that the truck's

driver, a white man with a face tattoo, was the shooter, and that the passengers were both black men. Brenda told Hasan right away.

26.    Brenda stayed in touch with Hasan and Beaman over the next few months, further reporting what she learned.

27.    In the meantime, Hasan and Beaman did little to catch the killer. For example, it was not until three weeks after the murder that they contacted Doris Organ, whose home had been shot during the murder and on whose front lawn Saunders's body was found. Upon information and belief, Hasan and Beaman never meaningfully followed up with Organ nor showed her a lineup.

28.    As the investigation sat open, more people from the neighborhood offered information. Descriptions of the truck and its passengers continued to vary. One woman told Hasan she thought two white men and a black man in a black Ford Ranger killed Saunders. Her son told Hasan the same. Another man said he saw two white men and a black man in a black truck and that the middle passenger was the shooter.

29.    Even other police officers conveyed to Hasan and Beaman information concerning potential witnesses. Upon information and belief, Hasan and Beaman did nothing to further investigate this or in the alternative, covered up whatever they found.

30.    In early June, the FBI picked up Lawone on outstanding drug charges, so Hasan and Beaman interviewed him. Lawone told them that the truck was a black GMC with a white driver, a white middle passenger with a face tattoo, and a black third passenger. This time, he said the middle passenger was the shooter. The officers let Lawone go.

31.    Soon after, Brenda called back again to say that she found out her brother had a fight with someone recently before his death, suggesting he could be a suspect. Hasan and Beaman

never investigated that. In the alternative, on information and belief, they suppressed or destroyed whatever they found out.

32.    At least twice during the investigation, once early on and once just before trial, Brenda also called to say she learned that a man called "Country" Grant was involved in her brother's murder. Hasan and Beaman never investigated that the first time; the second time, they found out Country had a long and violent criminal background but did not follow up. In the alternative, on information and belief, they suppressed or destroyed whatever they found out.

33.    In early July, other CDP officers impounded a black GMC truck while investigating a different murder. The truck had been parked on East 93d during that investigation.

34.    Hasan and Beaman interviewed Wilhelmina Mason, to whom the GMC was registered. She told them the truck really belonged to Robert "Sonny" Allen, a light skinned black man who had recently asked her to get plates for the truck for him. She said she had a feeling that truck was involved in the murder.

35.    Ms. Mason informed Hasan and Beaman that Lawone—who had witnessed the events and then fled through backyards when the shots began—saw Robert "Sonny" Allen and another man, Victor, in the GMC immediately after the murder, driving on Heath Ave. onto East 93rd. Marah Avenue is a one-way street traveling west to east. Heath is a two-way street separated from Marah Ave. through backyards.

36.    Ms. Mason also provided Beaman and Hasan information leading them to find that the GMC was previously registered to Tyrone Gregory Aiken, who sold it to Robert "Sonny" Allen two months earlier.

37.    Hasan and Beaman learned that Robert "Sonny" Allen had a violent criminal history.

38. Aiken later confirmed to Hasan and Beaman Ms. Mason's description of Robert "Sonny" Allen and that he had an associate called Victor.

39. Despite all this, Hasan and Beaman never meaningfully investigated the involvement of Robert "Sonny" Allen or Victor. In the alternative, on information and belief, they suppressed or destroyed whatever they found out.

40. It was not until July 19—almost two months after the murder—that Hasan and Beaman first heard Michael Buehner's name at all in connection with the crime. Michael did not come up from any of the many potential witnesses nor in connection with any implicated truck. The only source suddenly alleging Michael's involvement was a confidential informant, whose identity Defendants are still concealing. This informant suggested Michael's name, and Michael's alleged cousin Randy Price, to a CDP narcotics officer, who transmitted the suggestion to Beaman and Hasan. There was no independent basis to suspect Michael's involvement in the shooting.

41. A couple of days later, Hasan and Beaman brought Lawone in again to question him. They showed him a photo array with Michael Buehner in it. He could not make an identification.

42. A few days after that, Hasan and Beaman brought Tierra Edwards and Gail Jenkins in to see a photo array with Michael in it. They too did not identify him.

43. In September, Brenda called again, and asked Beaman and Hasan to interview a woman from the neighborhood, Debbie Powell, who had witnessed the murder from her house. Powell told Beaman and Hasan that all three people in the truck were black men, including the shooter. She said she had seen the shooter at the crime scene, and had tried to tell police that first morning, but they had ignored her. She said that everybody in the neighborhood

knew that the men involved were black, but they were telling police that the shooter was white to cover up the shooter's identity.

44. Around this time, Hasan and Beaman interviewed both Michael Buehner and Randy Price. They both truthfully denied any involvement in the shooting. Michael did not even know the neighborhood or any of the people involved.

45. Up until this time, Hasan and Beaman never followed up on alternate suspects Robert "Sonny" Allen or "Country" Grant or Victor, nor did they further explore information from Brenda or from witnesses in the neighborhood or from other officers. Instead, based only upon the confidential informant's secondhand advice, they zeroed in on Michael Buehner and Randy Price.

46. Similarly, although Hasan and Beaman had inculpatory information about the black GMC and at least one other similar small black truck, they zeroed in on Michael Buehner's truck, which did not fit any witness description.

47. In December, over six months after the shooting, Hasan and Beaman brought Lawone Edwards and Randy Price each into custody and coerced them to identify Michael Buehner as the shooter.

48. The Officer Defendants coerced the statement of Lawone Edwards. Lawone, a 19-year-old with multiple drug cases hanging over him and who had recently witnessed his friend's murder, was vulnerable to coercion. Hasan and Beaman showed him a physical lineup in which the only person common with the prior photo show-up was Michael Buehner. None of the men in the physical lineup looked like Michael; they were different heights and ages. Even then, Lawone could not choose someone. So, Hasan coached him to identify Michael. Hasan also threatened Lawone to obtain the identification of Michael, making clear that

Lawone needed to choose Michael and say that he was positive about the identification. Lawone followed orders. Lawone knew that he could not truly positively identify Michael.

49. The Officer Defendants coerced the statement of Randy Price. Randy was also young and had a family to provide for and had recently been released from prison on a different matter. He had maintained his innocence through multiple interviews so far. Hasan and Beaman had him charged with capital murder, without probable cause, as though he was the shooter. Hasan and Beaman played him a tape of what they represented was a recorded witness statement inculpating him and Michael in the shooting. Upon information and belief, that tape was fabricated and/or suppressed; the Officer Defendants have never produced it. Hasan and Beaman promised Randy a plea deal with a much shorter sentence if he said he was there and identified Michael as the shooter. Randy followed orders. Randy was, in fact, not involved with the shooting at all.

50. Hasan and Beaman had Lawone identify Randy from an in-person lineup also. Like the lineup containing Michael, the other men looked totally different from Randy in age and height and weight. Hasan and Beaman, as before, made it clear who Lawone must select and Lawone complied.

51. Hasan and Beaman thus coerced and fabricated identifications from Lawone Edwards and Randy Price, who would become the State's key witnesses in the trial against Michael Buehner. Their fabricated testimony would put Randy, a white man, driving the truck; Michael, a white man with no face tattoo, as the middle passenger and shooter; and a third unknown passenger, at the crime scene.

52. No real evidence supported Michael's arrest, let alone an indictment and trial.

53. The Officer Defendants never came up with other inculpatory evidence. There was no murder weapon, nor fingerprints nor DNA, nor ultimately any black truck, tying Michael to the shooting. To the contrary, upon information and belief such evidence existed and would have exculpated Michael, but Defendants withheld or destroyed it.

54. Nevertheless, satisfied with their fabrication, Hasan and Beaman never investigated the alternate suspects, who continued to commit crimes, but instead caused the arrest, indictment, and prosecution of Michael Buehner based upon fabricated witness statements.

**The Officer Defendants continued their violations through Michael's trial. The Prosecutor Defendants, acting pursuant to County policy, breached their duty to investigate the case and instead used and permitted the fabrication and suppression of evidence and the coerced and unreliable identifications to bring charges and prosecute Buehner.**

55. Prior to and during the trial, the Officer Defendants failed to produce exculpatory and impeachment evidence to the Prosecutor's Office or to Buehner's defense. This included, among other things, the following:

   a. The Officer Defendants covered up all the ways in which they used coercion and unlawful identification procedures to fabricate Lawone's and Randy's identifications and eventual testimony.

   b. The Officer Defendants suppressed and have still never produced the recorded interview they played during the Randy Price interrogation.

   c. The Officer Defendants withheld the content of the statements of Gail Jenkins and Debbie Powell, as well as the identity and content of the statement of Wilhelmina Mason. These statements all would have impeached Lawone's testimony with respect to the race and position of the shooters. These statements further would have suggested alternate suspects and a different vehicle.

d.   The Officer Defendants withheld the identities of, and information regarding, alternate suspects whom they failed to investigate including Robert "Sonny" Allen and Eric "Country" Grant.

e.   The Officer Defendants, upon information and belief, withheld and/or destroyed and/or failed to preserve additional physical and forensic evidence that was exculpatory or could have been tested to reveal exculpatory information. This includes the destruction of the GMC truck involved in the murder before Michael's indictment, and upon information and belief at least one other truck which they investigated, as well as any contents of those vehicles or trace evidence left inside. Upon information and belief, this also includes forensic testing and/or other physical evidence which Defendants have destroyed, failed to preserve, lost, and/or still possess but are withholding.

56.   Pleading in the alternative, the Prosecutor Defendants or some agent(s) of the Cuyahoga County Prosecutor's Office had access to some, but not all, of the above-described exculpatory evidence, and violated the *Brady* rule by withholding it from the defense.

57.   In addition, the Prosecutor Defendants failed to provide other similar information to the defense, including the identities of at least one investigating police detective and, upon information and belief, other City employees and witnesses who possessed exculpatory information.

58.   In addition, the Prosecutor Defendants or some agent(s) of the Cuyahoga County Prosecutor's Office suppressed, destroyed, lost, or failed to preserve additional physical evidence or to maintain its chain of custody when that evidence was in the Prosecutors'

control. Upon information and belief, this includes the clothing of the victim and/or evidence of forensic testing of the same.

59.     In addition, pleading in the alternative, the Prosecutor Defendants, or one of them, or some other agent(s) of the Cuyahoga County Prosecutor's Office became aware of some, but not all, of the fabrications that the Officer Defendants made up concerning the witness testimony, and pursued the prosecution anyway.

60.     In addition, pleading in the alternative, Bombik even went so far as to agree to the early release of Randy Price in exchange for his testimony against Michael. This resulted in Randy only serving approximately 12 months in prison.

61.     Randy Price also provided testimony in another case which Hasan was the investigating Detective which was captioned *State of Ohio v. Gino Khoury* Case No. CR422767. However, in that case, the efforts of Hasan and Price were thwarted when Judge Stuart Friedman authored a decision that held the testimony of Randy Price was completely fabricated, untrustworthy, or inaccurate and was not due to a memory lapse.

62.     In addition, upon information and belief, the Prosecutor Defendants, in their investigatory capacities, recklessly failed to conduct a pretrial investigation sufficient to uncover the Officer Defendants' misconduct, which should have been obvious. This failure caused them to neglect their duty to investigate true suspects, and instead cause the prosecution of Michael Buehner without probable cause.

63.     In addition, upon information and belief, the Prosecutor Defendants, in their investigatory capacities, committed additional misconduct before and after trial, including in their roles advising the police and maintaining evidence.

64.  Defendants, and other agents of the Cuyahoga County Prosecutor's Office, and other officers of CDP, continued to suppress and fail to preserve evidence during the long years of Michael's wrongful imprisonment, up to and during his retrial, and upon information and belief, still today.

65.  Each Defendant, upon information and belief, committed further misconduct similar to that specifically described here, including fabrication and *Brady* violations, in the investigation, charging, trial, and retrial of this case, which is not yet known or understood.

**Because of Defendants' actions, together and separately, a jury lacked the evidence it was entitled to consider and wrongfully convicted Buehner. He spent over 20 years wrongfully imprisoned.**

66.  As a result of the above-described misconduct and, upon information and belief, additional similar misconduct of which Plaintiff is still not aware, Mr. Buehner was charged, arrested, tried, and convicted of a murder he did not commit, and spent over 20 years in prison.

67.  The jury that convicted Michael had almost no physical or forensic evidence to rely upon, and instead relied chiefly on the false and coerced testimony of Lawone Edwards and Randy Price.

68.  Jurors expressed concern multiple times about these two witnesses' credibility, but never received the benefit of any of the above-described evidence. Each time the jurors expressed these concerns, they had to continue to deliberate without accurate testimony or impeachment evidence.

69.  Neither of the Officer Defendants nor the Prosecutor Defendants ever intervened to prevent the false testimony and evidence being offered. Despite knowing about the evidentiary suppression and fabrication that lead to the false evidence at trial, the Officer Defendants

sat at trial without attempting to interrupt these due process violations. Hasan testified at trial consistent with his misconduct, not the truth.

70.    The defense attorneys who investigated Michael's case and defended him did not have the benefit of critical impeachment witnesses, suppressed or destroyed forensic and other evidence, the ability to examine or obtain expert witness testimony regarding critical evidence, or the truthful testimony of either of the State's key witnesses.

71.    With the case against him thus concocted by Defendants, and without the benefit of *Brady* evidence to investigate or rebut the testimony, Michael Buehner could not prevail at trial. He was convicted and sentenced to 18 years to life in prison.

**After Michael fought for his innocence from behind bars, he gathered enough information to expose the misconduct and a new jury acquitted him in light of the evidence described here.**

72.    Over the next 20-plus years, after multiple appeals and applications for post-conviction relief, Michael obtained the CDP files revealing the extent to which the Officer Defendants withheld exculpatory evidence from the prosecution, and, pleading in the alternative, that the Prosecutor Defendants withheld exculpatory evidence from the defense.

73.    When, on this basis, Michael was finally granted a new trial, he further discovered the extent to which the Officer Defendants coerced Lawone Edwards and Randy Price's testimony and used unconstitutional procedures to obtain their identifications, in violation of Michael's due process rights. Eventually, both Lawone and Randy completely recanted their inculpatory testimony in sworn affidavits.

74.    Despite now having full notice of this extensive police and prosecutor misconduct, the Cuyahoga County Prosecutor's Office decided to try Michael Buehner again for the same crimes.

75.     At the retrial, Michael had the benefit of the previously withheld evidence, and an opportunity to correct the fabricated identifications. For example, Lawone Edwards testified as to how Hasan and Beaman coerced his testimony. Debbie Powell testified that she witnessed the shooting and that Michael was not the shooter. Now that they had this evidence, the jury acquitted Michael in less than two hours.

76.     Michael Buehner has been exonerated and now seeks compensation for the wrongs that caused his decades-long nightmare.

77.     In the time since the original investigation, Defendants' continuing suppression of evidence prolonged Michael's unjust imprisonment, key witnesses died, and even more evidence was lost or destroyed. Today, multiple of the above-named witnesses are dead. Defendants have allowed the trucks that were investigated to be destroyed. Defendants have lost or destroyed physical evidence including the victim's clothes. Mr. Buehner cannot perform testing on those items nor interview those witnesses to learn about even further misconduct which, upon information and belief, Defendants committed.

78.     Despite Defendants' destruction of evidence however, upon information and belief, Defendants committed additional *Brady* violations and other unconstitutional conduct still not known to Plaintiff, of a similar kind to that alleged here, which similarly contributed to Plaintiff's injuries, and which Plaintiff still may discover.

79.     As set forth in further detail below, the Officer Defendants' and Prosecutor Defendants' misconduct was not rogue. To the contrary, it was done pursuant to the official policy and custom of the City of Cleveland and of Cuyahoga County.

***Factual allegations summarizing Cleveland's policy, pattern, and practice of misconduct which was the moving force behind the violations here***

80.   The police misconduct alleged in this Complaint was undertaken pursuant to the City's official policies and practices.

81.   The City, through CDP, maintained a decades-long official policy and custom in which police regularly used unconstitutional measures to secure wrongful convictions. These measures included withholding, suppressing, or destroying exculpatory evidence, fabricating evidence, feeding information to witnesses, engaging in unduly suggestive identification and lineup procedures, and engaging in leading, coercive, and unduly suggestive questioning of and contact with witnesses. These were widespread, clear, and persistent patterns and practices of the officers in the CDP and were established for decades before and continued after Michael Buehner's wrongful conviction.

82.   This misconduct is well-documented as far back as the 1970s and continued through the time of the investigation and prosecutions at issue here.

83.   The lasting pattern and practice demonstrating the City's policy is evident in, for example, the following cases and historical materials related to withholding evidence:

a.   In the 1975 wrongful prosecution of Wiley Bridgeman, Ronnie Bridgeman, and Rickey Jackson, Cleveland Police Commander testified that it was the practice of detectives at the time <u>not</u> to provide all information to the prosecutor. Instead, in "[a]lmost every investigation you have," the practice was "[d]on't ask, don't tell. And you don't give it to them." (*Jackson v. Cleveland, et al*., N.D. Ohio No. 1:15-CV-989, Tell Dep., R.103, PageID#3675; Id. PageID#3673; Tell Aff., R.103-3, PageID#3845.) Not all interviews were turned over. (Id., Tell Dep., R.103, PageID#3674.) Each detective determined what information he would give to the

17

prosecutor. (*Id*., Tell Dep., R.103, PageID#3789-3790.) Detectives' personal files contained information and notes not contained in the official file turned over to prosecutors. There were no policies governing keeping personal files or notes. (*Id*., Tell Aff., R.103-3, PageID#3846; Tell Dep., R.103, PageID3665-3666, 3788-3790, 3792-3793, 3799-3800.) The prosecutor received a "cleaned up version" of the file, not the whole file. (*Id*., Tell Dep., R.103, PageID#3800-3801.) This practice was the same among all detectives. (*Id*., Tell Dep., R.103, PageID#3801-3802.) In *Jackson*, police suppressed the coerced nature of the identification, statement, and testimony of the sole witness to a murder as well as his attempts to recant. Resulting fabricated evidence was presented at trial. *Jackson v. City of Cleveland*, 925 F.3d 793, 814-817 (6th Cir. 2019).

b.    In the 1995 wrongful conviction of Anthony Lemons, police failed to disclose exculpatory information to the prosecutor prior to or during trial. Lemons was exonerated in 2014 based on this evidence. *See State v. Lemons*, Cuyahoga County, Ohio Court of Common Pleas, Case No. CR-95-323266-ZA; Cory Schafer, "Anthony Lemons was wrongfully imprisoned for nearly two decades in Cleveland killing, court finds," Cleveland.com (Jan. 11, 2019), available at https://www.cleveland.com/metro/2017/07/anthony_lemons_was_wrongfully.html

c.    The same misconduct persisted after Michael Buehner's trial—in 2007, Michael Sutton and Kenny Philips were wrongfully convicted of violent crimes but in 2021, Ohio's Eighth District Court of Appeals found that exculpatory information was suppressed. Two CDP officers who did not testify in the original trial later

undermined the testimony of the two officers who did, and the new testimony—"would seriously call into question the accuracy and truthfulness of [the two testifying officers]." *See State v. Sutton, et. al.*, 8th Dist. Cuyahoga No. 108748, 2021-Ohio-854, appeal not allowed, 164 Ohio St.3d 1404, 2021-Ohio-2742, 172 N.E.3d 172. Michael and Kenny were exonerated.

    a. The United States Court of Appeals for the Sixth Circuit has recognized not only CDP's official written policy, but also its longstanding failure to train its officers to turn over *Brady* evidence. *Jackson*, 925 F.3d at 828.

84. Similarly, CDP has a documented historical practice reaching back to the 1970s of fabricating evidence, using suggestive and/or coercive identification procedures, and coercing witnesses to testify untruthfully.

85. The ongoing pattern demonstrating this policy is evident in, for example, the following cases related to fabrication, identification, and coercion:

    a. In *Jackson,* which addressed 1975 wrongful convictions, the Sixth Circuit found that evidence demonstrated CDP officers coerced a witness identification by a 12-year-old boy, resulting in fabricated evidence at trial. 925 F.3d at 814-817.

    b. In 1988, Anthony Michael Green was wrongfully convicted based in part upon CDP's suggestive photo lineup procedures which led the victim to identify the wrong man. Green was exonerated in 2001. *See* Eric Slater, "DNA Proves What Man Long Insisted," Los Angeles Times (Jan. 21, 2002), available at https://www.latimes.com/archives/la-xpm-2002-jan-21-mn-24028-story.html.

    c. In 1995, Anthony Lemons was wrongfully convicted of murder because of, among other things, CDP's suggestive identification practices. When police first

questioned the victim, she could not identify the attacker; nine months later, she still could not; later at an in person lineup, she wrongly identified Lemons. Police included Lemons in every lineup and otherwise coerced the identification. *See State v. Lemons*, Cuyahoga County, Ohio Court of Common Pleas, Case No. CR-95-323266-ZA; Cory Schafer, "Anthony Lemons was wrongfully imprisoned for nearly two decades in Cleveland killing, court finds," Cleveland.com (Jan. 11, 2019), available at https://www.cleveland.com/metro/2017/07/anthony_lemons_was_wrongfully.html

86. The historical and entrenched nature of all these policies and practices is well-established.

87. For example, dating back to the 1960s, former Cleveland Mayor Carl Stokes described that the failures of the Cleveland Division of Police and its officers went to the highest levels, including the Office of Mayor. His autobiography, "Promises of Power," published in 1973, provides some of these facts:

    a. Stokes explains that when he became Mayor in 1967, he viewed the election "as a mandate to reform the Police Department." (171.) In his words, "This great hope became my greatest frustration, my greatest failure."

    b. Stokes noted that Cleveland police officers were "all almost totally lacking in the training in human relations that some departments have at least made a beginning to provide." (173.) "The most obvious, and to me the most important, failure of the police was in their dealings with the black community."

    c. Stokes also remarked on the policy or practice under which improper or criminal conduct toward black people was left without consequence: "And all the police

20

knew that few policemen faced charges or an appearance before the grand jury for shooting a black man while on duty." (173.)

    d.    Stokes noted that the officers' determination "to live by the old ways won out," and that "we were never able to penetrate their inward ways, their cohesive hostility to any change." (174.)

    e.    Stokes also provided insight into the true leadership within the CDP itself: "A clique of senior police officers actually ran the Cleveland Division of Police—no matter who was chief." (177.)

    f.    In the end, Stokes conceded that the improvements he sought for the Police Department never occurred: "But it is true that I accomplished none of the substantive, structural reforms of the department that I had hoped for." (205.)

88.    In 1974, the Mayor appointed the **Cleveland Crime Commission** to investigate police corruption. The **Crime Commission produced a report on police corruption and criminal conduct**. The Commission recommended solving structural problems at the highest levels, noting that establishing a position of Director of Police would "solidify the presently diffused executive responsibility for the Police Department's Operations." This "would establish lines of responsibility and accountability and would foster the changes necessary to correct the structural, organizational and procedural sources that can lead to police corruption and misconduct." (3.) The Cuyahoga County Grand Jury also investigated police corruption in 1974.

89.    This report also included in its Appendix a 1966 **study by Public Administration Service on the Cleveland Division of Police**, noting massive structural and organizational problems. This study noted that Police Division's "formal organization violates sound

organizational concepts in many respects. It is further confused by informal arrangements, power centers, and unusual lines of communications which make the apparent structure of organization virtually meaningless." Moreover, "there is a lack of uniform policies and procedures, common objectives, and control." (20.)

a.  This study also explained that the CDP can perhaps "best be described as a loose federation." "Such an organization precludes effective leadership, and encourages tendencies to build small empires, and to create sinecure positions." (20). Such "small empires" show that there are various policymakers within the CDP. Additionally, "[t]he management process of planning is conspicuously absent." (22.) "[T]here is no sense of urgency about planning for the solution of even obviously critical problems."

b.  Supervision problems were severe: "The management process of directing is but little exercised by many commanders and effective field supervision is virtually non-existent." "Some of the commanding officers interviewed could not fully define their own responsibilities, let alone those of subordinate elements or personnel." (22.) "The management process of controlling is little exercised in any meaningful sense, because the concept is not recognized, its significance is not appreciated and the administrative processes that make control possible are not present." "No great improvement can be made in Cleveland's police service unless organization and management are brought to higher standards."

90.  The report noted how indifferent the CDP was to its own obvious shortcomings: "The problems of police and community relations are so critical in Cleveland that they warrant immediate and serious attention leading to the adoption of new concepts, policies,

programs, and procedures. Yet the division stands aloof from very serious community problems, and it has no real program directed toward the analysis of these problems, nor for their solution. Training in police and community relations is not offered in sufficient depth or extent."  And "[n]o tactical or strategical plans have been devised." (23.)

91.    In 1975, the Cleveland Foundation issued a written report regarding the Cleveland Division of Police after extensive study and interviews with the Chief of Police and many officers in the CDP. The report recognized the lack of supervision over the massive power delegated to subordinate officers, and it quoted one commentator as follows: "No other agency, so far as I know, does so little supervising of vital policy determinations which directly involve justice or injustice to individuals." (1.)

a.    The report was titled **"Private Sector Assistance to the Cleveland Division of Police,"** authored by John D. Maddox and Mark H. Furstenberg. Maddox was a local attorney and Furstenberg was the Director of Personnel for the Boston Police Department.   The purpose of the report was to effectuate the Cleveland Foundation's "continuing effort to assist the Department." (4.) One main goal was to "ascertain in cooperation with the Police Department problem areas in its operation . . . ." Moreover, "[t]he majority of individuals interviewed were officers of the Department who must deal with these problems in the daily discharge of their duties."

b.    The report also noted racial concerns with police interactions at that time, explaining that "[m]inorities dissatisfied simultaneously with the abuse they have suffered at the hands of police demanded more influence over the policies of the

police department and greater access to it." Yet, this "has produced little change in police departments." (14.)

    c.    The report also noted a lack of training within the CDP. There was no "ongoing inservice training" for all officers, with "inservice training" defined as "the periodic training received by a police officer throughout his career to maintain, update, and improve his police knowledge and skills." The report noted that there was "little formal training going on in the Department . . . ." (27.)

    d.    The importance of and need for training was known to final policymakers of the City and CDP. The lack of training in the CDP at that time was so severe that Cleveland police officers emphasized that it was a major concern. The report stated, "The need for inservice training was one of the two problems most frequently mentioned by the officers interviewed." (27.)

92.    Further, the City and CDP have a similarly entrenched history of failing to supervise, investigate, and discipline allegations of officer misconduct like that at issue here.

    b.    For example, despite having knowledge of news reports and complaints against a detective for false testimony and beating confessions out of detainees, the City failed to investigate or take disciplinary action against the involved officer. Former CDP Commander William Tell testified that it was well known among CDP officers that they could get away with serious misconduct without being disciplined. *Jackson v. Cleveland*, et al., N.D. Ohio No. 1:15-CV-989-CAB, Tell Affidavit, R.103-3, ¶15(a), PageID#3848.

    c.    In another case, Tell testified that in the early 1980s he attempted to report a fellow officer's fabrication of evidence and use of excessive force in shooting a young

woman, and Internal Affairs ruled the complaint not substantiated and took no action against the officer who engaged in misconduct. He described the events, saying, "the police department … covered it up" and that Internal Affairs reached a conclusion that was "purposefully untrue." *Id.,* Tell Dep., R.103, PageID#3637-3640, 3642.

d.   Tell witnessed years of repeated misconduct by his fellow officers, indicative of a pattern, practice, custom, and policy of such misconduct. He was aware of other officers conducting interrogations of suspects where officers punched suspects in the face and head, knocking them down, in efforts to get those suspects to confess or implicate others. When physically beating these people, the officers would say things along the lines of, "Now you're going to tell us the truth." Tell testified that "the thin blue line" and fear of being ostracized prevented him from reporting these events. *Id.,* Tell Dep., R.103, PageID#3684-3688.

e.   When Tell attempted to notify superiors in the CDP of the wrongful conduct described above, he was either reprimanded or told not to pursue the claims of misconduct any further. Other officers engaged in similar misconduct were not usually disciplined for those acts. *Id.,* Tell Affidavit, R.103-3, ¶14(d), PageID#3848. He also opted not to report misconduct by his fellow officers to Internal Affairs on other occasions, including occasions when supervisors were present during the misconduct, for fear of being ostracized by CDP officers if he did report. He testified that he had seen other officers ostracized in the past. *Id.,*, Tell Dep., R.103, PageID#3633-3633, 3639. He noted that other police specifically targeted an officer named Ron Turner, because he did his job, and that the other

officers would "steal his evidence, they would throw his cases out." *Id*. PageID#3638. Tell testified that, because of his objections to police practices in interrogations, he was kicked out of the Detective Bureau. *Id*., PageID#3693 Misconduct regularly occurred in the presence of supervisors. *Id*., PageID#3782-3783. Tell was aware that when officers "actually broke the code of silence and reported misconduct," that "[t]hey were ostracized." Id., PageID#3786. He testified that it was correct that he "got the message" that if he saw "violations of the Constitution, violations of the law, abusing people, beating people, stealing things from people, you better not talk about it, because something is going to happen to you." Id., PageID#3787.

93.  Similarly, in a historically entrenched and still ongoing policy and practice, City policy makers and CDP supervisors facilitated a code of silence within the CDP. In accordance with this code, police department detectives refused to report, and otherwise lied about, misconduct committed by their colleagues, including the misconduct at issue in this case. The City of Cleveland's training, supervisory, and disciplinary practices supported this code of silence, by protecting from discipline officers who engaged in misconduct and teaching police officers that they must abide by the code.

a.  In *Jackson*, CDP Detectives Tell and Turner testified about the "code of silence" under which officers were ostracized if they reported misconduct of fellow officers. *Jackson v. Cleveland*, et al., N.D. Ohio No. 1:15-CV-989-CAB, Tell Dep., R.103, PageID#3687-3688, 3712-3714, 3758-3759, 3784-3788; Turner Dep., R.104, PageID#3897-3900, 3905-3906, 3966, 3973-3974.

    b.     This practice and policy of a Code of Silence over the years leading up to and beyond the prosecution of Plaintiff is evident in the testimony of former CDP Commander William Tell as far back as the 1960s and 70s, through the time of all of the misconduct described in this complaint and beyond, in relation to the prosecutions of Wiley Bridgeman, Ronnie Bridgeman, and Rickey Jackson, Anthony Lemons, Michael Sutton, Kenny Phillips, Anthony Michael Green, and others—all of whom were prosecuted in cases where the misconduct of CDP officers was not reported by fellow officers during prosecution and trial, and did not come to light until years or decades later.

94.    As a result of the City's and the CDP's established practice of failing to track and identify police officers who are repeatedly accused of the same kinds of serious misconduct; failing to properly investigate cases in which the police are implicated in fabricating or suppressing evidence, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the CDP, CDP officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

95.    At all times relevant to this Complaint, policymakers for the City and the CDP knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training, or supervision, even though the need for a legitimate mechanism for new or different policies, training, oversight, or punishment of officers was obvious.

96.    The City and CDP were thus on notice of a widespread problem with police corruption including the misconduct at issue here for many years. The widespread pattern and practice

of using unconstitutional measures to secure convictions was so well settled as to constitute a de facto policy in the Cleveland Division of Police. The practice was allowed to exist because municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, ratifying it.

97.     As set forth above, the misconduct described in this Complaint was undertaken pursuant to the official policy of the City and CDP. The constitutional violations alleged herein were a predictable consequence of such official policy, which was the moving force behind the violations. The City's policymakers and officers to whom massive authority was delegated ratified these violations. The City is liable because its individual actors' violations of Michael Buehner's rights were caused by the City's policies, practices, and customs.

98.     Specifically, policymakers for the City on matters relating to the CDP knew, among other things, that there was a need to implement policies, train, and supervise police officers on how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct interrogations and witness interviews and interactions, how to conduct identifications or lineups or showups, how to conduct arrests, how to write police reports or notes of witness statements and evidence, and how not to conduct unduly suggestive identifications or interrogations. The City and CDP decided not to implement any legitimate mechanism for oversight or punishment of officers who violated their *Brady* obligations or peoples' constitutional rights, or who fabricated evidence or fed information to witnesses or used suggestive identification procedures or coerced or intimidated witnesses.

99.  The City and CDP's policies and practices described herein caused the Officer Defendants to believe that they could abuse Michael Buehner's rights and cover up what they did without fear of discipline.

100.  Additional cases involving the same types of misconduct at issue in this case have continued to accumulate over decades.

101.  The City's and CDP's failure to train, supervise, and discipline its officers effectively condoned, ratified and sanctioned the kind of misconduct that the Officer Defendants committed against Michael Buehner in this case. As set forth above, the City and CDP's official policy facilitates and encourages constitutional violations such as those that occurred in this case.

102.  The City and officials within the CDP failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

103.  The constitutional violations that caused Michael Buehner's wrongful conviction were not isolated events. To the contrary, the constitutional violations resulted from the City of Cleveland's policies and practices of pursuing wrongful convictions using unconstitutional measures, including by: (a) relying on profoundly flawed investigations and coercive or intimidating policing tactics; (b) fabricating inculpatory evidence and suppressing exculpatory evidence; (c) using unduly suggestive identification procedures which violated due process; (d) failing to adequately train, supervise, monitor, and discipline its police officers; (e) and maintaining the police code of silence.

104.    Consistent with the municipal policy and practice described herein, members of the CDP, including but not limited to the Officer Defendants, systematically fabricated and coerced evidence, suppressed evidence both from the prosecuting attorneys and from criminal defendants, and used other measures which violated Plaintiff's right to due process and right to a fair trial, to secure wrongful convictions.

***Factual allegations summarizing Cuyahoga County's policy, pattern, and practice of misconduct which was the moving force behind the violations here***

105.    The prosecutorial misconduct described in this Complaint was undertaken pursuant to the County's official policies and practices.

106.    Cuyahoga County maintained a decades-long official policy that permitted the suppression of certain exculpatory evidence. Pursuant to this policy, Cuyahoga County prosecutors regularly suppressed exculpatory evidence, in violation of the constitutional rights of criminal defendants.

107.    The County's policy continues through today, and includes the suppression, withholding, destruction, and failure to preserve impeachment and exculpatory evidence at all stages of investigation, charging, trial, appeals and postconviction litigation, wrongful imprisonment litigation, civil litigation, and public records transactions.

108.    The County's official policy originated from and was expressly written in a letter from County Prosecutor John T. Corrigan setting forth the County's requirements. Corrigan was Cuyahoga County's Prosecutor from 1956 until 1991. In that position, he was a final policymaker for Cuyahoga County. Through the Corrigan letter, the County maintained a policy that prosecutors not disclose certain "evidence favorable to the defendant," including "reports" made by "police departments" and "statements made by witnesses." This official policy thus permitted the suppression of otherwise exculpatory evidence. The

30

United States Court of Appeals for the Sixth Circuit has recognized the Corrigan letter could establish such a policy. *Jackson v. Cleveland,* 925 F.3d 723 (6th Cir. 2019).

109. This official policy was in place at all times relevant to the allegations here. It continued after Corrigan's tenure, into the 1990s, the 2000s, when the Prosecutor Defendants withheld and destroyed exculpatory evidence in violation of Plaintiff' rights. It continued through Plaintiff's retrial and the current proceedings, when additional individual prosecutors continued to mishandle, fail to preserve, and otherwise hide *Brady* evidence.

110. In accordance with this official policy permitting the suppression of exculpatory evidence in Cuyahoga County, Cuyahoga County prosecutors regularly withheld and/or suppressed exculpatory evidence and there is a custom of tolerance of such unconstitutional conduct. This was a widespread, clear, and persistent pattern and practice of the attorneys in the Cuyahoga County prosecutor's office and is well-documented as far back as the 1970s, continuing through the prosecutions here and beyond.

111. This ongoing pattern demonstrating this policy and practice is evident in, for example, the following cases in which County prosecutors withheld exculpatory evidence:

    a.    In the 1975 wrongful conviction of Isaiah Andrews, Cuyahoga County prosecutors withheld exculpatory evidence including police reports that contained evidence of another suspect and information about physical evidence inculpating that suspect and exculpating Isaiah. In part as a result of the County's misconduct (because there was, as here, also police misconduct at issue) Andrews was wrongfully convicted. *See Andrews v. Cleveland,* No. 22-cv-250, 2023 WL 3025096, at *2 (N.D. Ohio Apr. 20, 2023).

b.      In the 1987 wrongful conviction of Ronald Larkins, Cuyahoga County prosecutors withheld exculpatory witness statements, including statements with descriptions of the perpetrator that did not match Larkins, and other impeachment evidence. Because "exculpatory evidence in the prosecution's possession… was never turned over to Larkins," he was granted a new trial. *State v. Larkins*, 8th Dist. Cuyahoga No. 82325, 2003-Ohio-5928.

c.      Reginald Jells was also convicted of murder in 1987 and was granted a writ of habeas corpus in 2008, based on the suppression of evidence by Cuyahoga County prosecutors. There, prosecutors suppressed evidence exculpating Jells as to mitigating factors for a death sentence. This evidence included, like here, impeachment evidence regarding a witness who claimed to have seen Jells abduct the victim (while she positively identified Jells as the assailant at trial, in the suppressed report, she admitted that "she couldn't see the male well"). *Jells v. Mitchell*, 538 F.3d 478 (Table) (6th Cir. 2008).

d.      Likewise, in 1987, George Seiber was prosecuted a violent robbery, then granted a write of habeas corpus based upon prosecutor suppression of evidence in 1998. Like here, the entire case rested on two key witnesses. Prosecutors withheld an exculpatory police report that impeached one of those witness's testimony and withheld the fact that one of the prosecutors had made promises to a witness in return for his testimony. *Seiber v. Coyle*, 156 F.3d 1232 (Table) (6th Cir. 1998).

e.      In 1988, Joe D'Ambrosio was wrongfully convicted of murder. He was granted a writ of habeas corpus after the court found that the Cuyahoga County prosecutors suppressed 13 different pieces of evidence including police reports, witness

statements, and other evidence, that either contradicted the testimony of the only eyewitness and or constituted evidence of an alternative suspect. *D'Ambrosio v. Bagley*, 527 F.3d 489 (6th Cir. 2008).

f.      Similarly, in 1989, Thomas Michael Keenan was convicted of crimes stemming from the same facts as D'Ambrosio, then was re-tried and re-sentenced on other grounds in 1996. Cuyahoga County prosecutors suppressed exculpatory evidence during both the 1989 trial and 1996 retrial. This evidence included facts inculpating an alternate suspect, a recording from an informant naming other suspects, and police reports capturing witness statements undermining the State's case. *Keenan v. Bagley*, No. 1:01 CV 2139, 2012 WL 1424751 (N.D. Ohio Apr. 24, 2012).

g.      Anthony Lemons was wrongfully convicted of murder and attempted murder in 1994. The Court granted him a new trial in 2013 after finding that Cuyahoga County prosecutors suppressed exculpatory evidence at trial. This included police reports that impeached the state's eyewitness testimony and called into question police identification procedures. an eyewitness and victim of the attempted murder. These demonstrated the witness failed to identify Lemons in the initial photo lineup, and that police had previously determined that the shoes she identified seeing during the murder were not manufactured until years later. *See Lemons v. State,* 164 N.E.2d 538, 549 (Ohio Ct. App. 2020).

h.      In 2001, Octavious Hood was wrongfully convicted of a sex offense after Cuyahoga County prosecutors suppressed the impeaching police report and the written statement of the victim. *State v. Hood*, 8th Dist. Cuyahoga No. 80294, 2002-Ohio-4081.

i.   Later, in 2004, Vernon Brown was wrongfully convicted of two murders and sentenced to death. Cuyahoga County prosecutors suppressed exculpatory police reports showing that another man had actually claimed responsibility for the murders. Brown was granted a new trial. *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858.

j.   These are mere examples. Many cases of similar misconduct persisted and continue to persist to the present, including those that are still unknown.

112.   This policy's persistence through the 2000s reveals itself in other County prosecutor misconduct. For instance, the County has an ongoing pattern of withholding criminally exculpatory evidence in public records requests after trials, just like in criminal litigation. For example:

a.   Following Ronald Larkins' wrongful conviction, he sought records through a writ of mandamus. The Supreme Court of Ohio held that he was not entitled to the documents because they were "exempt from disclosure based upon the work product exception of R.C. 149.43(A)(2)(c)." *State ex rel Steckman v. Jackson*, 70 Ohio St.3d 420 (1994). Following *Steckman*, "information assembled by law enforcement officials… is work product" and "excepted from required release" "[e]xcept as required by Crim.R. 16," which requires the disclosure of evidence favorable to the defendant. Despite the requirement to produce exculpatory evidence, Larking only obtained the records after someone else requested them from the police department in 1999. With the benefit of that previously suppressed evidence, Larkins' indictment was dismissed. In dismissing the indictment rather than granting a new trial, the court noted that Larkins could not have a fair trial

because the passage of time had so greatly prejudiced him where "the defendant ha[d] been trying at least since 1994 to obtain the exculpatory evidence in possession of the State" and that "the State [had] purposely secret[ed] exculpatory evidence from" him and then "actively s[ought] to conceal that evidence for a period of years." Thus, the same policy that was in effect in the 1980s that caused Cuyahoga County prosecutors to suppress exculpatory evidence in Larkins' case also caused the suppression of the same records in the 1990s, in response to Larkins' public records request.

b.    Likewise, Charles Jackson was wrongfully convicted of murder in 1991, and after his conviction he sought public records as well. Cuyahoga County prosecutor Barbara Marburger selectively redacted the records the County produced, hiding the exculpatory information. When Jackson later obtained unredacted versions of the records elsewhere, he was granted a new trial based upon the suppression.

c.    Similarly, East Cleveland 3, Derrick Wheatt, Laurese Glover, and Eugene Johnson, were wrongfully convicted of murder in 1996. They likewise sought public records after their appeals. In that case, the police were willing to turn over the file, but the Cuyahoga County prosecutor's office sent a letter to East Cleveland directing it not to disclose exculpatory records. East Cleveland disclosed the evidence anyway, and all three men relied upon it to secure new trials. As this Court wrote then, the County's "only apparent interest" in interfering with what East Cleveland did with its own records "was to defeat review of the facts supporting the prosecution." *Wheatt v. City of East Cleveland*, Nos. 1:17-cv-377, 1:17-cv-611, 2017 WL 5187780 (N.D. Ohio Nov. 9, 2017).

35

d.      These are mere examples. Many cases of similar misconduct persisted and continue to persist to the present, including those that are still unknown.

e.      In these instances, the County committed *Brady* violations in advance of and at trial, then continued their suppression in response to a public records request after trial. This demonstrates that the County policy, by which certain exculpatory evidence is excepted from disclosure, continued.

113.    Cuyahoga County and officials within the County prosecutor's office failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thus perpetuated the unlawful practices described above.

114.    The policies and practices of the County were the moving force behind the misconduct described in this Complaint and the violation of Plaintiff's rights. The widespread practices were so well settled as to constitute *de facto* policy in the Cuyahoga County Prosecutor's Office. They persisted because County policymakers with authority over these practices were deliberately indifferent to the constitutional violations, and approved them.

115.    The County is liable because the County, through its policymakers and its prosecutors, maintained policies, practices, and customs that were the moving force behind the violations of Plaintiff's rights as described here.

116.    The constitutional violations that caused Plaintiff's wrongful conviction were not isolated events. To the contrary, the violations resulted from the County's policies and practices of suppressing and destroying exculpatory evidence.

117.    Consistent with the policy and practice described herein, the Prosecutor Defendants and additional individual prosecutors and County agents suppressed and destroyed evidence

before, during, and after trial. This course of conduct continued after trial in the failure to preserve evidence and, upon information and belief, continues today.

***Factual allegations summarizing Michael Buehner's injuries***

118.   As a result of the misconduct alleged here, Plaintiff Michael Buehner spent over twenty years locked up for a crime he did not commit.

119.   His long years of wrongful imprisonment deprived him of his liberty itself and of all things in life that free people have. At the time of his incarceration, Michael was the father of a four-year-old and a one-year-old son. Michael was deprived of his opportunity to see his boys grow up.

120.   Defendants robbed Michael Buehner—then a 23-year-old bridge painter—of his family, career, and dreams for his future. They robbed him of his freedom to move outside of confinement and see the sunshine in the morning. They ruined his relationships with his friends and family and his aspirations to build his family. He missed holidays, births, weddings, and funerals with his loved ones including his mother. The Defendants destroyed his life.

121.   Michael, now free after spending nearly half his life incarcerated, must attempt to make a life for himself without the benefit of decades of experiences, education, work, and relationships and instead on a foundation of abuse and trauma.

122.   As a result of Defendants' misconduct, Michael suffered not only a long-term wrongful imprisonment and loss of liberty, but extreme physical and psychological pain and suffering, including anxiety, emotional distress, and other psychic and emotional injuries and continues to suffer still. He lost wages, lost future earning capacity, and incurred costs and other damages as well.

123.   All of Michael Buehner's economic and noneconomic damages were proximately caused by Defendants' misconduct.

**Causes of Action**

**First Claim for Relief**

**42 U.S.C. § 1983 — Fourteenth Amendment:**
**Due Process Violation through Unconstitutional Identification Procedures**

124.   All the foregoing paragraphs are incorporated as though fully set forth here.

125.   In the manner described more fully above, Defendants, individually and together, fabricated evidence by using coercion and unconstitutionally suggestive identification procedures. This included but was not limited to using threats and bribes and other coercive measures to secure identifications, using unduly suggestive photo line-up and in-person lineup practices, and everything from coaching witness identifications to fabricating them out of whole cloth.

126.   On information and belief, Defendants committed additional unduly suggestive identification practices and coercive techniques than those specifically articulated above, which because of their continuing misconduct, has still not come to light.

127.   These procedures caused a violation of Plaintiff's due process rights and interfered with his right to a fair trial.

128.   Defendants were acting under color of law and within the scope of their employment when they took these actions.

129.   As a direct and proximate result of Defendants' misconduct, Plaintiff suffered the violations of his rights, as well as injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, pecuniary losses, and other grievous and continuing injuries and damages as set forth above.

130.    In addition to committing this misconduct, Defendants each failed to intervene in one another's acts.

131.    Defendants are jointly and severally liable for this conduct.

**Second Claim for Relief**

**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:**
**Fabrication of False Evidence**

132.    All the foregoing paragraphs are incorporated as though fully set forth here.

133.    In the manner described more fully above, Defendants, individually and together, fabricated evidence. Their fabrications included but were not limited to the witness statements and identifications, trial testimony and evidence in anticipation of testimony, and police reports, to justify the arrest and prosecution of Plaintiff.

134.    On information and belief, Defendants committed additional fabrications than those specifically articulated above, which because of their continuing misconduct, has still not come to light.

135.    Defendants knowingly made false statements and fabricated evidence, and a reasonable likelihood exists that the false evidence affected the decision of the jury.

136.    Defendants thus violated Plaintiff's right to due process guaranteed by the U.S. Constitution.

137.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

138.    Defendants' misconduct directly resulted in Plaintiff's unjust criminal conviction. This denied him his constitutional right to a fair trial guaranteed by the U.S. Constitution. This caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

139.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered the violations of his rights, as well as injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, pecuniary losses, and other grievous and continuing injuries and damages as set forth above.

140.    In addition to committing this misconduct, Defendants each failed to intervene in one another's acts.

141.    Defendants are jointly and severally liable for this conduct.

### Third Claim for Relief

### 42 U.S.C. § 1983 — Fourteenth Amendment:
### Brady Violations

142.    All the foregoing paragraphs are incorporated as though fully set forth here.

143.    In the manner described more fully above, Defendants deliberately failed to disclose and otherwise withheld, suppressed, and destroyed exculpatory and impeachment evidence.

144.    The Officer Defendants suppressed and destroyed exculpatory and impeachment evidence and withheld it from the prosecutors and the Defense.

145.    The Prosecutor Defendants suppressed and destroyed exculpatory and impeachment evidence and withheld it from the Defense.

146.    On information and belief, Defendants continue to withhold and fail to preserve or disclose exculpatory and impeachment evidence that has still not come to light.

147.    On information and belief, Defendants committed additional *Brady* violations than those specifically articulated above, which because of their continuing misconduct, has still not come to light.

148.    Defendants thus deprived Plaintiff of his constitutional right to due process of law.

149.   Defendants were acting under color of law and within the scope of their employment when they took these actions.

150.   Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, denying him his constitutional right to a fair trial. Defendants misled and misdirected the criminal prosecution of Plaintiff. Absent this misconduct, the prosecution of the Plaintiff could not and would not have been pursued. Further, there is a reasonable probability that the jury would have reached a different verdict and Plaintiff would not have been convicted.

151.   As a direct and proximate result of Defendants' misconduct, Plaintiff suffered the violations of his rights, as well as injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, pecuniary losses, and other grievous and continuing injuries and damages as set forth above.

152.   In addition to committing this misconduct, Defendants each failed to intervene in one another's acts.

153.   Defendants are jointly and severally liable for this conduct.

### Fourth Claim for Relief

### 42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:
### Malicious Prosecution

154.   All the foregoing paragraphs are incorporated as though fully set forth here.

155.   In the manner described more fully above, Defendants, individually and together, instigated, influenced, or participated in the decision to arrest, charge, and prosecute Plaintiff without probable cause.

156.   As a result of the criminal prosecutions, Plaintiff suffered a deprivation of liberty not limited to his initial seizure, but which lasted many years.

157. Plaintiff' criminal prosecution ultimately terminated in his favor.

158. Defendants knowingly fabricated and suppressed evidence and this evidence was material to the arrest, charging, and prosecutions of Plaintiff. In the absence of Defendants' misconduct, Plaintiff would not have been arrested, charged, indicted, prosecuted, or convicted.

159. In the manner described more fully above, Defendants' misconduct denied Plaintiff his constitutional rights to procedural due process under the Fourteenth Amendment and rights under the Fourth Amendment to be free from continued detention without probable cause. Absent Defendants' misconduct, there was no cause for Plaintiff's continued detention or prosecutions.

160. Defendants' misconduct ultimately caused Plaintiff to be wrongfully convicted and held for many years for crimes of which he was innocent.

161. Defendants were acting under color of law and within the scope of their employment when they committed this misconduct.

162. As a direct and proximate result of the Defendants' actions, Plaintiff suffered the violations of his rights, as well as injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, pecuniary losses, and other grievous and continuing injuries and damages as set forth above.

163. In addition to committing this misconduct, Defendants each failed to intervene in one another's acts.

164. Defendants are jointly and severally liable for this conduct.

### Fifth Claim for Relief

### Ohio State Law — Reckless Breach of Duty

165. All the foregoing paragraphs are incorporated as though fully set forth here.

166.     Defendants recklessly breached their duties to Michael Buehner, to the victim, and to the public while engaged in police and other public functions and activities. They did this by, among other things alleged in this Complaint, committing *Brady* violations, fabricating evidence, coercing witness testimony, failing to meaningfully investigate a crime, causing the malicious prosecution of Michael Buehner, letting potentially dangerous criminal suspects loose in the community to commit crimes while locking up the wrong man, and involving untold witnesses, jurors, officers of the Court in a known perversion of the justice system.

167.     As a direct and proximate result of Defendants' conduct, Plaintiff suffered the violations of his rights, as well as injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, pecuniary losses, and other grievous and continuing injuries and damages as set forth above.

168.     In addition to committing this misconduct, Defendants each failed to intervene in one another's acts.

169.     Defendants are jointly and severally liable for this conduct.

**Sixth Claim for Relief**

**Ohio Rev. Code 2307.60(A)(1) — Civil Liability for Criminal Acts**

170.     All the foregoing paragraphs are incorporated as though fully set forth here.

171.     In all the ways alleged in this Complaint, Defendants, individually and together, willfully deprived Michael Buehner of his rights secured by the Constitution and laws of the United States. This is, among other things, a criminal violation of Ohio Rev. Code § 2921.45(A) and of 18 U.S.C. 242. Defendants also committed multiple criminal acts against Michael Buehner, including but not limited to kidnapping.

172. As a direct and proximate result of these criminal acts, Plaintiff suffered the violations of his rights, as well as injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, pecuniary losses, and other grievous and continuing injuries and damages as set forth above.

173. Because Plaintiff's injuries resulted from Defendants' criminal acts, he is entitled to relief under Ohio Rev. Code § 2307.60(A)(1), Ohio's statute imposing civil liability for criminal acts.

174. In addition to committing this misconduct, Defendants each failed to intervene in one another's acts.

175. Defendants are jointly and severally liable for this conduct.

### Seventh Claim for Relief

### Ohio State Law — Malicious Prosecution

176. All the foregoing paragraphs are incorporated as though fully set forth here.

177. Defendants, individually and together, instituted and continued the criminal prosecution of Plaintiff maliciously. They knowingly initiated and pursued the prosecution of Plaintiff based upon fabricated evidence and *Brady* evidence.

178. No probable cause exited to arrest, charge, or prosecute Plaintiff.

179. Plaintiff's criminal prosecution ultimately, after his retrial, terminated in his favor.

180. Defendants committed this misconduct knowingly and recklessly while working for the City and the County.

181. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the violations of his rights, as well as injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, pecuniary losses, and other grievous and continuing injuries and damages as set forth above.

182. In addition to committing this misconduct, Defendants each failed to intervene in one another's acts.

183. Defendants are jointly and severally liable for this conduct.

### Eighth Claim for Relief

### Ohio State Law — Abuse of Process

184. Pleading in the alternative, if there was probable cause and proper form supporting the criminal proceedings against Plaintiff, these proceedings were nonetheless an illegal attempt to accomplish an ulterior purpose for which they were not designed.

185. Defendants, individually and together, caused the criminal prosecutions of Michael Buehner despite knowing these prosecutions depended upon fabricated evidence and *Brady* evidence, in order to secure his wrongful conviction.

186. This wrongful abuse of process has resulted in direct damage. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the violations of his rights, as well as injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, pecuniary losses, and other grievous and continuing injuries and damages as set forth above.

187. In addition to committing this misconduct, Defendants each failed to intervene in one another's acts.

188. Defendants are jointly and severally liable for this conduct.

### Ninth Claim for Relief

### 42 U.S.C. § 1983 — Monell Policy and Practice Claim
### Against Defendant Cuyahoga County

189. All the foregoing paragraphs are incorporated as though fully set forth here.

190. Defendant Cuyahoga County is liable for the violations of Plaintiff' constitutional rights as described in this Complaint by virtue of its official policies and practices.

191. The actions of the Prosecutor Defendants and other individual County agents who violated Michael Buehner's rights were undertaken pursuant to policies, practices, and customs of the County and the Cuyahoga County Prosecutor's Office. These policies, practices, and customs were approved, encouraged, and/or ratified by County policymakers with final policymaking authority.

192. This includes the County's official policy of permitting the suppression and/or destruction of certain exculpatory evidence including police reports and witness statements and other evidence. This official policy began in the 1970s and continues to the present day.

193. Pursuant to this policy, Cuyahoga County prosecutors regularly suppressed exculpatory evidence, in violation of the constitutional rights of criminal defendants in Cuyahoga County.

194. This also includes the policy, pattern, and practice of losing or destroying evidence and failing to maintain a chain of custody over evidence during the investigatory, trial, postconviction, and retrial states of criminal proceedings and as to public records access. This policy has regularly deprived criminal defendants and civil litigants in Cuyahoga County of accessing or testing evidence and obtaining exculpatory evidence.

195. These practices were so well-settled as to constitute *de facto* policy in the Cuyahoga County prosecutor's office. These policies were allowed to persist because officials with final policymaking authority exhibited deliberate indifference to the violations.

196. The County implemented and maintained its policies, practices, and customs as described in this Complaint with deliberate indifference to Plaintiff's constitutional rights.

197.   The County's policies, practices, and customs named here and were a moving force behind the violations of Plaintiff's rights.

198.   As a direct and proximate result of Cuyahoga County's actions and inactions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Tenth Claim for Relief

**42 U.S.C. § 1983 — Monell Policy and Practice Claim**
**Against Defendant City of Cleveland**

199.   All the foregoing paragraphs are incorporated as though fully set forth here.

200.   The City of Cleveland is liable for the violations of Plaintiff's constitutional rights as described in this Complaint by virtue of its official policies and practices.

201.   The misconduct by the individual Officer Defendants and all other individual Cleveland Police Officers and CDP agents who violated Michael Buehner's rights were undertaken pursuant to policies, practices, and customs of the City and the Cleveland Division of Police. These policies, practices, and customs were approved, encouraged, and/or ratified by City and/or CDP policymakers with final policymaking authority.

202.   The City's policies, practices, and customs included failing to adequately train, supervise, monitor, and discipline officers who engaged in constitutional violations; pursuing wrongful convictions through reliance on profoundly flawed investigations; using unduly suggestive and coerced identifications; intimidating and bribing witnesses; fabricating evidence; suppressing and destroying evidence; failing to enact policies or enact legitimate oversight that would stop known constitutional violations from happening even though the

need to do so was obvious; and refusing to intervene in misconduct through the police code of silence as described in this Complaint.

203. These widespread practices were so well-settled as to constitute de facto policy in the Cleveland Division of Police. These practices were allowed to persist because final policymakers exhibited deliberate indifference to the problems, thereby ratifying them. This policy, ratification, failure to train, and custom of tolerance caused individual police officers including the Officer Defendants here to violate peoples' rights with impunity.

204. The City implemented and maintained its policies, practices, and customs as described in this Complaint with deliberate indifference to Plaintiff's constitutional rights.

205. The City's policies, practices, and customs named here and were a moving force behind the violations of Plaintiff's rights.

206. As a direct and proximate result of the City of Cleveland's actions and inactions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Tenth Claim for Relief

### 42 U.S.C. § 1983 — Supervisory Liability
### Against Defendant Joseph Petkac

207. All the foregoing paragraphs are incorporated as though fully set forth here.

208. The legal violations complained of here were proximately caused by (i) the intentional misconduct of supervising officer Joseph Petkac, or (ii) by his reckless or deliberate indifference to his subordinates' misconduct, knowing that ignoring that misconduct would violate Plaintiff's rights.

209.    Specifically, Petkac was aware of and facilitated, condoned, and oversaw the unconstitutional measures used by the other Officer Defendants to obtain or provide false evidence, suppress exculpatory and impeachment evidence, intimidate witnesses, and to use unduly suggestive identification procedures. Or, Petkac failed to intervene in or was deliberately or recklessly indifferent to the other Officer Defendants' misconduct.

210.    Petkac was acting under color of law and within the scope of his employment at all times relevant.

211.    As a direct and proximate result of Petkac's behavior, Plaintiff's rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## **Prayer for Relief**

Plaintiff Michael Buehner respectfully requests that this Court enter judgment in his favor and against Defendants. Plaintiff specifically requests that the Court (1) enter a declaratory judgment finding that Plaintiff's rights were violated by individual state actors as pleaded above, (2) award damages including compensatory and punitive damages and all other available awards, jointly and severally and against each Defendant, (3) award attorney fees including those available under 42 U.S.C. § 1988; and (4) award any other relief that is available under the law and that this Court deems appropriate.

## **Jury Trial Demanded**

Plaintiff demands a trial by jury on all triable issues pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted this 17th Day of July 2024,

*/s/ Elizabeth Bonham*

49

Sarah Gelsomino (0084340)
Elizabeth Bonham (0093733)
FRIEDMAN GILBERT + GERHARDSTEIN
50 Public Square, Suite 1900
Cleveland, OH 44113-2205
T: 216-241-1430
F: 216-621-0427
sarah@FGGfirm.com
elizabeth@fggfirm.com

Jacqueline Greene (0092733)
FRIEDMAN GILBERT + GERHARDSTEIN
35 East 7th Street, Suite 201
Cincinnati, OH  45202
T: 513-572-4200
F: 216-621-0427
jacqueline@FGGfirm.com


*/s/ Russell A. Randazzo*
RUSSELL A. RANDAZZO (0082221)
Randazzo Law, L.L.C.
55 Public Square, #2100
Cleveland, Ohio 44113
Ph: (216) 350-4434
Fac: (216) 274-9318
Russell@rrandazzolaw.com

*Counsel for Plaintiff Michael Buehner*