# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **MICHAEL BUEHNER,** | **Case No. 1:24-cv-01218-PAB** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **THE CITY OF CLEVELAND, et al.,** | |
| **Defendants.** | **MEMORANDUM OPINION & ORDER** |

Pending before the Court are the following Motions: (1) Defendants Richard Bombik ("Bombik") and Christopher Keim ("Keim") (collectively, "Prosecutor Defendants") and Defendant Cuyahoga County's ("County") Motion for Judgment on the Pleadings ("County and Prosecutors' Motion") (Doc. No. 22); (2) Defendant City of Cleveland's ("City") Motion for Judgment on the Pleadings ("City's Motion") (Doc. No. 26); (3) Defendants Sahir Hasan ("Hasan"), Michael Beaman ("Beaman"), and Joseph Petkac's ("Petkac") (collectively, "Officer Defendants") Motion for Judgment on the Pleadings ("Officers' Motion") (Doc. No. 27); and (4) Plaintiff Michael Buehner's ("Plaintiff" or "Buehner") Motion for Leave to File Surreply in Support of Consolidated Opposition to the City's Motion to Dismiss ("Motion for Surreply") (Doc. No. 39).  Each Motion is ripe for review.

For the following reasons, the Court orders as follows.  The County and Prosecutors' Motion is **GRANTED IN PART AND DENIED IN PART**.  The Officers' Motion is **GRANTED IN PART AND DENIED IN PART**.  The City's Motion is **DENIED**.  Buehner's Motion for Surreply is **GRANTED**.

## I.       Procedural History

On July 17, 2024, Buehner filed a Complaint against the City, Officer Defendants, the County, and Prosecutor Defendants.  (Doc. No. 1.)  Buehner's Complaint alleges eleven[1] causes of action: (i) a violation of 42 U.S.C. § 1983 (Unconstitutional Identification Procedures); (ii) a violation of 42 U.S.C. § 1983 (Fabrication of False Evidence); (iii) a violation of 42 U.S.C. § 1983 (Brady Violations); (iv) a violation of 42 U.S.C. §1983 (Malicious Prosecution); (v) Reckless Breach of Duty under Ohio law; (vi) a violation of Ohio Rev. Code § 2307.60(A)(1) (Civil Liability for Criminal Acts); (vii) Malicious Prosecution under Ohio law; (viii) Abuse of Process under Ohio law;  (ix) a violation of 42 U.S.C. § 1983 (Monell Policy and Practice Claim Against Defendant Cuyahoga County); (x) a violation of 42 U.S.C. § 1983 (Monell Policy and Practice Claim Against Defendant City of Cleveland); and (xi) a violation of 42 U.S.C. § 1983 (Supervisory Liability Against Defendant Petkac).

On September 3, 2024, Officer Defendants filed their Answer.  (Doc. No. 8.)  On October 2, 2024, Prosecutor Defendants and the County filed their Answer.  (Doc. No. 10.)  That same day, the City also filed its Answer.  (Doc. No. 11.)  On October 10, 2024, Prosecutor Defendants and the County filed an Amended Answer.  (Doc. No. 14.)  On November 12, 2024, the Court held a Case Management Conference and set case deadlines.  (Doc. Nos. 17, 18.)

On December 6, 2024, the County and Prosecutors' Motion was filed.  (Doc. No. 22.)  On January 13, 2025, Buehner filed an Opposition to the County and Prosecutors' Motion.  (Doc. No.

---

[1] In his Complaint, Buehner references two separate claims both as "Count Ten."  The Court thus refers to the second of these claims—specifically, the claim for a violation of 42 U.S.C. § 1983 for Supervisory Liability Against Defendant Petkac—as "Count Eleven."

28.) On February 3, 2025, a Reply in Support of the County and Prosecutors' Motion was filed. (Doc. No. 30.)

On January 13, 2025, the City's Motion and the Officers' Motion were filed. (Doc. Nos. 26 and 27.) On February 10, 2025, Buehner filed a Consolidated Opposition to those Motions. (Doc. No. 31.) On February 24, 2025, the City filed a Reply in Support of its Motion. (Doc. No. 35.) On February 27, 2025, Officer Defendants filed a separate Reply in Support of their Motion. (Doc. No. 36.)

On March 14, 2025, Buehner filed his Motion for Surreply. (Doc. No. 39.) On March 17, 2025, the City filed an Opposition to Buehner's Motion for Surreply. (Doc. No. 40.) On March 28, 2025, Officer Defendants filed a separate Opposition to Buehner's Motion for Surreply. (Doc. No. 50.)

## II.    Factual Allegations

Buehner sets forth the following factual allegations in his Complaint. (Doc. No. 1.)

### A.    Introduction

The present case arises out of Buehner's claims that Defendants "caused his decades-long wrongful imprisonment." (Doc. No. 1 at PageID #1.) "On May 24, 2001, someone who was not Michael Buehner shot and killed young Jerry Saunders during a drug deal on East 93rd and Marah." (*Id.*) Buehner alleges that "Cleveland homicide detectives, following Cleveland police policy, conducted a recklessly deficient investigation and could not figure out the culprit, so they framed Michael Buehner instead." (*Id.* at PageID #1–2.) According to Buehner, "[t]hey did so by suppressing and destroying now-discovered evidence and fabricating and coercing now-recanted testimony." (*Id.* at PageID #2.) Buehner also alleges that "Cuyahoga County prosecutors, following

3

County policy, continued to investigate and ultimately prosecuted [Buehner] without probable cause … while continuing to suppress and failing to preserve exculpatory evidence." (*Id.*) Buehner alleges that "Defendants' misconduct caused [him] to lose over 20 years of his life to the Ohio prison system and deprived Jerry Saunders's family of justice against the real killer." (*Id.*)

**B.      The Parties**

Buehner is a 47-year-old man living in Lorain, Ohio. (*Id.*)  Officer Defendants were, at all times relevant to these allegations, "duly appointed police officers employed by the City of Cleveland, acting within the scope of their employment and under the color of law." (*Id.*)  The City is an Ohio municipal corporation that operates the Cleveland Division of Police. (*Id.* at PageID #3.)  The City was the employer and principal of the Officer Defendants at all times relevant to these allegations and "is also responsible for the policies, practices, and customs of the Cleveland Division of Police." (*Id.*)

Prosecutor Defendants were, at all times relevant to these allegations, assistant prosecutors employed by the Cuyahoga County Prosecutor's Office. (*Id.*)  According to Buehner, the Prosecutor Defendants were, at all times relevant, "acting in their investigatory or prosecutorial capacities for Cuyahoga County and acting within the scope of their employment and under color of law."[2] (*Id.*)  The County is a government entity in the State of Ohio and was, at all times relevant to these allegations, the employer and principal of the Prosecutor Defendants. (*Id.*)  The County "is also responsible for the local policies, practices, and customs of the County and its Prosecutor's Office." (*Id.*)

---

[2] As discussed later in this Opinion, Officer Defendants and Prosecutor Defendants "are sued in their individual capacities." (Doc. No. 1 at PageID #2–3.)

4

### C.      Background to the Murder

On May 24, 2001, one of three men in a small black pickup truck shot and killed Jerry Saunders during a drug deal on East 93rd and Marah Avenue in Cleveland.  (*Id.*)  Buehner was not there.  (*Id.*)  Late at night on May 23, 2001, young Jerry Saunders was outside in the street with his friend Lawone Edwards.  (*Id.* at PageID #4.)  The young men were trying to sell drugs to earn money.  (*Id.*)  A small black pickup truck pulled down the street near them and they ran up to it to it try to make a sale.  (*Id.*)  One of the people from the truck shot Saunders twice, killing him.  (*Id.*)  The truck drove away and Lawone ran.  (*Id.*)

By the time the Cleveland Police arrived at the murder scene in the early morning, they found Jerry Saunders's body and pieces of bullets, and not much else.  (*Id.*)  The lead investigating homicide detective that morning was Hasan.  (*Id.*)  Buehner alleges that "Hasan, along with other CDP [Cleveland Division of Police] officers acting at his direction, cursorily processed the crime and interviewed just three potential witnesses in the neighborhood."  (*Id.*)  According to Buehner, "[t]he officers did not fully canvas the area for witnesses or physical or trace evidence.  They did not make a thorough catalogue of who was there nor of what they found."  (*Id.*)

Buehner also alleges that "[t]he officers did not even obtain statements from people living on the street who were present during the initial investigation.  For example, the officers rejected at least one such witness, Deborah Powell's voluntary request to provide a statement."  (*Id.*)  Similarly, according to Buehner, "the officers took the name of another such witness, Katrina Mustin, who was on the scene and administering CPR to Saunders when officers arrived.  However, nobody took her statement that morning, and upon information and belief Hasan and Beaman never obtained any evidence from her, showed her a lineup, or followed up with her in any way."  (*Id.*)  "Of the original

5

three witness statements officers did record, two people purported to have seen who was in the truck. Tierra Edwards said the driver, a white man, was the shooter; the middle passenger, she didn't see; and the third passenger was a black man. Gail Jenkins said the driver, a white man, was the shooter and the other two passengers were black men." (*Id.* at PageID #4–5.)

According to Buehner, "Hasan and the other CDP officers performed no more meaningful work that morning. They collected little physical or forensic evidence besides photos, a bullet casing and pellets, the victim's body and clothes, and a jacket that Lawone had dropped when he ran away. There was no murder weapon there. The truck was gone. Neither Michael Buehner's name, nor any description matching him, ever came up." (*Id.* at PageID #5.) "Because of the lack of physical or forensic evidence, witness identification was critical in the investigation, and ultimately at trial. This included witness reports identifying the small black truck as well as the race and appearance of its passengers." (*Id.*)

Buehner alleges that "Hasan and his partner Defendant Michael Beaman directed the investigation as the lead detectives," and that "[o]ver the next several months, they steered the investigation towards the wrongful arrest and prosecution" of Buehner. (*Id.*) Buehner further alleges that "Defendant Joseph Petkac was the Lieutenant over Hasan and Beaman who approved and signed off on their reports of the investigation," and that "[u]pon information and belief Petkac knew about and approved all of Hasan and Beaman's misconduct …" (*Id.*)

### D. Pre-Indictment Investigation

Buehner's Complaint next provides a summary of the pre-indictment investigation. According to Buehner, "[f]rom the beginning of the investigation, Brenda Dennis, the victim's sister, was devoted to finding information about her brother's murder." (*Id.*) Buehner alleges that "[j]ust a

couple days after the murder, [Brenda] spoke to Lawone … [who] told her that the truck's driver, a white man with a face tattoo, was the shooter, and that the passengers were both black men." (*Id.* at PageID #5–6.)  At the time of the shooting, Buehner was a 23-year-old white man with brown hair and no face tattoos.  (*Id.* at PageID #5.)  Brenda told Hasan right away and stayed in touch with Hasan and Beaman over the next few months, further reporting what she learned.  (*Id.* at PageID #6.)

According to Buehner, "[i]n the meantime, Hasan and Beaman did little to catch the killer." (*Id.*)  "For example, it was not until three weeks after the murder that they contacted Doris Organ, whose home had been shot during the murder and on whose front lawn Saunders's body was found." (*Id.*)  Buehner alleges that "[u]pon information and belief, Hasan and Beaman never meaningfully followed up with Organ nor showed her a lineup."  (*Id.*)

"As the investigation sat open, more people from the neighborhood offered information" and "[d]escriptions of the truck and its passengers continued to vary." (*Id.*)  "One woman told Hasan she thought two white men and a black man in a black Ford Ranger killed Saunders," and "[h]er son told Hasan the same." (*Id.*)  "Another man said he saw two white men and a black man in a black truck and that the middle passenger was the shooter." (*Id.*)  Further, "[e]ven other police officers conveyed to Hasan and Beaman information concerning potential witnesses." (*Id.*)  Buehner alleges that "[u]pon information and belief, Hasan and Beaman did nothing to further investigate this or in the alternative, covered up whatever they found." (*Id.*)

In early June, the FBI picked up Lawone on outstanding drug charges, so Hasan and Beaman interviewed him. (*Id.*)  Lawone told them that the "truck was a black GMC with a white driver, a

white middle passenger with a face tattoo, and a black third passenger." (*Id.*)  This time, Lawone said the middle passenger was the shooter.[3]  (*Id.*)  The officers let Lawone go.  (*Id.*)

Soon after, Brenda called back again to say that she found out her brother had a fight with someone recently before his death, suggesting he could be a suspect.  (*Id.*)  According to Buehner, "Hasan and Beaman never investigated that," or "[i]n the alternative, on information and belief, they suppressed or destroyed whatever they found out." (*Id.* at PageID #6–7.)  Buehner further alleges that "[a]t least twice during the investigation, once early on and once just before trial, Brenda also called to say she learned that a man called 'Country' Grant was involved in her brother's murder." (*Id.* at PageID #7.)  Buehner alleges that "Hasan and Beaman never investigated that the first time; the second time, they found out Country had a long and violent criminal background but did not follow up," or "[i]n the alternative, on information and belief, they suppressed or destroyed whatever they found out." (*Id.*)

In early July, other CDP officers impounded a black GMC truck while investigating a different murder.  (*Id.*)  The truck had been parked on East 93rd during that investigation.  (*Id.*)  Hasan and Beaman interviewed Wilhelmina Mason ("Mason"), to whom the GMC was registered.  (*Id.*)  She told them the truck really belonged to Robert "Sonny" Allen (hereinafter "Sonny"), a light skinned black man who had recently asked her to get plates for the truck for him.  (*Id.*)  Mason also said she had a feeling that truck was involved in the murder.  (*Id.*)  Mason informed Hasan and Beaman that Lawone—who had witnessed the events and then fled through backyards when the shots began—saw Sonny and another man, Victor, in the GMC immediately after the murder, driving on Heath Ave.

---

[3] As explained previously, Lawone had initially said that the driver was the shooter.  (Doc. No. 1 at PageID #5–6.)

onto East 93rd.[4]  (*Id.*)  Mason further provided Beaman and Hasan information leading them to find that the GMC was previously registered to Tyrone Gregory Aiken ("Aiken"), who sold it to Sonny two months earlier.  (*Id.*)  Hasan and Beaman also learned that Sonny had a violent criminal history. (*Id.*)  Aiken later confirmed Mason's description of Sonny to Hasan and Beaman and that he had an associate called Victor.  (*Id.* at PageID #8.)  According to Buehner, "[d]espite all this, Hasan and Beaman never meaningfully investigated the involvement of [Sonny] or Victor," or "[i]n the alternative, on information and belief, they suppressed or destroyed whatever they found out."  (*Id.*)

Buehner alleges that "[i]t was not until July 19—almost two months after the murder—that Hasan and Beaman first heard Michael Buehner's name at all in connection with the crime."  (*Id.*) Buehner did not come up from any of the many potential witnesses nor in connection with any implicated truck.  (*Id.*)  Rather, "[t]he only source suddenly alleging [Buehner's] involvement was a confidential informant, whose identity Defendants are still concealing."  (*Id.*)  This informant suggested Buehner's name, and Buehner's alleged cousin Randy Price ("Price"), to a CDP narcotics officer, who transmitted the suggestion to Beaman and Hasan.  (*Id.*)  According to Buehner, "[t]here was no independent basis to suspect [his] involvement in the shooting."  (*Id.*)

A couple of days later, Hasan and Beaman brought Lawone in again to question him and showed him a photo array with Buehner in it.  (*Id.*)  Lawone could not make an identification.  (*Id.*) A few days after that, Hasan and Beaman brought Tierra Edwards and Gail Jenkins in to see a photo array with Buehner in it.  (*Id.*)  They too did not identify him.  (*Id.*)

---

[4] According to Buehner, "Marah Avenue is a one-way street traveling west to east," while "Heath is a two-way street separated from Marah Ave. through backyards."  (Doc. No. 1 at PageID #7.)

In September, Brenda called again, and asked Beaman and Hasan to interview a woman from the neighborhood, Debbie Powell, who had witnessed the murder from her house. (*Id.*) Powell told Beaman and Hasan that all three people in the truck were black men, including the shooter. (*Id.*) She said she had seen the shooter at the crime scene, and had tried to tell police that first morning, but they had ignored her. (*Id.*) She also said that everybody in the neighborhood knew that the men involved were black, but they were telling police that the shooter was white to cover up the shooter's identity. (*Id.* at PageID #8–9.) Around this time, Hasan and Beaman interviewed both Buehner and Price, who "both truthfully denied any involvement in the shooting." (*Id.* at PageID #9.) "[Buehner] did not even know the neighborhood or any of the people involved." (*Id.*)

According to Buehner, "[u]p until this time, Hasan and Beaman never followed up on alternate suspects Sonny or 'Country' Grant or Victor, nor did they further explore information from Brenda or from witnesses in the neighborhood or from other officers." (*Id.*) "Instead, based only upon the confidential informant's secondhand advice, they zeroed in on [Buehner] and [Price]." (*Id.*) "Similarly, although Hasan and Beaman had inculpatory information about the black GMC and at least one other similar small black truck, they zeroed in on Buehner's truck, which did not fit any witness description." (*Id.*)

Buehner alleges that "[i]n December, six months after the shooting, Hasan and Beaman brought Lawone Edwards and [Price] each into custody and coerced them to identify Buehner as the shooter." (*Id.*) According to Buehner, Lawone was "a 19-year-old with multiple drug cases hanging over him and who had recently witnessed his friend's murder" and was "vulnerable to coercion." (*Id.*) Hasan and Beaman showed Lawone a physical lineup in which the only person common with the prior photo show-up was Buehner. (*Id.*) According to Buehner, "[n]one of the men in the physical

10

lineup looked like [Buehner]; they were different heights and ages," and "[e]ven then, Lawone could not choose someone."  (*Id.*)  Buehner alleges that Hasan coached Lawone to identify Buehner and also threatened Lawone to obtain the identification of Buehner, making clear that Lawone needed to choose Buehner and say that he was positive about the identification.  (*Id.* at PageID #9–10.) According to Buehner, Lawone "followed orders" but "knew that he could not truly positively identify [Buehner]."  (*Id.* at PageID #10.)  Hasan and Beaman had Lawone identify Price from an in-person lineup also, and "[l]ike the lineup containing [Buehner], the other men looked totally different from [Price] in age and height and weight."  (*Id.*)  According to Buehner, "Hasan and Beaman, as before, made it clear who Lawone must select and Lawone complied."  (*Id.*)

Buehner similarly alleges that the Officer Defendants coerced the statement of Price.  (*Id.*) According to Buehner, "[Price] was also young and had a family to provide for and had recently been released from prison on a different matter."  (*Id.*)  Price "had maintained his innocence through multiple interviews so far."  (*Id.*)  Buehner alleges that "Hasan and Beaman had [Price] charged with capital murder, without probable cause, as though he was the shooter," and "played him a tape of what they represented was a recorded witness statement inculpating him and [Buehner] in the shooting."  (*Id.*)  Buehner alleges that "[u]pon information and belief, that tape was fabricated and/or suppressed; the Officer Defendants have never produced it."  (*Id.*)  According to Buehner, "Hasan and Beaman promised [Price] a plea deal with a much shorter sentence if he said he was there and identified [Buehner] as the shooter," and that "[Price] followed orders" even though he "was, in fact, not involved with the shooting at all."  (*Id.*)

"Hasan and Beaman thus coerced and fabricated identifications from [Lawone] and [Price], who would become the State's key witnesses in the trial against [Buehner]."  (*Id.*)  "Their fabricated

11

testimony would put [Price], a white man, driving the truck; [Buehner], a white man with no face tattoo, as the middle passenger and shooter; and a third unknown passenger, at the crime scene." (*Id.*) Buehner alleges that "[n]o real evidence supported [his] arrest, let alone an indictment and trial," and that "[t]he Officer Defendants never came up with other inculpatory evidence." (*Id.* at PageID #10–11.) According to Buehner, "[t]here was no murder weapon, nor fingerprints nor DNA, nor ultimately any black truck, tying [Buehner] to the shooting." (*Id.* at PageID #11.) Buehner alleges that "[t]o the contrary, upon information and belief such evidence existed and would have exculpated [Buehner], but Defendants withheld or destroyed it." (*Id.*)  "Nevertheless, satisfied with their fabrication, Hasan and Beaman never investigated the alternate suspects, who continued to commit crimes, but instead caused the arrest, indictment, and prosecution of [Buehner] based upon fabricated witness statements." (*Id.*)

### E.    Defendants' Violations Prior To and During the Trial

Buehner alleges that "[p]rior to and during the trial, the Officer Defendants failed to produce exculpatory and impeachment evidence to the Prosecutor's Office or to Buehner's defense." (*Id.*) According to Buehner, this included, among other things, the following:

- "The Officer Defendants covered up all the ways in which they used coercion and unlawful identification procedures to fabricate Lawone's and [Price's] identifications and eventual testimony.
- The Officer Defendants suppressed and have still never produced the recorded interview they played during the [Price] interrogation.
- The Officer Defendants withheld the content of the statements of Gail Jenkins and Debbie Powell, as well as the identity and content of the statement of Wilhelmina Mason.  These statements all would have impeached Lawone's testimony with respect to the race and position of the shooters.  These statements further would have suggested alternate suspects and a different vehicle.
- The Officer Defendants withheld the identities of, and information regarding, alternate suspects whom they failed to investigate including Robert "Sonny" Allen and Eric "Country" Grant.

12

- The Officer Defendants, upon information and belief, withheld and/or destroyed and/or failed to preserve additional physical and forensic evidence that was exculpatory or could have been tested to reveal exculpatory information. This includes the destruction of the GMC truck involved in the murder before [Buehner's] indictment, and upon information and belief at least one other truck which they investigated, as well as any contents of those vehicles or trace evidence left inside. Upon information and belief, this also includes forensic testing and/or other physical evidence which Defendants have destroyed, failed to preserve, lost, and/or still possess but are withholding."

(*Id.* at PageID #11–12.)

Buehner also alleges the following with respect to the Prosecutor Defendants:

- "Pleading in the alternative, the Prosecutor Defendants or some agent(s) of the Cuyahoga County Prosecutor's Office had access to some, but not all, of the above-described exculpatory evidence, and violated the *Brady* rule by withholding it from the defense.
- In addition, the Prosecutor Defendants failed to provide other similar information to the defense, including the identities of at least one investigating police detective and, upon information and belief, other City employees and witnesses who possessed exculpatory information.
- In addition, the Prosecutor Defendants or some agent(s) of the Cuyahoga County Prosecutor's Office suppressed, destroyed, lost, or failed to preserve additional physical evidence or to maintain its chain of custody when that evidence was in the Prosecutors' control. Upon information and belief, this includes the clothing of the victim and/or evidence of forensic testing of the same.
- In addition, pleading in the alternative, the Prosecutor Defendants, or one of them, or some other agent(s) of the Cuyahoga County Prosecutor's Office became aware of some, but not all, of the fabrications that the Officer Defendants made up concerning the witness testimony, and pursued the prosecution anyway.
- In addition, pleading in the alternative, Bombik even went so far as to agree to the early release of [Price] in exchange for his testimony against [Buehner]. This resulted in [Price] only serving approximately 12 months in prison.[5]
- In addition, upon information and belief, the Prosecutor Defendants, in their investigatory capacities, recklessly failed to conduct a pretrial investigation sufficient to uncover the Officer Defendants' misconduct, which should have been obvious. This

---

[5] Buehner also alleges that "Price also provided testimony in another case which Hasan was the investigating Detective," but that "in that case, the efforts of Hasan and Price were thwarted when Judge Stuart Friedman authored a decision that held the testimony of [Price] was completely fabricated, untrustworthy, or inaccurate and was not due to a memory lapse." (Doc. No. 1 at PageID #13.)

> failure caused them to neglect their duty to investigate true aspects, and instead cause the prosecution of [Buehner] without probable cause.
>
> • In addition, upon information and belief, the Prosecutor Defendants, in their investigatory capacities, committed additional misconduct before and after trial, including in their roles advising the police and maintaining evidence."

(*Id.* at PageID #12–13.)

Buehner alleges that "Defendants, and other agents of the Cuyahoga County Prosecutor's Office, and other officers of CDP, continued to suppress and fail[ed] to preserve evidence during the long years of [Buehner's] wrongful imprisonment, up to and during his retrial, and upon information and belief, still today."  (*Id.* at PageID #14.)  Buehner further alleges that "[e]ach Defendant, upon information and belief, committed further misconduct similar to that specifically described here, including fabrication and *Brady* violations, in the investigation, charging, trial, and retrial of this case, which is not yet known or understood."  (*Id.*)

## F.    Buehner's Wrongful Conviction

Buehner alleges that "[a]s a result of the above-described misconduct and, upon information and belief, additional similar misconduct of which Plaintiff is still not aware, [Buehner] was charged, arrested, tried, and convicted of a murder he did not commit, and spent over 20 years in prison."  (*Id.*)  According to Buehner, the jury that convicted him had almost no physical or forensic evidence to rely upon, and instead relied chiefly on the false and coerced testimony of Lawone and Price.  (*Id.*)  Buehner alleges that "[j]urors expressed concern multiple times about these two witnesses' credibility, but never received the benefit of any of the above-described evidence," and that "[e]ach time the jurors expressed these concerns, they had to continue to deliberate without accurate testimony or impeachment evidence."  (*Id.*)  At trial, "[n]either of the Officer Defendants nor the Prosecutor Defendants ever intervened to prevent the false testimony and evidence being offered."  (*Id.*)

14

According to Buehner, "[d]espite knowing about the evidentiary suppression and fabrication that [led] to the false evidence at trial, the Officer Defendants sat at trial without attempting to interrupt these due process violations," and "Hasan testified at trial consistent with his misconduct, not the truth." (*Id.* at PageID #14–15.)

Thus, "[t]he defense attorneys who investigated [Buehner's] case and defended him did not have the benefit of critical impeachment witnesses, suppressed or destroyed forensic and other evidence, the ability to examine or obtain expert witness testimony regarding critical evidence, or the truthful testimony of either of the State's key witnesses." (*Id.* at PageID #15.) "With the case against him thus concocted by Defendants, and without the benefit of *Brady* evidence to investigate or rebut the testimony, [Buehner] could not prevail at trial." (*Id.*) He was convicted and sentenced to 18 years to life in prison. (*Id.*)

### G.    New Trial and Acquittal

"Over the next 20-plus years, after multiple appeals and applications for post-conviction relief, Buehner obtained the CDP files revealing the extent to which the Officer Defendants withheld exculpatory evidence from the prosecution, and, pleading in the alternative, that the Prosecutor Defendants withheld exculpatory evidence from the defense." (*Id.*) When, on this basis, Buehner was granted a new trial, he "further discovered the extent to which the Officer Defendants coerced [Lawone] and [Price's] testimony and used unconstitutional procedures to obtain their identifications, in violation of [Buehner's] due process rights. (*Id.*) Eventually, both Lawone and Price completely recanted their inculpatory testimony in sworn affidavits. (*Id.*)

At the retrial, Buehner had the "benefit of the previously withheld evidence, and an opportunity to correct the fabricated identifications." (*Id.* at PageID #16.) For example, Lawone

15

testified as to how Hasan and Beaman coerced his testimony. (*Id.*) Debbie Powell testified that she witnessed the shooting and that Buehner was not the shooter. (*Id.*) "Now that they had this evidence, the jury acquitted Buehner in less than two hours." (*Id.*)

According to Buehner, "[i]n the time since the original investigation, Defendants' continuing suppression of evidence prolonged Buehner's unjust imprisonment, key witnesses died, and even more evidence was lost or destroyed." (*Id.*) Buehner alleges that "[d]espite Defendants' destruction of evidence however, upon information and belief, Defendants committed additional *Brady* violations and other unconstitutional conduct still not known to Plaintiff, of a similar kind to that alleged here, which similarly contributed to Plaintiff's injuries, and which Plaintiff still may discover." (*Id.*)

### H.      Official Policies and Customs of the City and County

Buehner alleges that the "Officer Defendants' and Prosecutor Defendants' misconduct was not rogue," but rather "was done pursuant to the official policy and custom of the City of Cleveland and of Cuyahoga County." (*Id.*) Buehner includes allegations pertaining to both the City and County's alleged policies and customs. (*See generally id.* at PageID #17–37.) The Court summarizes these allegations below.

#### 1.      City's Official Policies and Customs

Buehner alleges that "[t]he City, through CDP, maintained a decades-long official policy and custom in which police regularly used unconstitutional measures to secure wrongful convictions … includ[ing] withholding, suppressing, or destroying exculpatory evidence, fabricating evidence, feeding information to witnesses, engaging in unduly suggestive identification and lineup procedures, and engaging in leading, coercive, and unduly suggestive questioning of and contact with witnesses."

(*Id.* at PageID #17.)  According to Buehner, "[t]his misconduct is well-documented as far back as the 1970s and continued through the time of the investigation and prosecutions at issue here."  (*Id.*)

Buehner alleges that the lasting pattern and practice demonstrating the City's policy is evident in numerous cases and historical materials related to withholding evidence.  (*Id.*)  Buehner first points to "the 1975 wrongful prosecution of Wiley Bridgeman, Ronnie Bridgeman, and Rickey [sic] Jackson," in which the Cleveland Police Commander testified that it was the practice of detectives at the time not to provide all information to the prosecutor—specifically, that "in '[a]lmost every investigation you have,' the practice was '[d]on't ask, don't tell.  And you don't give it to them.'" (*Id.*)  "Not all interviews were turned over," as "[e]ach detective determined what information he would give to the prosecutor."  (*Id.* at PageID #17–18.)  "Detectives' personal files contained information and notes not contained in the official file turned over to prosecutors," and "[t]here were no policies governing keeping personal files or notes."  (*Id.* at PageID #18.)  "The prosecutor received a 'cleaned up version' of the file, not the whole file," and "[t]his practice was the same among all detectives."  (*Id.*)

Buehner points to numerous cases related to withholding evidence.  This includes the 1975 wrongful prosecution described above and the 1995 wrongful conviction of Anthony Lemons, which occurred prior to Buehner's conviction.  (*Id.* at PageID #17–18.)  Buehner also references the 2007 wrongful convictions of Michael Sutton and Kenny Philips, which occurred following Buehner's conviction.  (*Id.* at PageID #18–19.)  According to Buehner, "[t]he United States Court of Appeals for the Sixth Circuit has recognized not only CDP's official written policy, but also its longstanding failure to train its officers to turn over *Brady* evidence," citing *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019).  (*Id.*)  Next, Buehner alleges that CDP similarly "has a documented historical

practice reaching back to the 1970s of fabricating evidence, using suggestive and/or coercive identification procedures, and coercing witnesses to testify untruthfully." (*Id.*) Buehner points to numerous cases "demonstrating this policy," again referencing the 1975 and 1995 wrongful convictions discussed above, as well as the 1988 wrongful conviction of Anthony Michael Green. (*Id.* at PageID #19–20.)

According to Buehner, "[t]he historical and entrenched nature of all these policies and practices is well-established." (*Id.* at PageID #20.) Buehner alleges that in the 1960s, "former Cleveland Mayor Carl Stokes described that the failures of the Cleveland Division of Police and its officers went to the highest levels, including the Office of Mayor." (*Id.*) In his autobiography, Stokes noted that "[t]he most obvious, and to me the most important, failure of the police was in their dealings with the black community." (*Id.*) Stokes further described the difficulties associated therewith,[6] and Buehner notes that "[i]n the end, Stokes conceded that the improvements he sought for the Police Department never occurred." (*Id.* at PageID #20–21.)

Buehner next alleges that "[i]n 1974, the Mayor appointed the Cleveland Crime Commission to investigate police corruption … [which] produced a report on police corruption and criminal conduct."[7] (*Id.* at PageID #21.) That report also included in its Appendix a 1996 study by Public Administration Service on the Cleveland Division of Police, noting massive structural and organizational problems. (*Id.*) The study referenced the "lack of uniform policies and procedures,

---

[6] The exact language from Stokes' autobiography can be found in Buehner's Complaint. (*See* Doc. No. 1 at PageID #20–21.)

[7] Buehner also alleges that "[t]he Cuyahoga County Grand Jury also investigated police corruption in 1974." (Doc. No. 1 at PageID #21.)

common objectives, and control" and described the CDP as a "loose federation" that "precludes effective leadership, and encourages tendencies to build small empires, and to create sinecure positions."[8]  (*Id.* at PageID #22.)  Buehner alleges that "[s]uch 'small empires' show that there are various policymakers within the CDP."  (*Id.*)  The study also indicated that CDP "has no real program directed toward the analysis of these problems, nor for their solution."  (*Id.* at PageID #23.)

Next, Buehner alleges that "[i]n 1975, the Cleveland Foundation issued a written report regarding the Cleveland Division of Police after extensive study and interviews with the Chief of Police and many officers in the CDP."  (*Id.*)  This report, in relevant part, noted the lack of training within the CDP and "lack of supervision over the massive power delegated to subordinate officers." (*Id.*)  The report also quoted one commentator as follows: "No other agency, so far as I know, does so little supervising of vital policy determinations which directly involve justice or injustice to individuals."[9]  (*Id.*)

Buehner also alleges that the "City and CDP have a similarly entrenched history of failing to supervise, investigate, and discipline allegations of officer misconduct like that at issue here."  (*Id.* at PageID #24.)  Buehner alleges that former CDP Commander William Tell testified in *Jackson* that it was well known among CDP officers that they could get away with serious misconduct without being disciplined.  (*Id.*)  According to Buehner, in another case, Tell testified that he attempted to report a fellow officer's fabrication of evidence and use of excessive force in shooting a woman, but that no action was taken, "the police department … covered it up," and Internal Affairs reached a conclusion

---

[8] The exact language from the study can be found in Buehner's Complaint.  (*See* Doc. No. 1 at PageID #21–23.)

[9] The exact language from this report can be found in Buehner's Complaint.  (*See* Doc. No. 1 at PageID #23.)

that was "purposefully untrue." (*Id.* at PageID #24–25.) Per Buehner, Tell witnessed years of repeated misconduct by his fellow officers, indicative of a pattern, practice, custom, and policy of such misconduct. (*Id.* at PageID #25.) This misconduct included officers conducting interrogations of suspects and physically beating them, while "say[ing] things along the lines of, 'Now you're going to tell us the truth.'" (*Id.*)

Buehner also points to Tell's testimony that "the thin blue line" and fear of being ostracized prevented him from reporting these events, and that when Tell attempted to notify superiors in the CDP of the wrongful conduct described above, he was either reprimanded or told not to pursue the claims of misconduct any further. (*Id.*) Other officers engaged in similar misconduct were not usually disciplined for those acts. (*Id.*) Buehner references Tell's testimony that other police specifically targeted an officer "because he did his job." (*Id.*) That officer, because of his objections to police practices in interrogations, was kicked out of the Detective Bureau. (*Id.* at PageID #26.) According to Buehner, Tell testified that he "got the message" that if he saw "violations of the Constitution, violations of the law, abusing people, beating people, stealing things from people, you better not talk about it, because something is going to happen to you." (*Id.*)

Next, Buehner alleges that "[s]imilarly, in a historically entrenched and still ongoing policy and practice, City policy makers and CDP supervisors facilitated a code of silence within the CDP." (*Id.*) Specifically, Buehner alleges that "police department detectives refused to report, and otherwise lied about, misconduct committed by their colleagues, including the misconduct at issue in this case." (*Id.*) According to Buehner, the City's "training, supervisory, and disciplinary practices supported this code of silence, by protecting from discipline officers who engaged in misconduct and teaching

police officers that they must abide by the code." (*Id.*) Buehner points to the numerous cases described above as examples of this. (*Id.* at PageID #26–27.)

Buehner alleges that because of the above, "CDP officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences." (*Id.* at PageID #27.) Buehner also alleges that "policymakers for the City and CDP knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training, or supervision." (*Id.*) According to Buehner, "[t]he widespread pattern and practice of using unconstitutional measures to secure convictions was so well settled as to constitute a de facto policy in the Cleveland Division of Police," and "municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, ratifying it." (*Id.* at PageID #27–28.)

Buehner alleges that the misconduct described in his Complaint[10] was undertaken pursuant to the official policy[11] of the City and CDP, and that the constitutional violations alleged were a "predictable consequence of such official policy, which was the moving force behind the violations." (*Id.* at PageID #28.) This included the City's policymakers knowing of the need to implement

---

[10] Specifically, Buehner alleges that "[c]onsistent with the municipal policy and practice described herein, members of CDP, including but not limited to the Officer Defendants, systemically fabricated and coerced evidence, suppressed evidence both from the prosecuting attorneys and from criminal defendants, and used other measures which violated Plaintiff's right to due process and right to a fair trial, to secure wrongful convictions." (Doc. No. 1 at PageID #30.)

[11] Buehner describes the "City of Cleveland's policies and practices of pursuing wrongful convictions from using unconstitutional measures" to include the following: "(a) relying on profoundly flawed investigations and coercive or intimidating policing tactics; (b) fabricating inculpatory evidence and suppressing exculpatory evidence; (c) using unduly suggestive identification procedures which violated due process; (d) failing to adequately train, supervise, monitor, and discipline its police officers; (e) and maintaining the police code of silence." (Doc. No. 1 at PageID #29.)

21

policies, train, and supervise police officers[12] and failing to act, as well as the "City and CDP decid[ing] not to implement any legitimate mechanism for oversight or punishment of officers," causing the "Officer Defendants to believe that they could abuse [Buehner's] rights and cover up what they did without fear of discipline." (*Id.* at PageID #28–29.)  According to Buehner, City and officials within the CDP failed to act to remedy the abuses described above "despite actual knowledge of the pattern of misconduct" and similar misconduct "continu[ing] to accumulate over decades." (*Id.* at PageID #29.)

### 2.      County's Official Policies and Customs

Buehner alleges that the prosecutorial misconduct described in his Complaint was undertaken pursuant to the County's official policies and practices.  (*Id.* at PageID #30.)  According to Buehner, the County "maintained a decades-long official policy that permitted the suppression of certain exculpatory evidence," and that "[p]ursuant to this policy, [County] prosecutors regularly suppressed exculpatory evidence, in violation of the constitutional rights of criminal defendants." (*Id.*)  Buehner alleges that such policy "continues through today, and includes the suppression, withholding, destruction, and failure to preserve impeachment and exculpatory evidence at all stages of investigation, charging, trial, appeals and postconviction litigation, wrongful imprisonment litigation, civil litigation, and public records transactions." (*Id.*)

---

[12] Specifically, Buehner alleges that this included the need to implement policies, train, and supervise police officers on how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct interrogations and witness interviews and interactions, how to conduct identifications or lineups or showups, how to conduct arrests, how to write police reports or notes of witness statements and evidence, and how not to conduct unduly suggestive identifications or interrogations.  (Doc. No. 1 at PageID #28.)

According to Buehner, "[t]he County's official policy originated from and was expressly written in a letter from County Prosecutor John T. Corrigan setting forth the County's requirements" (hereinafter the "Corrigan letter").  (*Id.*)  Buehner alleges that "Corrigan was Cuyahoga County's prosecutor from 1956 until 1991" and "[i]n that position, he was a final policymaker" for the County. (*Id.*)  Buehner alleges that through the Corrigan letter, the County maintained a policy that prosecutors not disclose certain "evidence favorable to the defendant," including "reports" made by "police departments" and "statements made by witnesses," and that this official policy "permitted the suppression of otherwise exculpatory evidence."  (*Id.*)  According to Buehner, the "United States Court of Appeals for the Sixth Circuit has recognized the Corrigan letter could establish such a policy," citing *Jackson v. Cleveland*, 925 F.3d 723 (6th Cir. 2019).  (*Id.* at PageID #31.)

Buehner alleges that "[t]his official policy was in place at all times relevant to the allegations here."  (*Id.*)  Specifically, Buehner alleges that the policy "continued after Corrigan's tenure, into the 1990s and 2000s, when the Prosecutor Defendants withheld and destroyed exculpatory evidence in violation of Plaintiff's rights," as well as "through Plaintiff's retrial and the current proceedings, when additional individual prosecutors continued to mishandle, fail to preserve, and otherwise hide *Brady* evidence."  (*Id.*)  According to Buehner, "[i]n accordance with this official policy permitting the suppression of exculpatory evidence in Cuyahoga County, [County] prosecutors regularly withheld and/or suppressed exculpatory evidence and there is a custom of tolerance of such unconstitutional conduct."  (*Id.*)

Buehner alleges that "[t]his was a widespread, clear, and persistent pattern and practice of the attorneys in the [County] prosecutor's office and is well-documented as far back as the 1970s,

continuing through the prosecutions here and beyond." (*Id.*)  Buehner points to nine cases[13] between 1975 and 2004 "in which County prosecutors withheld exculpatory evidence" to demonstrate this pattern and practice and alleges that "[t]hese are mere examples" and that "[m]any cases of similar misconduct persisted and continue to persist to the present, including those that are still unknown." (*Id.* at PageID #31–34.)

According to Buehner, this "policy's persistence through the 2000s reveals itself in other County prosecutor misconduct," such as the County's "ongoing pattern of withholding criminally exculpatory evidence in public records requests after trials, just like in criminal litigation." (*Id.* at PageID #34.)  Buehner points to three cases[14] seeking to demonstrate this pattern, again alleging that "[t]hese are mere examples" and that "[m]any cases of similar misconduct persisted and continue to persist to the present, including those that are still unknown." (*Id.* at PageID #34–36.)  Buehner alleges that in these cases, "the County committed *Brady* violations in advance of and at trial, then continued their suppression in response to a public records request after trial," all of which "demonstrates that the County policy, by which certain exculpatory evidence is excepted from disclosure, continued." (*Id.* at PageID #36.)

According to Buehner, the "County and officials within the County prosecutor's office failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct." (*Id.*)  Buehner alleges that the "policies and practices were the moving force

---

[13] The specific cases cited, and details related thereto, can be found in Buehner's Complaint.  (*See* Doc. No. 1 at PageID #31–34.)

[14] The specific cases cited, and details related thereto, can be found in Buehner's Complaint.  (*See* Doc. No. 1 at PageID #34–36.)

behind the misconduct" alleged,[15] and that the "constitutional violations that caused [his] wrongful conviction were not isolated events" but rather "resulted from the County's policies and practices of suppressing and destroying exculpatory evidence."  (*Id.*)  Buehner alleges that the "widespread practices were so well settled as to constitute *de facto* policy in the Cuyahoga County Prosecutor's Office," and that such practices "persisted because County policymakers with authority over these practices were deliberately indifferent to the constitutional violations, and approved them."  (*Id.*)

## III.    Standard of Review

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).

The same standard for deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim applies to a Rule 12(c) motion for judgment on the pleadings.  *See Roth v. Guzman*, 650 F.3d 603, 605 (6th Cir. 2011).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative

---

[15] Specifically, Buehner alleges that "consistent with the policy and practice described herein, the Prosecutor Defendants and additional individual prosecutors and County agents suppressed and destroyed evidence before, during, and after trial," and that "[t]his course of conduct continued after trial in the failure to preserve evidence and, upon information and belief, continues today.  (Doc. No. 1 at PageID #36–37.)

level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the complaint raises a right to relief above the speculative level— "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'"  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555-56).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.

Consequently, the examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 679.

## IV.    Analysis

Pending before the Court are the following Motions: (1) the County and Prosecutors' Motion (Doc. No. 22); (2) the City's Motion (Doc. No. 26); (3) the Officers' Motion (Doc. No. 27); and (4) Buehner's Motion for Surreply (Doc. No. 39).

As a preliminary matter, the Court finds that good cause exists to consider the additional filings submitted by the Parties and therefore GRANTS Buehner's Motion for Surreply.[16] (Doc. No. 39.) Accordingly, the Court will consider the arguments and authority contained in Buehner's Motion for Surreply (Doc. No. 39) and the City and Officer Defendants' Oppositions thereto (Doc. Nos. 40, 50). The Court will also consider the arguments contained in Buehner's Notice of Supplemental Authority (Doc. No. 57) and Officer Defendants' Amended Response thereto (Doc. No. 59).

The Court will address the remaining Motions in-turn, below.

### A.    Prosecutor Defendants' Motion (Counts One through Eight)[17]

The Court first begins with the Prosecutor Defendants' Motion. (Doc. No. 22.)

#### 1.    Absolute Immunity for Prosecutor Defendants as to Federal Claims

Prosecutor Defendants maintain that they are entitled to absolute immunity as to Buehner's federal claims. (*See generally* Doc. No. 22 at PageID #167–70.) In response, Buehner asserts that absolute immunity should be denied because: (i) the doctrine of absolute prosecutorial immunity

---

[16] Specifically, the Court finds that the issues raised in Buehner's Surreply either address new grounds that were raised for the first time on reply or appropriately clarify misstatements appearing in the Reply Briefs. *See NCMIC Ins. Co. v. Smith*, 375 F. Supp.3d 831, 835–36 (S.D. Ohio 2019). Further, the Court finds that there is no prejudice to Defendants because the Court will also address each of their Oppositions to Buehner's Surreply. *See id.* at 836. The Court will address this more substantively below in its discussions of each individual issue raised by the parties.

[17] The Court recognizes that Prosecutor Defendants and the County include their respective arguments in the same Motion. (*See* Doc. No. 22.) However, to avoid confusion, the Court refers to the arguments pertaining to the Prosecutor Defendants as the "Prosecutor Defendants' Motion" and the arguments pertaining to the County as the "County's Motion."

should be abolished; and (ii) even if not abolished, Buehner has alleged that Prosecutor Defendants' conduct was not necessarily done in a protected capacity.  (Doc. No. 28 at PageID #281–82.)  The Court will address each argument below.

### a.  Whether Absolute Prosecutorial Immunity Should Be Abolished

In his Opposition, Buehner submits that the doctrine of absolute prosecutorial immunity should be abolished within the context of § 1983.  (Doc. No. 28 at PageID #281.)  Specifically, Buehner contends that in enacting 42 U.S.C. § 1983, "the United States Congress intended to abrogate prosecutorial immunity," and thus, this "court-made immunity doctrine contravenes the text and purpose of § 1983."  (*Id.*)  Buehner also asserts that the "ahistoric, atextual application of absolute prosecutorial immunity in wrongful conviction cases produces especially absurd and unjust results." (*Id.*)  Accordingly, Buehner maintains that the Court should deny absolute immunity to the Prosecutor Defendants.  (*Id.*)

In their Reply, Prosecutor Defendants contend that there is no basis for abolishing prosecutorial immunity considering Supreme Court precedent.  (Doc. No. 30 at PageID #304–05.) Prosecutor Defendants assert that "[s]imilar arguments have been made, and categorically rejected by the U.S. Supreme Court," and that none of the cases cited by Buehner "actually held that common law immunities, such as absolute immunity, were ever abrogated."  (*Id.* at PageID #304.)

The Sixth Circuit recently applied the doctrine of absolute prosecutorial immunity to a claim brought under §1983 for malicious prosecution, fabrication of evidence, and destruction of exculpatory evidence. *See Price v. Montgomery County, Ky.*, 72 F.4th 711 (6th Cir. 2023).  In *Price*, the plaintiff (i.e., the defendant in the underlying criminal matter) brought an action against a prosecutor for allegedly advising a witness to destroy exculpatory evidence, despite the plaintiff

28

having obtained a court order requiring the disclosure of such evidence.  *Id.* at 716–18.  Specifically, the plaintiff obtained a court order directing jail personnel to grant him access to certain letters written by an incarcerated witness indicating that her confession was coerced.  *Id.* at 718.  However, the witness had already been released on bond.  *Id.*  Plaintiff's counsel thus contacted the witness, who in-turn contacted the prosecutor to ask about the order.  *Id.*  In response, the prosecutor "told [the witness] to get rid of the letters rather than turn them over, so she did."  *Id.*

The court concluded that the prosecutor was entitled to absolute prosecutorial immunity for his alleged part in the destruction of exculpatory evidence.[18]  *Id.* at 722.  The court noted that prosecutorial immunity "extends even to 'unquestionably illegal or improper conduct,' including instances where a defendant is genuinely wronged."  *Id.* at 719.  Further, the court acknowledged that prosecutorial immunity has its limits where the prosecutor's actions are not intimately associated with the judicial process, such as "investigative efforts to obtain an arrest warrant, authorize wiretaps, or advise the police."  *Id.* at 719–20.  Notwithstanding this limitation, the court nevertheless concluded that "prosecutors maintain their immunity when intentionally failing to disclose exculpatory evidence" and that the prosecutors "role in the destruction of evidence thus did not exceed the scope of his immunity as a prosecutor."  *Id.*  Finally, the court reached the same conclusion with respect to the prosecutor's "purported thwarting of a court order" in advising the witness to destroy the evidence, noting that while the alleged conduct was troubling and not condoned or encouraged, it was "not conduct so outside the prosecutorial role that it loses its cloak of absolute immunity."[19]  *Id.* at 721.

---

[18] Notably, the Sixth Circuit affirmed the district court's application of absolute prosecutorial immunity at the motion to dismiss stage.  *See Price*, 72 F.4th at 719.

[19] The court explained that "[b]y definition, matters related to a court order in a criminal case are naturally part of the prosecutorial process."  *Price*, 72 F.4th at 721.  The court also noted that the prosecutor did not technically violate a court

One year later, the United States Supreme Court denied the plaintiff's petition for a writ of certiorari.  *See Price v. Montgomery County, Ky.*, 144 S. Ct. 2499 (Mem) (2024).  Justice Sotomayor issued a statement respecting the denial of certiorari, indicating that the "[c]ourt's denial of certiorari should not signal tolerance of the prosecutor's conduct," and noted that it was "difficult to see how the conduct alleged here … is 'intimately associated with the judicial phase of the criminal process.'"  *Id.* at 2500.  Accordingly, Justice Sotomayor concluded that "[i]f this is what absolute prosecutorial immunity protects, the [Supreme] Court may need to step in to ensure that the doctrine does not exceed its 'quite sparing' bounds."  *Id.* at 2501 (internal quotation marks omitted).

The Court declines to find that absolute prosecutorial immunity should be entirely abolished within the context of § 1983.  Indeed, the Sixth Circuit recently applied absolute prosecutorial immunity as such, and the Supreme Court has not held otherwise.  *See supra*.  Such precedent is binding upon this Court.  In support of his position, Buehner points to footnotes in *Price*—in both Judge Nalbandian's concurrence and in Justice Sotomayor's statement respecting the denial of certiorari—that "summariz[es] recent scholarship finding § 1983 abrogated common law immunity doctrines."  (*See* Doc. No. 28 at PageID #281.)  Although Judge Nalbandian indicated "skeptic[ism] as to whether, in 1871, common-law practice recognized absolute prosecutorial immunity," *see Price*, 72 F.4th at 727 n.2, he ultimately concluded that two of the three prosecutorial actions challenged—advising a witness and destroying evidence—"warrant[ed] absolute immunity."[20]  *Id.* at 726.

---

order *directed to him* (rather than towards the witness), and thus, did not reach the issue of whether prosecutorial immunity applies where a prosecutor directly violates a court order.  *See id.* ("As [the prosecutor] did not violate a court order directed to him, we leave a question of that manner for resolution in a future case.").

[20] Judge Nalbandian departed from the majority only with respect to the third prosecutorial action challenged—"violating a court order"—in which he concluded that such action was only entitled to qualified immunity, not absolute prosecutorial immunity.  *See Price*, 72 F.4th at 726.

Similarly, while Justice Sotomayor referenced Judge Nalbandian's discussion on the issue, she noted that "[t]his new scholarship reinforces why, at a minimum, this immunity doctrine should be *employed sparingly*"—suggesting that the doctrine could still be employed in some circumstances. *Price*, 144 S. Ct. at 2500 n.2 (emphasis added).  Accordingly, the Court declines to find that the doctrine of absolute prosecutorial immunity should be entirely abolished within the context of § 1983 actions.[21]

### b. Whether Prosecutor Defendants are Entitled to Absolute Prosecutorial Immunity

The Court next addresses whether Prosecutor Defendants are entitled to absolute prosecutorial immunity at this stage.

In their Motion, Prosecutor Defendants first argue that they are entitled to absolute prosecutorial immunity as to Buehner's federal claims.  (*Id.* at PageID #167.)  Prosecutor Defendants assert that state prosecutors are "absolutely immune from civil liability when acting within the scope of their prosecutorial duties."  (*Id.*)  Prosecutor Defendants contend that this inquiry "requires analyzing whether the prosecutor's alleged activities 'were intimately associated with the judicial phase of the criminal process,'" and that if so, a prosecutor is absolutely immune from liability "even for egregious conduct such as the 'knowing use of false testimony and the suppression of material evidence at [a] criminal trial.'"  (*Id.*)  In performing this analysis, Prosecutor Defendants assert that

---

[21] Indeed, since Justice Sotomayor's statement respecting the denial of certiorari, numerous courts within the Sixth Circuit have continued to apply the doctrine of absolute prosecutorial immunity in § 1983 actions.  *See, e.g.*, *Hamilton v. Fleming*, 2025 WL 968293, at *8 (E.D. Mich Mar. 31, 2025); *Burns v. Ottawa County Sheriff's Department*, 2025 WL 794392, at *5 (W.D. Mich. Mar. 13, 2025); *Henderson v. County of Kent*, 2024 WL 4661399, at *13 (W.D. Mich. Nov. 4, 2024); *Connie Reguli and Wendy Hancock v. Tracy Hetzel et al.*, 2025 WL 1524495, at *10 n.9 (M.D. Tenn. May 28, 2025); and *Halliburton v. Weirich*, 2024 WL 4263636, at *4 (W.D. Tenn. Sept. 23, 2024).

31

the critical inquiry is "how closely related the prosecutor's challenged activity is to his *role as an advocate* intimately associated with [sic] the judicial phase of the criminal process"—in other words, whether the prosecutors' challenged actions were "investigative" versus "judicial" acts. (*Id.*)

Applying that test, Prosecutor Defendants assert that Buehner's Complaint does not allege that they performed such investigatory functions, and instead concerns actions taken by them "*while* they were acting as advocates for the State of Ohio during the pendency of Plaintiff's criminal case." (*Id.* at PageID #169.) Thus, Prosecutor Defendants contend that they are "immune from liability for alleged *Brady* violations, fabrication of evidence, or malicious prosecution if they were acting as 'advocate[s] for the State' and their appearance was 'intimately associated with the judicial phase of the criminal process.'" (*Id.* at PageID #169–70.)

In his Opposition, Buehner asserts that the Prosecutor Defendants are not entitled to absolute immunity from Buehner's federal claims. (Doc. No. 28 at PageID #281.) Buehner maintains that the Prosecutor Defendants should be denied absolute immunity at this stage because Buehner "has alleged that their misconduct was not necessarily done in a protected capacity." (*Id.*) Buehner asserts that he has pleaded that: (i) the Prosecutor Defendants' alleged actions were taken "in their investigatory or prosecutorial capacities" in the alternative; (ii) the former prosecutors "breached their duty to investigate [the murder]" and instead committed serious misconduct; (iii) in their non-advocacy capacities, the former prosecutors suppressed, destroyed, and fabricated specific material evidence; (iv) they encouraged illegal behavior to manipulate the criminal proceedings; and (v) "in their investigatory capacities" they committed other similar misconduct not yet known. (*Id.* at PageID #283.) Finally, Buehner submits that he has alleged that the prosecutor misconduct here "occurred

in an advocacy, or investigative, or other capacity, but without discovery, he cannot know which." (*Id.*)

In their Reply, Prosecutor Defendants reiterate that Buehner "has not sufficiently pled their conduct was done in a non-protected capacity."  (Doc. No. 30 at PageID #305.)  Specifically, Prosecutor Defendants assert that Buehner's allegations pertaining to suppression, destruction, and fabrication of evidence are related to "an advocate's preparation for the initiation of a prosecution or for judicial proceedings."  (*Id.* at PageID #308.)  Prosecutor Defendants argue the same as to Buehner's allegations that they "lacked probable cause to bring the case."  (*Id.* at PageID #307.) Finally, Prosecutor Defendants contend that courts have held "there is no constitutional duty to 'do a better investigation'" when addressing claims that prosecutors should have arranged for better investigations before initiating the prosecution, and thus, Buehner's "failure to investigate" claim is meritless.  (*Id.* at PageID #309.)

"State prosecutors are absolutely immune from civil liability when acting within the scope of their prosecutorial duties."  *Howell v. Sanders*, 668 F.3d 344, 349 (6th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409, 420 (1976)); *see also Spurlock v. Thompson*, 330 F.3d 791, 797 (6th Cir. 2003).  "The Supreme Court employs a 'functional approach' to determine when a prosecutor is acting within the scope of his duties as a prosecutor and when he is merely giving legal advice or investigating."  *Id.* (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)); *see also Vakilian v. Shaw*, 302 Fed. App'x. 350, 357 (6th Cir. 2008).

"The analytical key to prosecutorial immunity … is advocacy—whether the actions in question are those of an advocate."  *Harris v. Bornhorst*, 513 F.3d 503, 509–10 (6th Cir. 2008) (citing *Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006)).  Absolute immunity thus extends to

33

"prosecutors whose activities are 'intimately associated' with the judicial process." *Price*, 72 F.4th at 719; *see also Spurlock*, 330 F.3d at 798. For example, courts have found that "prosecutors maintain their immunity when intentionally failing to disclose exculpatory evidence."[22] *Price*, 72 F.4th at 720. Similarly, "the knowing presentation of false testimony at trial is protected by absolute immunity" because "[p]rosecutorial decisions regarding witness testimony, including what witnesses to use at trial, and what questions to ask them, are activities intimately associated with the judicial phase of a criminal trial …"[23] *Spurlock*, 330 F.3d at 797–98; *see also Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) (recognizing absolute prosecutorial immunity for "appearances at probable cause and grand jury hearings, evaluation of evidence and presentation of that evidence at pre-trial and trial proceedings, and preparation of witnesses for trial") (citations omitted).

Courts have also held that "a prosecutor who maliciously institutes a false prosecution with no probable cause is entitled to absolute immunity" because "[t]he decision to prosecute or not prosecute, even if malicious, enjoys absolute immunity." [24] *Howell*, 668 F.3d at 350; *Red Zone 12, LLC v. City of Columbus*, 2018 WL 1401069, at *4 (S.D. Ohio Mar. 20, 2018). In similar fashion,

---

[22] This includes both "failing to disclose the evidence or failing to preserve it." *Price*, 72 F.4th at 720.

[23] *See also Adams v. Hanson*, 656 F.3d 397, 405 (6th Cir. 2011) ("[P]rosecutors do not forfeit their absolute immunity when they knowingly make false statements while advocating before the court … so long as the statements were related to the proceeding[s] in which they were made.") (internal quotation marks omitted).

[24] As explained by the Supreme Court, the reason that absolute immunity applies in such scenarios is because there is a "common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not." *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 n.5 (1993). As such, "[a] prosecutor's decision to file a criminal complaint and seek an arrest warrant and the presentation of these materials to a judicial officer fall squarely within the aegis of absolute prosecutorial immunity." *Ireland v. Tunis*, 113 F.3d 1435, 1446 (6th Cir. 1997). In doing so, "a prosecutor is unquestionably functioning as an advocate for the state in the judicial process, and absolute immunity is fully justified because the integrity of the judicial system depends in large part upon a prosecutor's ability to exercise independent judgment in deciding whether and against whom to bring criminal charges." *Id.* (citing *Imbler*, 424 U.S. at 431).

courts have rejected claims that prosecutors "should have arranged for better investigations and built a more complete record before initiating the prosecution," concluding that "there is no constitutional duty to 'do a better investigation.'" *Latta v. Chapala*, 221 Fed. App'x. 443, 444 (7th Cir. 2007); *see also Gavitt v. Born*, 835 F.3d 623, 645 (6th Cir. 2016); *Gavitt v. Ionia County*, 67 F. Supp.3d 838, 857 (E.D. Mich. 2014). This is because a prosecutor's conduct in "[d]eciding when the evidence is sufficient to stop investigating and seek an indictment is a standard prosecutorial function and covered by absolute immunity …" *Latta*, 221 Fed. App'x at 445; *Gavitt*, 67 F. Supp.3d at 857.

However, "prosecutors are not entitled to absolute immunity for 'investigative' or 'administrative' acts." *Spurlock*, 330 F.3d at 798 (citing *Burns*, 500 U.S. at 483 n.2); *see also Harris*, 513 F.3d at 510 ("[P]rosecutors are not absolutely immune … when they perform administrative, investigative, or other functions."). "If the challenged actions of the prosecutor were not performed in his role as [an] advocate, if they do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings, then only qualified immunity applies." *Harris*, 513 F.3d at 510. For example, "[p]rosecutors act as investigators and are entitled at most to only qualified immunity when giving legal advice to the police, including giving legal advice prior to the existence of probable cause and prior to the prosecutor's determination that she would initiate criminal proceedings against a defendant, fabricating false evidence before a special grand jury was empaneled, and directing the police's investigation …"[25] *Watkins v. Healy*, 986 F.3d 648, 661 (6th Cir. 2021) (cleaned up).

---

[25] *See also Adams v. Hanson*, 656 F.3d 397, 402 (6th Cir. 2011) ("Investigative acts outside the scope of absolute immunity include giving legal advice to the police during a pretrial investigation [and] conspiring to fabricate evidence during the time before convening a grand jury …"); *Spurlock*, 330 F.3d at 798 ("[P]rosecutors are not entitled to absolute immunity for the act of giving legal advice to police."); *Buckley*, 509 U.S. at 275 (denying absolute immunity for a "prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime").

This distinction falls upon "the nature of the function performed, not the identity of the actor who performed it." *Vakilian*, 302 Fed. App'x. at 357.  For instance, "[s]earching for clues and corroboration that might give [the prosecutor] probable cause to recommend that a suspect be arrested is not protected by absolute immunity, but the professional evaluation of the evidence assembled by the police is so protected." *Id.*  This is because "absolute immunity does not protect the investigative functions normally performed by a detective or police officer." *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 691 (6th Cir. 2020) (internal quotation marks omitted).

In other words, "[w]hen the functions of prosecutors and detectives are the same … the immunity that protects them is also the same." *Buckley*, 509 U.S. at 276.  Indeed, the Sixth Circuit recently found that absolute immunity did not protect a prosecutor from the following alleged actions: (i) threatening to charge a witness with two murders during an interrogation; (ii) promising a witness immunity for testifying at the defendant's trial notwithstanding the witness's statements regarding the defendant's lack of involvement in the murder; (iii) assisting with the interrogation of the witness; and (iv) conspiring with a detective to intimidate and coerce the witness into falsely implicating the defendant. *Watkins*, 986 F.3d at 662.  Notably, all four of these actions occurred "before any probable cause hearing, before any arrest warrant was sought, or before a grand jury was convened." *Id.* (citations omitted).

Applying the case law to the allegations against the Prosecutor Defendants set forth in Buehner's Complaint, and as explained more fully below, the Court concludes that many of Buehner's allegations involve conduct that is protected by absolute prosecutorial immunity, but that a few of Buehner's allegations involve prosecutorial conduct do not.

Buehner alleges that Prosecutor Defendants had access to exculpatory evidence and violated the *Brady* rule "by withholding it from the defense" or by suppressing, destroying, losing, or failing to preserve evidence.  (Doc. No. 1 at PageID #12.)  But the "fail[ure] to disclose [exculpatory] evidence or fail[ure] to preserve it … [are] decision[s] … made in an 'advocative' capacity" and thus implicate absolute prosecutorial immunity.  *Price*, 72 F.4th at 720–21.  Buehner also alleges that Prosecutor Defendants "became aware of some … of the fabrications that the Officer Defendants made up concerning the witness testimony" and "pursued the prosecution anyway."  (Doc. No. 1 at PageID #12.)  Yet "[t]he decision to prosecute or not prosecute, even if malicious, enjoys absolute immunity," as does "the knowing presentation of false testimony at trial …" *Red Zone 12, LLC*, 2018 WL 1401069, at *4; *Spurlock*, 330 F.3d at 797–98.  Accordingly, absolute immunity shields Prosecutor Defendants from liability for this alleged conduct.

The same holds true regarding Buehner's allegations that Prosecutor Defendants "recklessly failed to conduct a pretrial investigation sufficient to uncover the Officer Defendants' misconduct" and that such failure "caused them to neglect their duty to investigate true suspects, and instead cause the prosecution of [Buehner] without probable cause.  (Doc. No. 1 at PageID #13.)  As explained above, a "prosecutor who maliciously institutes a false prosecution with no probable cause is entitled to absolute immunity."  *Howell*, 6687 F.3d at 350.  Further, there is "no constitutional duty to 'do a better investigation'" such as to have required Prosecutor Defendants to "uncover the Officer Defendants' misconduct."  *Latta*, 221 Fed. App'x at 444; *Gavitt*, 835 F.3d at 645.  Rather, "the professional evaluation of the evidence assembled by the police is so protected" by absolute immunity because "[d]eciding when the evidence is sufficient to stop investigating and seek an indictment is a standard prosecutorial function …" *Vakilian*, 302 Fed. App'x at 357; *Latta*, 221 Fed. App'x at 445;

*Gavitt*, 67 F. Supp.3d at 857.  Accordingly, the Court finds that Prosecutor Defendants are entitled to absolute immunity as to these allegations.

However, the Court reaches a different conclusion as to the other allegations contained in Buehner's Complaint against Prosecutor Defendants.  Specifically, the Court finds that certain of Buehner's allegations involve prosecutorial conduct that may be considered "investigatory" in nature pursuant to the above-discussed case law.  For instance, Buehner alleges that Bombik "agree[d] to the early release of [Price] in exchange for his testimony against [Buehner]."  (Doc. No. 1 at PageID #13.)  This was done despite the Officer Defendants having wrongfully "had [Price] charged with capital murder" even though he had "maintained his innocence through multiple interviews [thus] far," and having "promised [Price] a plea deal with a much shorter sentence if he said he was there and identified [Buehner] as the shooter."[26]  (*Id.* at PageID #10.)  As another example, Buehner also alleges that the Defendants fabricated evidence that was "material to the *arrest*, *charging*, and prosecutions of Plaintiff."  (Doc. No. 1 at PageID #42 (emphasis added).)

It is unclear at this stage whether these alleged actions occurred before or after the "judicial phase of the criminal process" had begun in Buehner's prosecution.  But, construing these allegations in totality and in the light most favorable to Buehner, it is plausible that Prosecutor Defendants' actions occurred "prior to [their] determination that [they] would initiate criminal proceedings against" Buehner, and thus would be considered investigatory and outside the scope of prosecutorial

---

[26] Buehner also alleges that Prosecutor Defendants committed misconduct "in their investigatory capacities … including in their roles advising the police."  (Doc. No. 1 at PageID #13 (emphasis added).)  It is true that "advising the police" could fall outside the scope of prosecutorial immunity if done during the investigatory phase.  *See Spurlock*, 330 F.3d at 798 ("[P]rosecutors are not entitled to absolute immunity for the act of giving legal advice to police.").  However, the Court finds Buehner's lone allegation of "advising the police" to be conclusory.

immunity. *See Watkins*, 986 F.3d at 661–63. This would particularly be true if done while "[s]earching for clues and corroboration that might give [the prosecutor] probable cause to recommend" arresting Buehner, as "absolute immunity does not protect the investigative functions normally performed by a detective or police officer." *Vakilian*, 302 Fed. App'x. at 357; *Rieves*, 959 F.3d at 691. For example, the alleged fabrication of evidence that was material to the arrest and charging of Buehner may be unprotected because "conspiring to fabricate evidence during the time before convening a grand jury" is considered an "investigative act[] outside the scope of absolute immunity …"[27] *Adams v. Hanson*, 656 F.3d 397, 402 (6th Cir. 2011). Bombik's alleged conduct relating to obtaining Price's testimony may also fall outside the scope of absolute immunity if conducted at the investigatory stage. *See Watkins*, 986 F.3d at 661–62 (denying absolute immunity

---

[27] This conclusion does not conflict with the Court's earlier finding that Prosecutor Defendants are entitled to absolute immunity for continuing to pursue the prosecution despite eventually becoming aware of the Officer Defendants' alleged misconduct. Indeed, the Supreme Court has explained this distinction as follows:

> "Furthermore, there is no 'true anomaly' in denying absolute immunity for a state actor's investigative acts made before there is probable cause to have a suspect arrested just because a prosecutor would be entitled to absolute immunity for the malicious prosecution of someone whom he lacked probable cause to indict. That criticism ignores the essence of the function test. The reason that lack of probable cause allows us to deny absolute immunity to a state actor for the former function (fabrication of evidence) is that there is no common-law tradition of immunity for it, whether performed by a police officer or prosecutor. The reason that we grant it for the latter function (malicious prosecution) is that we have found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not."

*Buckley*, 509 U.S. at 274 n.5. Following this line of reasoning, Prosecutor Defendants would be entitled to absolute immunity for the "decision to bring an indictment," even if it is later found that probable cause did not exist. However, it would be a different story if Prosecutor Defendants were *involved* in the fabrication of evidence in an investigatory capacity, as detailed in *Watkins v. Healy*, 986 F.3d 648, 662 (6th Cir. 2021), because such actions would be "completely divorced from 'the judicial phase of the criminal process.'" *Id.* at 662; *cf. Ireland*, 113 F.3d at 1447 (granting prosecutorial immunity for decision to file a criminal complaint because the plaintiff "[did] not contend that her alleged constitutional deprivation arose from the prosecutors' investigative activities undertaken antecedent to the decision to file criminal charges …"). As explained in *Watkins*, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." 986 F.3d at 663. Therefore, such actions taken by the Prosecutor Defendants *prior* to the probable cause determination cannot be seen as advocative. Nor would such actions be protected after the probable cause determination if the challenged conduct was made in an investigative capacity, as discussed *infra*. *See also Watkins*, 986 F.3d at 663–64.

where, during investigatory phase, prosecutor "promised [witness] immunity for testifying …

notwithstanding [witness's] statements regarding [defendant's] lack of involvement in the …

murder"); *see also id.* at 663 n.23.

Finally, it should be noted that "a determination of probable cause does not guarantee a

prosecutor absolute immunity from liability for all actions taken afterwards." *Watkins*, 986 F.3d at

663. Even after that determination is made, "a prosecutor may engage in 'police investigative work'

that is entitled only to qualified immunity." *Id.* (citing *Buckley*, 509 U.S. at 274 n.5). In other words,

while a "prosecutor acts only as an investigator and not an advocate *before* probable cause surfaces,"

a prosecutor "may act as either investigator or advocate *after* probable cause arises" depending on the

nature of the action. *Id.* Thus, even if the Prosecutor Defendants committed these alleged actions

following the probable cause stage, it is plausible—depending on the specifics of their conduct—that

such actions could still be considered investigative and therefore not protected by of absolute

immunity. *See id.* at 663–64.

In sum, the Court cannot conclude at this time that Prosecutor Defendants are entitled to

absolute immunity for every alleged action in Buehner's Complaint. As explained above, Prosecutor

Defendants' alleged *Brady* violations would be protected by absolute immunity, and thus, the Court

hereby dismisses Count Three as to the Prosecutor Defendants. As to Counts One, Two, and Four,[28]

---

[28] The Court is aware that Count Four alleges "malicious prosecution" which is generally afforded prosecutorial immunity. However, Count Four specifically alleges that Defendants "fabricated" evidence that was material to the *arrest* and *charging* of Buehner, and that in the absence of such misconduct, Buehner "would not have been arrested [or] charged …" (Doc. No. 1 at PageID #42.) Thus, Count Four does not merely implicate the *decision* to prosecute, but rather the *participation* in the fabrication of evidence prior to doing so. Such allegations therefore cause Count Four to fall within the same camp as Counts One and Two. *See Watkins*, 986 F.3d at 662 n.21 (declining to dismiss claim for "malicious prosecution" on the basis of absolute prosecutorial immunity because allegations included the "purported knowing fabrication of evidence during interrogation, which is clearly an investigative function").

however, the Court finds that Buehner has sufficiently alleged that Prosecutor Defendants may have acted in a manner outside of their advocative role.  Accordingly, the Court declines to dismiss those claims at this juncture.  Discovery will shed light on the specific details of the conduct alleged and illuminate whether Prosecutor Defendants acted in an advocative or investigatory capacity.[29]  The Parties will have the opportunity to revisit this issue at the summary judgment stage after the record has been further developed.

### 2.    Qualified Immunity for Prosecutor Defendants as to Federal Claims

The Court next turns to the parties' arguments regarding qualified immunity.

### a.  Qualified Immunity at Motion to Dismiss Stage

As a preliminary matter, the Court addresses Buehner's argument that the Court should decline to consider qualified immunity at the motion to dismiss stage and instead address the issue at summary judgment.  (Doc. No. 28 at PageID #284.)  Buehner asserts that the "fact-intensive nature" of qualified immunity makes it "difficult for a defendant to claim … on the pleadings *before* discovery."  (*Id.*)

It is true that the Sixth Circuit has stated that "it is generally inappropriate for a district court to grant a Rule 12(b)(6) motion to dismiss on the basis of qualified immunity." *Buddenberg v. Weisdack*, 939 F.3d 732, 738-739 (6th Cir. 2019).  *See also Saalim v. Walmart,* 97 F.4th 995, 1003

---

[29] Indeed, discovery may very well show that these few remaining allegations occurred in the advocacy phase of Buehner's prosecution and not the investigatory phase.  If so, Prosecutor Defendants would be entitled to absolute immunity for such conduct.  However, at this phase, the Court cannot conclude at which exact phase these allegations occurred, as Buehner's Complaint could be construed either way.  Accordingly, construing the Complaint in the light most favorable to Buehner, the Court finds it premature to conclude that such allegations definitively occurred during the advocacy phase of the prosecution.

(6th Cir. 2024); *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015).  However, the Sixth Circuit

recently clarified (and limited) this statement, as follows:

> We held, long before *Buddenberg* and *Wesley*, that district courts have "a duty to address" qualified immunity when it is "properly raised prior to discovery." After all, qualified immunity shields government defendants not merely from liability, but also from litigation and discovery, because "[i]nquiries of this kind can be peculiarly disruptive of effective government," so they could not (and do not) give license to deny qualified immunity, without a reasoned opinion, whenever the defense is raised in a Rule 12 motion.

> However, as we recently explained in *Crawford*, *Wesley* does have a point: analyzing the second prong of qualified immunity—whether the alleged constitutional violation is clearly established — "is sometimes difficult" on the pleadings, since that "inquiry may turn on case-specific details that must be fleshed out in discovery." *Crawford,* 15 F.4th at 765 (collecting cases). That, *Crawford* explained, is what *Wesley*'s "at best imprecise" language meant to convey. *Crawford*, 15 F.4th at 763 ("[M]ost statements of this proposition are careful to explain that its application rests on qualified immunity's clearly established prong."); *id.* at 765.

> Still, that "is only a 'general preference,' not an absolute one." *Siefert*, 951 F.3d at 761 (quoting *Guertin*, 912 F.3d at 917); *Crawford,* 15 F.4th at 765 (explaining that "the inquiry is nuanced" and not reducible to a hard-and-fast rule). In some cases, the clearly established prong may be determined on the pleadings. Indeed, *Buddenberg* itself determined, on appeal from the denial of a motion to dismiss raising qualified immunity, that the plaintiff's "right to report public corruption, unethical conduct, and sex-based discrimination within her workplace was clearly established." 939 F.3d at 741.

> **More importantly, *Crawford* made crystal clear that that general preference does not at all cover qualified immunity's first prong—whether the complaint plausibly alleged a constitutional violation. 15 F.4th at 764–65 … Put differently, if the complaint fails to allege facts plausibly showing the violation of a constitutional right (regardless of whether that right was clearly established), granting qualified immunity is appropriate on the pleadings**. *Id.; see Siefert,* 951 F.3d at 762. The assertion of qualified immunity, by itself, does not change that.

> So, in this case, as in every other case in which a defendant timely raises qualified immunity, the district court was required to determine whether Myers plausibly alleged a constitutional violation and, if so, whether that right was clearly established.

*Myers v. City of Centerville, Ohio*, 41 F.4th 746, 758-759 (6th Cir. 2022) (emphasis added) (cleaned up). *See also Saalim,* 97 F.4th at 1003 (noting that "a district court cannot defer a decision on qualified immunity merely because it must make the decision on a Rule 12 motion. *** Rather, because qualified immunity is a defense not just to liability but to having to litigate the suit itself, a district court must resolve the question as soon as possible.") (citing *Myers*, 41 F.4th at 758-759)); *Kerchen v. University of Michigan*, 100 F.4th 751, 761 (6th Cir. 2024) (observing that "this Court has long held that district courts may not avoid ruling on the merits of a qualified immunity defense and permit litigation to proceed further.")

Thus, to the extent Buehner argues that this Court should deny qualified immunity solely because it is raised at the pleadings stage, this argument is without merit and rejected. In accordance with *Myers, supra*, the Court will proceed to address the question of whether Buehner has plausibly alleged that Prosecutor Defendants violated his clearly established constitutional rights.

### b. Qualified Immunity Analysis

In their Motion, Prosecutor Defendants submit that they are entitled to qualified immunity. (Doc. No. 22 at PageID #170.) First, Prosecutor Defendants maintain that they did not violate a clearly established right because no court has "held a prosecutor liable for failing to conduct a pre-trial investigation into a law enforcement agency who provided evidence or submitted charges to the prosecutor's office." (*Id.* at PageID #171.) Second, Prosecutor Defendants assert that to hold them liable as such, the Court would have to "ignore or overturn decades of precedent granting absolute immunity to prosecutors for actions taken during the judicial phase of the criminal process." (*Id.*) Thus, Prosecutor Defendants contend that they would not have been on notice for their purported actions even if the Court went this route. (*Id.* at PageID #172.)

In his Opposition, Buehner asserts that should the Court consider qualified immunity at this stage, it should conclude that Buehner adequately alleged that Prosecutor Defendants violated his clearly established rights.  (Doc. No. 28 at PageID #284.)  Specifically, Buehner references his allegations regarding "*Brady* violations, fabrication of evidence, unlawful identification procedures, and malicious prosecution," and maintains that his "right to be free from each of these varieties of civil rights violations was clearly established by 2001."[30]  (*Id.* at PageID #284–85.)

In their Reply, Prosecutor Defendants assert that Buehner fails to address their argument regarding courts not having held prosecutors liable for "failing to conduct a pre-trial investigation into a law enforcement agency who provided evidence or submitted charges to the prosecutor's office."  (Doc. No. 30 at PageID #309–10.)  Further, Prosecutor Defendants reiterate that if the Court were to decide that prosecutorial immunity should be abrogated, the constitutional right at issue "still is not clearly established" courts have not "held a prosecutor liable for violating a Plaintiff's constitutional rights during the active prosecution of a criminal case."  (*Id.* at PageID #310.)

Under the doctrine of qualified immunity, "courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and 'the right was "clearly established" at the time of the challenged conduct.'"  *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  In evaluating qualified immunity at the pleading stage, the Court must determine whether the complaint plausibly alleges facts showing that (1) the government official violated a plaintiff's constitutional

---

[30] Buehner also asserts that the Court should find that the qualified immunity doctrine "should also be abolished, based upon all the same scholarship discussed above showing that § 1983 abrogates common law immunities."  (Doc. No. 28 at PageID #283–84.)  The Court rejects these arguments for the same reasons discussed in relation to absolute immunity. *See supra* Section IV.A.1.a.

rights, and (2) that this right was clearly established at the time of the violation. *See Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020); *see also Saalim v. Walmart,* 97 F.4th 995, 1003 (6th Cir. 2024); *Kerchen v. University of Michigan*, 100 F.4th 751, 761 (6th Cir. 2024). "If, taking all the facts as true and reading all inferences in the plaintiff's favor, the plaintiff has not plausibly show[n] a violation of his clearly established rights, then the [official] is entitled to immunity from suit." *Id.*; *see also Crawford v. Tilley*, 15 F.4th 752, 766 (6th Cir. 2021).

For a law to be "clearly established," it must be so clear at the time of the incident that every reasonable official would understand the unlawfulness of his conduct. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). As the Supreme Court explained:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *al-Kidd*, *supra*, at 741-42 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S. at 666. Otherwise, the rule is not one that "every reasonable official" would know. *Id.* at 664.
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the [official's] conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (*per curiam*). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff* [*v. Rickard*, 572 U.S. 765, 779 (2014)]. A rule is too general if the unlawfulness of the [official's] conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson* [*v. Creighton*, 483 U.S. 635, 641 (1987)].

*Id.* at 63-64 (cleaned up). Thus, in evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the *particular* situation that

45

[the official] confronted and ask whether the law clearly established that [his] conduct was unlawful." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020). In reading a complaint in the light most favorable to the plaintiff, it need only be "plausible" that an official's acts violated the plaintiff's clearly established constitutional right. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

As a preliminary matter, the Court agrees with Prosecutor Defendants that there is "no constitutional duty to 'do a better investigation.'" *Latta*, 221 Fed. App'x at 444; *Gavitt*, 835 F.3d at 645. But Buehner's Complaint alleges misconduct far beyond this sole allegation—including allegations of fabricating evidence, advising police, and improperly eliciting witness testimony. *See supra* Section IV.A.1.b. In *Burks v. Egeler*, 512 F.2d 221 (6th Cir. 1975), the Sixth Circuit stated that the Supreme Court had "made it clear that the Fourteenth Amendment right to due process prohibits a knowing and deliberate use by a state of perjured evidence in order to obtain a conviction." *Id.* at 224 (citing *Mooney v. Holohan*, 294 U.S. 103 (1935)); *see also Jackson*, 925 F.3d at 825. Thus, construing Buehner's allegations in the light most favorable to him, it is plausible that Prosecutor Defendants may have been involved in fabricating evidence that was material to the arrest and charging of Buehner, or that Prosecutor Defendants were involved in coercing and fabricating Price's witness testimony by "promis[ing] [Price] a plea deal" to get out of fabricated capital murder charges designed to get him to testify.[31] And such fabricated testimony, used to convict Buehner, would have violated his Fourteenth Amendment right to due process. *See Burks*, 512 F.2d at 224.

---

[31] The Court more fully addresses the allegations regarding Price's fabricated testimony below as they relate to the Officer Defendants. *See infra* Section IV.C.2.b.i.

Simply put, this analysis requires a more fully developed factual record to evaluate the issue of qualified immunity. *See Hart*, 973 F.3d at 635; *Wesley*, 779 F.3d at 433. While Buehner sets forth these general allegations in his Complaint, the exact details as to how the Prosecutor Defendants' alleged actions transpired will not be clear until discovery has concluded. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) ("Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely govern[ed] by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not."). However, at the present stage, the Court concludes that Buehner's Complaint can be plausibly read such that Prosecutor Defendants would have violated his clearly established right to be free from the knowing and deliberate use of perjured evidence to obtain a conviction.

Accordingly, the Court declines to grant qualified immunity at this stage, and instead will revisit this issue at the summary judgment stage.

### 3. Absolute Immunity for Prosecutor Defendants as to State Law Claims

The Court next turns to the parties' arguments regarding absolute prosecutorial immunity as to Buehner's state law claims.

In their Motion, Prosecutor Defendants submit that they are entitled to absolute prosecutorial immunity as to Buehner's state law claims. (Doc. No. 22 at PageID #172.) Prosecutor Defendants assert that the "Ohio rules governing prosecutorial immunity mirror the federal rule," and thus maintain that their actions "fall within their advocacy function [and] meet the requirement of being intimately associated with the judicial phase of the criminal process" such as to entitle them to immunity." (*Id.* at PageID #172–73.) Finally, Prosecutor Defendants contend that absolute immunity

47

applies to Count Six alleging "Civil Liability for Criminal Acts" because O.R.C. § 2307.60(A) "does not carve out an exception to prosecutorial immunity." (*Id.* at PageID #173.)

In his Opposition, Buehner asserts that Prosecutor Defendants are not entitled to absolute immunity for all the same reasons discussed with respect to his federal claims. (Doc. No. 28 at PageID #285–86.) Further, Buehner argues that absolute prosecutorial immunity is not available with respect to his claim under O.R.C. § 2307.60, which Buehner contends is a "broad remedial statute which does not exempt nor immunize any government conduct" and "specifically ensures that claimants can recover against state actors for violations of their constitutional rights, without exception." (*Id.* at PageID# 286.)

In their Reply, Prosecutor Defendants reiterate that prosecutorial immunity is codified under Ohio law, and thus contend that the Court should reject any arguments that immunity should be abrogated. (Doc. No. 30 at PageID #310.) Prosecutor Defendants also assert that R.C. § 2307.60 is "silent as to whether any immunities apply" to a claim under the statute, but that "such silence is dispositive" as Ohio law "clearly provides immunity to prosecutors." (*Id.* at PageID #311.)

"The Ohio rules governing prosecutorial immunity mirror the federal rules." *Beckett v. Ford*, 384 Fed. App'x. 435, 452 (6th Cir. 2010); *see also Jopek v. Cleveland*, 2010 WL 2136468, at *5 (8th Dist. May 27, 2010) ("R.C. 2744.03(A)(7) preserves the absolute immunity available to prosecutors at common law."). Just as with the federal rules, Ohio law provides absolute immunity to prosecutors "when their activities are 'intimately associated with the judicial phase of the criminal process,'" but "does not extend [absolute immunity] to a prosecutor engaged in essentially investigative or administrative functions." *Beckett*, 384 Fed. App'x. at 452.

48

Courts have applied the doctrine of absolute immunity to claims for civil liability under O.R.C. § 2307.60. *See, e.g.*, *Palomino v. Cuyahoga County*, 2022 WL 2967807 (N.D. Ohio July 27, 2022); *Hale v. Toth*, 2023 WL 5444109 (8th Dist. Aug. 24, 2023). In *Palomino*, the court concluded that the prosecutor defendants' alleged misconduct was "intimately associated with the judicial phase of the criminal process." 2022 WL 2967807, at *3. Accordingly, the court dismissed the plaintiff's state law claims against the prosecutor defendants, including two claims for "Civil Liability for Criminal Acts Under Ohio Rev. Code § 2307.60(A)(1)." *Id.* at *2, 4. Similarly, in *Hale*, the plaintiff brought claims against a police sergeant in his individual capacity under § 2307.60. 2023 WL 5444109, at *9–10. The court ultimately granted the police sergeant immunity under R.C. § 2744.03(A)(6)[32] with respect to the plaintiff's claim under § 2307.60. *See id.*

The Court declines to apply absolute prosecutorial immunity to Buehner's state law claims at this stage. As a general matter, the Court agrees with Prosecutor Defendants that absolute prosecutorial immunity *could* apply to a claim under § 2307.60 under certain facts. *See, e.g.*, *Palomino*, 2022 WL 2967807 at *4; *Hale*, 2023 WL 5444109, at *9–10. However, as explained previously, Buehner has alleged various conduct that could arguably be construed as "investigatory" in nature, such that absolute immunity would not apply. *See supra* Section IV.A.1.b. For the same reasons that application of absolute immunity is premature at this stage with regard to Buehner's

---

[32] The Court recognizes that the defendant in *Hale* was a police sergeant rather than a prosecutor. Notwithstanding this distinction, the court still granted the defendant immunity under § 2744.03(A) to defend against a claim brought under § 2307.60. The Court thus finds this distinction immaterial. Indeed, there is no reason that applying immunity to a § 2307.60 claim against an officer under § 2744.03(A)(6), which provides immunity to an employee of a political subdivision "[i]n addition to any immunity or defense referred to in division (A)(7)," would be analyzed differently than granting immunity under § 2744.03(A)(7) itself, which specifically applies to a political subdivision and an "employee who is a county prosecuting attorney."

federal claims, the Court declines to dismiss Buehner's state law claims[33] on the basis of absolute immunity at this juncture.

### 4.      Eleventh Amendment as to Claims Against Prosecutor Defendants

The Court next turns to the parties' arguments regarding the Eleventh Amendment's application to Prosecutor Defendants.

In their Motion, Prosecutor Defendants contend that Buehner's "official capacity claims against [them] are barred by the Eleventh Amendment."  (Doc. No. 22 at PageID #173.)  Prosecutor Defendants assert that Eleventh Amendment immunity bars all suits against the state, and that such "immunity extends to state officials sued in their official capacities."  (*Id.*)  In his Opposition, Buehner clarifies that he "did not raise official capacity claims against [the Prosecutor Defendants]," but rather "sued [Prosecutor Defendants] in their individual capacities only."  (Doc. No. 28 at PageID #286.)  Thus, Buehner contends that the "discussion of how courts treat official capacity claims against prosecutors is inapposite because no such claims are at issue here."  (*Id.* at PageID #287.)  In their Reply, Prosecutor Defendants do not respond to Buehner's assertions or address the Eleventh Amendment any further.  (*See generally* Doc. No. 30.)

Because Prosecutor Defendants are being sued in their individual capacities rather than in their official capacities, the Court agrees that the Eleventh Amendment is inapplicable to Prosecutor Defendants.  *See Maben v. Thelen*, 887 F.3d 252, 271 (6th Cir. 2018) ("The Eleventh Amendment, however, does not bar suits for damages against officers in their personal capacity under § 1983.");

---

[33] This includes Count Seven for malicious prosecution, as Buehner's allegations with respect to this claim extend beyond simply the decision to prosecute, but rather includes the fabrication of evidence and other misconduct that allegedly occurred prior to that decision.  *See supra* note 28.  Because such conduct could be construed as investigatory, *see supra* Section IV.A.1.b, the Court finds it premature to apply absolute prosecutorial immunity at this stage.

*Kanuszewski v. Michigan Dep't of Health and Human Servs.*, 927 F.3d 396, 413 (6th Cir. 2019) (same). Accordingly, the Court finds it unnecessary to address these arguments further.

**B.     County's Motion (Count Nine: *Monell* Claim Against the County)[34]**

The Court next turns to the County's Motion. (Doc. No. 22.)

### 1.     Whether the County Can Be Sued Under *Monell*

In its Motion, the County submits that Buehner's *Monell* claim must be dismissed because the "alleged constitutional violations were caused by agents of the State of Ohio." (Doc. No. 22 at PageID #175.) Specifically, the County asserts that "[u]nder Ohio law, a county prosecutor does not act on behalf of its employer while prosecuting a criminal defendant," but rather "acts on behalf of the State." (*Id.*) Accordingly, the County maintains that it is not the proper party and should be dismissed from this lawsuit." (*Id.* at PageID #176.)

In his Opposition, Buehner contends that the County can be sued under *Monell* where the *Monell* claim "relates to a pattern and practice involving the prosecutor's office." (Doc. No. 28 at PageID #287.) Buehner asserts that the "County maintained an official policy that caused its individual prosecutors to violate his rights." (*Id.*) Further, Buehner clarifies that a "*Monell* claim alleging that the County's official policy of civil rights violations caused a wrongful conviction is actionable under § 1983 against the County" because Buehner "alleges that the County's official policies caused the violations of his rights" rather than "seek[ing] to hold the County liable through individual prosecutors' bad acts." (*Id.* at PageID #288.) Accordingly, Buehner contends that he has pled a proper *Monell* claim against the County. (*Id.* at PageID #290–91.)

---

[34] *See supra* note 17.

In its Reply, the County maintains that "city prosecutors are considered state officials under Ohio law when they are 'responsible for prosecuting state criminal charges.'" (Doc. No. 30 at PageID #312.)  The County thus contends that Prosecutor Defendants' "conduct cannot have established a county policy, unconstitutional or otherwise."  (*Id.* at PageID #313.)  Next, the County asserts that at the time of Buehner's trial, "Ohio law gave local prosecutors no discretion to withhold exculpatory evidence from criminal defendants," and that "[w]here county officials are sued simply for complying with state mandates that afford no discretion, they act as an arm of the State." (*Id.* at PageID #314.) Finally, the County submits that even if Buehner can prove the existence of a custom, policy, or practice of the County, he has failed to "show that someone acting on behalf of the County violated his constitutional rights" because Prosecutor Defendants were never "acting on behalf of the County." (*Id.* at PageID #315.)

It is well established that a municipal entity may not be sued for injuries inflicted solely by its employees or agents under § 1983.  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978).  *See also Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015); *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014); *Heyerman v. County of Calhoun*, 680 F.3d 642 (6th Cir. 2012).  Rather, a plaintiff may only hold a municipal entity liable under § 1983 for the entity's own wrongdoing. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*.") (citing *Monell*, 436 U.S. at 692–94).  Or, as the Sixth Circuit explained, "a municipality is liable under § 1983 only where, 'through its deliberate conduct,' it was 'the 'moving force' behind the injury alleged.'"  *D'Ambrosio*, 747 F.3d at 388-389 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (citation omitted).

52

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  To properly allege a municipal liability claim, a plaintiff must adequately allege "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  *See also D'Ambrosio*, 747 F.3d at 386.  Moreover, a plaintiff must show a "direct causal link between the custom and the constitutional deprivation; that is, she must show that the particular injury was incurred because of the execution of that policy." *Doe v. Claiborne Cnty., Tenn. By. & Through Claiborne Cnty. Bd of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996) (internal quotation marks omitted); *see also Baynes*, 799 F.3d at 621; *Fair v. Franklin Cnty., Ohio*, 2000 WL 659418 at *3 (6th Cir. May 11, 2000) ("Monell requires that a plaintiff identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy."); *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir. 1993) (same).

The Court finds that Buehner is not prevented from pursuing a *Monell* claim against the County (to the extent that he is able to properly allege such a claim under one of the four bases described above) solely because his allegations involve Prosecutor Defendants' pursuit of criminal charges against him.  In *Connick*, the Supreme Court evaluated a *Monell* claim brought against a district attorney's office with respect to the "failure-to-train" prosecutors with respect to *Brady*

violations.[35]  563 U.S. at 59.  While the Supreme Court ultimately concluded that the plaintiff's

evidence was insufficient to demonstrate a pattern of deliberate indifference on the facts of that case,[36]

it nonetheless intimated that the plaintiff could have succeeded on his claim had he been able to prove

"that, absent additional specified training, it was 'highly predictable' that the prosecutors in his office

would be confounded by those gray areas and make incorrect *Brady* decisions as a result."  *Id.* at 71.

    While the County cites numerous cases dismissing *Monell* claims involving prosecutor

misconduct, the Court finds such cases to be distinguishable because those cases involve allegations

that the prosecutor's conduct *established* the municipal policy or custom, rather than the prosecutor's

conduct having been taken *pursuant* to existing policy or custom.  *See e.g.*, *Cady v. Arenac County*,

574 F.3d 334 (6th Cir. 2009); *Pusey v. City of Youngstown*, 11 F.3d 652 (6th Cir. 1993).

    In *Cady*, the court evaluated a *Monell* claim against Arenac County based on the county

prosecutor making "decisions related to the issuance of state criminal charges against [the plaintiff],

the entry of the [deferred prosecution agreement], and the prosecution of [the plaintiff]."  574 F.3d at

345.  Specifically, the plaintiff alleged that the county prosecutor was a "decisionmaker" under

*Monell*, and thus, that his actions with respect to the plaintiff "demonstrat[ed] … policy or custom."

*Id.*  The court concluded that in prosecuting the plaintiff, the county prosecutor was "acting as an

agent of the state rather than of Arenac County," and thus declined to find that such actions could

---

[35] The plaintiff in *Connick* also asserted a claim that the *Brady* violation was caused by an unconstitutional policy of the district attorney's office.  563 U.S. at 57.  Notably, that claim survived all the way to trial, but was ultimately rejected by the jury on the facts of that specific case.  *See id.*  Thus, the Supreme Court focused its analysis on the plaintiff's alternate theory of *Monell* liability as to the district attorney's "deliberate indifference to an obvious need to train the prosecutors in his office in order to avoid such constitutional violations."  *Id.*

[36] Specifically, the Supreme Court concluded that courts overturning "four convictions because of *Brady* violations by prosecutors in [district attorney's] office" over a ten-year period was insufficient to put the district attorney on notice that the office's *Brady* training was inadequate, and that the plaintiff's case "[did] not fall within the narrow range of 'single-incident' liability" hypothesized in *Canton v. Harris*, 489 U.S. 378 (1989).  *See Connick*, 563 U.S. at 62–63, 71.

constitute a "single act by a 'decisionmaker possess[ing] final authority to *establish* municipal policy …'" *Id.* (emphasis added).  Critically, however, the court indicated that the plaintiff "did not allege any Arenac County policy or custom, apart from [the county prosecutor's] actions, that violated his rights." *Id.*

Similarly, in *Pusey*, the court evaluated a *Monell* claim against the City of Youngstown seeking to hold it liable for "inadequate training of its prosecutor and through its acquiescence in the policy or custom which deprived the plaintiff of her rights."  11 F.3d at 659.  The court concluded that the prosecutor "was acting on behalf of the state when she prosecuted state criminal charges." *Id.*  Again, however, the court highlighted that the "[p]laintiff failed to allege any unconstitutional City policy or custom in her complaint." *Id.*  Although the plaintiff argued on summary judgment that the prosecutor's "failure to notify plaintiff may have been pursuant to an unconstitutional custom of the City," the court, citing to the prosecutor's unrefuted affidavit, found that "[t]he plaintiff suggested no facts to support a custom of failing to notify victims." *Id.*  In other words, just as in *Cady*, the court's conclusion simply reiterated the well-established rule that a "municipality is not liable under [§ 1983] for its employees' acts on a respondeat superior theory" without establishing some greater municipal policy or custom. *Id.*

Indeed, this distinction is demonstrated by the Sixth Circuit's opinion in *D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014).  In *D'Ambrosio*, the plaintiff sued both the prosecutor involved in his case (in his individual capacity) as well as Cuyahoga County. *Id.* at 386.  The court first addressed the plaintiff's argument that the prosecutor was a "policymaking official" of Cuyahoga County with respect to the decisions made in plaintiff's prosecution. *Id.*  In this regard, the court concluded that the "[prosecutor's] conduct cannot have *established* a county policy, unconstitutional

or otherwise," because he was acting as an agent of the state when prosecuting the plaintiff.[37]  *Id.* (emphasis added).

Nonetheless, the plaintiff also argued that his complaint identified a separate "unconstitutional county policy."  *Id.*  Specifically, the plaintiff "argu[ed] not that the prosecutors themselves established a policy of treating criminal defendants unconstitutionally, but that they were simply acting in accordance with a preexisting and ubiquitous county practice that can fairly be deemed to have originated with or at some point been adopted by the municipality."  *Id.*

Although this second argument also ultimately failed, it did so not because a municipality could never be sued under *Monell* for a prosecutor's actions during a case—but rather for pleading deficiencies.  *See id.* at 387–89.  The court found that the plaintiff's allegations were "insufficient to plausibly allege the existence of an official county policy of violating criminal defendants' constitutional rights."  *Id.* at 387.  In so holding, the court explained that the "thrust of the complaint is that [the prosecutor]—and perhaps one or two other members of the Prosecutor's Office—instigated and implemented habitually unconstitutional practices, not that they were following municipal policy in doing so."  *Id.*  Further, even construed as asserting a municipal custom of "inaction" in the face of prosecutors' habitually unconstitutional conduct, the complaint failed to allege a "clear and persistent" office-wide pattern but rather was "limited to allegations regarding the

---

[37] The Court observes that *Cady*, *Pusey*, and *D'Ambrosio* all appear to address the narrow exception under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), for establishing municipal policy based on a single decision or act by a municipal policymaker.  *See Cady*, 574 F.3d at 345 ("A single act by a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action ordered' may suffice in demonstrating that policy or custom.") (citing *Pembaur*, 475 U.S. at 481); *Pusey*, 11 F.3d at 659 (similar); *D'Ambrosio*, 747 F.3d at 386 (similar).  These types of cases generally involve allegations that the actions of the *specific* prosecutors involved in prosecuting the plaintiff's case *established* or *created* municipal policy solely based on their actions in the case.  However, as explained further below, Buehner is not alleging that Prosecutor Defendants "created" County policy through their actions while prosecuting him, but rather that they acted *pursuant* to already-established County policy.

56

repeated failures of only one prosecutor." *Id.* at *387–88.  The court also concluded that under *Connick*, the minimal number of violations was not enough to put the county on "notice or constructive notice" of habitually unconstitutional conduct sufficient to allege "deliberate ignorance" to the need for a policy change. *Id.* at 388.

Accordingly, the court determined that "[b]y focusing almost exclusively on the conduct of [the prosecutor]," the plaintiff was "improperly attempting to impose liability upon the county simply because the municipality hired one 'bad apple'" rather than because of any larger municipal policy or custom. *Id.* at 389 (internal quotation marks omitted).  The court's holding, while ultimately ruling against the plaintiff for pleading deficiencies, thus recognized that a *Monell* claim—under the right circumstances—can be brought against a municipality where prosecutorial misconduct occurs *pursuant* to some municipal policy or custom.

Such is the case here.  The County argues that, under *D'Ambrosio*, Prosecutor Defendants' conduct during Buehner's prosecution "cannot have established a county policy."  (Doc. No. 30 at PageID #313.)  That contention misconstrues Buehner's claim.  In this instance, Buehner does not argue that Prosecutor Defendants themselves were "policymakers" for the County, or that their actions while prosecuting him "created" or "established" County policy as a result.  Rather, Buehner alleges that Prosecutor Defendants' actions were "undertaken *pursuant* to policies, practices, and customs of the County and the Cuyahoga County Prosecutor's Office … [which] were approved, encouraged, and/or ratified by County policymakers with final policymaking authority."  (Doc. No. 1 at PageID #46.)  In other words, Buehner alleges that Prosecutor Defendants were "acting in accordance with a preexisting and ubiquitous county practice that can fairly be deemed to have originated with or at some point been adopted by the municipality."  *D'Ambrosio*, 747 F.3d at 387;

57

*see also Estate of Andrews v. City of Cleveland, Ohio*, 112 F.4th 436, 443 (6th Cir. 2024) ("But a city will face liability under § 1983 if it implements an unconstitutional policy that causes a *Brady* violation.").  If Buehner has adequately pled facts to support that claim,[38] such a theory could support liability against the County.[39]

Other decisions within this circuit support this conclusion.  *See, e.g.*, *Jackson v. City of Cleveland*,[40] 586 F. Supp.3d 737 (N.D. Ohio 2022), *rev'd on other grounds*,[41] 64 F.4th 736 (6th Cir. 2023).  In *Jackson*, the plaintiff brought a *Monell* claim against Cuyahoga County based on the "specific 'policies, practices and customs' of the County and the prosecutor's office" of directing members of the Cleveland police to not disclose exculpatory police reports and files in response to public records requests.[42]  586 F. Supp.3d at 752.  The court declined to dismiss the claim at the

---

[38] The Court discusses each of the specific *Monell* theories alleged by Buehner further below.  *See infra* Section IV.B.2.

[39] The County also argues that former County Prosecuting Attorney John T. Corrigan acted as an arm of the state in the creation of any alleged "evidentiary policy in the context of criminal prosecutions" because "Ohio law gave local prosecutors no discretion to withhold exculpatory evidence from criminal defendants."  (Doc. No. 30 at PageID #314.) The Court addresses this argument further below in its discussion of whether Buehner has adequately pled a *Monell* claim. *See infra* Section IV.B.2.a.

[40] To avoid confusion, the Court pauses to note that there exists two separate lines of case law titled "*Jackson v. City of Cleveland*."  One set of cases involves the wrongful conviction of Ricky Jackson, while the other line of cases involves the wrongful conviction of Charles Jackson.  For clarity, any references to these cases will be accompanied by a citation.

[41] In *Jackson*, the district court's opinion addressed claims against both the prosecutor in the case and against Cuyahoga County.  Following the denial of her motion to dismiss, the prosecutor immediately appealed the case to the Sixth Circuit, which subsequently reversed the district court's decision as to the claims against her.  *See Jackson v. City of Cleveland*, 64 F.4th 736 (6th Cir. 2023).  However, the Sixth Circuit did not address the *Monell* claim brought against Cuyahoga County, which the district court had declined to dismiss at the 12(b)(6) stage.  *See Jackson v. City of Cleveland*, 586 F. Supp.3d 737 (N.D. Ohio 2022).  Rather, the *Monell* claim against Cuyahoga County proceeded to discovery, and was later dismissed upon joint stipulation of the parties.  *See Jackson v. City of Cleveland*, Docket No. 1:21-cv-01679, Doc. No. 99 (N.D. Ohio Nov. 21, 2023).

[42] The plaintiff's *Monell* claim against Cuyahoga County was brought in relation to the prosecutor's actions taken during the plaintiff's prosecution.  *See Jackson*, 586 F. Supp.3d at 752.

motion to dismiss stage, finding that the plaintiff had "sufficiently [pled] the existence of an official policy."[43] *Id.*

Therefore, for the foregoing reasons, the Court concludes that the County is not blanket-exempt from all *Monell* claims solely on the basis that a prosecutor "act[s] as an agent of the state" while prosecuting a criminal defendant. *D'Ambrosio*, 747 F.3d at 386.

### 2. Whether Buehner has Plausibly Pled a *Monell* Claim Against the County

Having concluded that the County is not automatically immune from being sued under *Monell* in relation to prosecutorial policies or customs, the Court next turns to whether Buehner has plausibly pled his *Monell* claim.

As explained previously, a plaintiff can allege a *Monell* claim in one of four ways: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or

---

[43] As explained previously, both *Jackson*, 586 F. Supp.3d at 752, and the present case differ from *Cady*, *Pusey*, and *D'Ambrosio* because in those cases, the plaintiff attempted to show that the specific prosecutors in their case "established" policy through their actions in prosecuting the case, rather than pointing to any widespread already-established county policy. The Court's independent research further underscores this distinction. Indeed, the numerous district courts within the Sixth Circuit that have dismissed similar *Monell* claims were faced with the situation presented in *Cady*, *Pusey*, and *D'Ambrosio*, where a prosecutor's actions in prosecuting a specific case were said to have "established" policy. *See, e.g.*, *Pinkney v. Berrien County*, 2021 WL 9316105, at *6 (W.D. Mich. July 20, 2021) ("[Plaintiff] has not alleged there is any separate policy or practice attributable to Berrien County that resulted in the deprivation of his constitutional rights."); *Gavitt v. Ionia County*, 67 F. Supp.3d 838, 860–61 (E.D. Mich. Dec. 15, 2014) (rejecting argument that the individual prosecutors "craft[ed] [county] policies that resulted in continued constitutional deprivations" through their repeated actions in specific prosecutions because such allegations were equivalent to holding a municipality liable on a *respondeat superior* theory); *Briner v. City of Ontario*, 2010 WL 3982755, at *24 (N.D. Ohio Oct. 7, 2010) ("However, even where the municipal liability is based upon the acts of a prosecutor, a plaintiff must still establish that the prosecutor's actions were pursuant to an unconstitutional policy or custom.") (citing cases); *Collins v. Deegan*, 49 Fed. App'x 571, 573 (6th Cir. 2002) (similar); *Wallace v. County of Calhoun*, 2010 WL 1494771, at *6–7 (W.D. Mich. Apr. 14, 2010) (similar); *Phillips v. City of Cincinnati*, 2019 WL 2289277, at *11 (S.D. Ohio May 29, 2019) ("Plaintiffs do not identify any existing, unconstitutional policy of Hamilton County. The only potentially unconstitutional policies alleged by Plaintiffs are the City's Encampment Policy and the State Court Order – neither of which are Hamilton County policies.") (emphasis in original). None of these cases involve the situation presented here—in which a plaintiff makes allegations of a prior established county policy *pursuant* to which the prosecutor later acted.

supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess*, 735 F.3d at 478; *see also D'Ambrosio*, 747 F.3d at 386.

Notably, the Supreme Court has instructed that federal courts should not "apply a heightened pleading standard more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure" to *Monell* claims alleging municipal liability under section 1983. *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993)). Thus, when evaluating a *Monell* claim on a motion to dismiss, "the *Iqbal* plausibility requirement is not to be relaxed." *Rolen v. City of Cleveland*, 2013 WL 12145960, at *3 (N.D. Ohio Aug. 7, 2013) (citing cases).

Here, Buehner maintains that he has pled a *Monell* claim under all four theories described above.[44] (Doc. No. 28 at PageID #291.) The Court will address each theory, below.

### a. Illegal Official Policy and Ratification by Final Decision-Making Authority

The Court first begins with the first and second *Monell* theories of liability: the existence of an illegal official policy and ratification of illegal decisions by an official with final decision-making authority.

_____

[44] In the County's Motion, it only addresses the second and fourth theories for asserting *Monell* liability. (*See* Doc. No. 22.) In his Opposition, Buehner maintains that he has actually alleged *Monell* liability under all four theories, and that the County thus waived arguments as to the first and third theories by not raising them in its Motion. (Doc. No. 28 at PageID #291.) In its Reply, the County responds that it has not waived any arguments that Buehner inadequately pled the first and third theories and that Buehner's Complaint did not clearly allege these theories. (*See* Doc. No. 30 at PageID #317 ("Defendants have waived nothing, and Plaintiff should have drafted a better complaint.").) In light of the confusion regarding which theories Buehner was alleging in his Complaint, the Court declines to automatically deny the County's Motion as to the first and third theories, and instead will evaluate these theories alongside the second and fourth theories.

In its Motion, the County asserts that the Corrigan Letter cannot serve as a basis for *Monell* liability because Corrigan was not a final policymaker for the County.[45]  (Doc. No. 22 at PageID #177.)  The County contends that Corrigan was a state policymaker and not a county policymaker under Ohio law, and thus, any such policy cannot be attributable to the County.  (*Id.* at PageID #177–78.)  Further, the County argues that Ohio law affords prosecuting attorneys no discretion in the disclosure of exculpatory evidence.  (*Id.* at PageID #179.)

In his Opposition, Buehner contends that he has pled that a final policymaker for the County ratified the *Brady* violations at issue and that an illegal official policy existed.  (Doc. No. 28 at PageID #291.)  Buehner maintains that the "County Prosecutor c[an] establish county policy under appropriate circumstances."  (*Id.*)  Thus, Buehner asserts that he has alleged that the County's official policy of violating the *Brady* rule in criminal investigations and prosecutions began with a written letter from County Prosecutor Corrigan, and that Corrigan and future officeholders maintained it and ratified the *Brady* violations routinely committed pursuant to it.  (*Id.* at PageID #291–92.)  Next, Buehner argues that the Corrigan Letter can establish policy because his *Monell* claim is "not against any prosecutor himself" acting as an agent of the state during a prosecution, "but rather challenges County policies that Corrigan initiated and that the office and its policymakers have maintained ever since."  (*Id.* at PageID #292.)  Finally, Buehner contends that the "Sixth Circuit has held this very letter could establish a policy under *Monell*."  (*Id.*)

---

[45] The County also argues that Buehner has failed to attach the Corrigan Letter to his Complaint.  (Doc. No. 22 at PageID #177.)  In response, Buehner contends that he is not required to attach the letter because a "Rule 12 motion does not test evidence, only pleadings," and that the parties are not at summary judgment.  (Doc. No. 28 at PageID #292.)  The Court finds Buehner's argument well-taken and agrees that the Corrigan Letter need not have been attached to the Complaint.

61

In its Reply, the County reiterates that the Corrigan Letter was not the moving force behind any alleged constitutional violations.  (Doc. No. 30 at PageID #318.)  The County first contends that Buehner misconstrues the Sixth Circuit's previous evaluation of the Corrigan Letter, because: (i) the County was not a party in *Jackson*, and thus, "county" policy was not being established; (ii) the letter was incorporated into a broader Cleveland policy (GPO 19-73) which was a "formal rule" "promulgated by Cleveland"; and (iii) the policy at issue involved a police department providing evidence to defense counsel rather than a prosecutor.  (*Id.* at PageID #318–19.)  Finally, the County asserts that *Jackson* is inapplicable based on the distinction between a prosecutor's duty to know and adhere to the rules of criminal procedure as compared to a police officer.  (*Id.* at PageID #320.)

As a preliminary matter, the Court agrees that the context in which the Sixth Circuit evaluated the Corrigan Letter in *Jackson* is distinguishable from the present case.  925 F.3d at 828.  Accordingly, the Court will independently evaluate the relevance of the Corrigan Letter within this specific context.

Both the first and second theories of *Monell* liability "are based on the illegality of the municipal law, policy, or practice at issue—whether ordinances, other official enactments, or the appropriate official's ratification."  *Jackson*, 622 F. Supp.3d 636, 641 (N.D. Ohio Aug. 18, 2022) (citing cases).  "When proceeding under the first theory of *Monell* liability, under which a plaintiff must show an official policy or legislative enactment, the plaintiff must show that there were 'formal rules or understandings—*often but not always committed to writing*—that were intended to, and did, establish fixed plans of actions to be followed under similar circumstances consistently and over time.'"  *Jackson*, 925 F.3d at 829 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)) (alterations omitted) (emphasis in original); *see also id.* at 830 ("[A] city may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written …").

As for the second theory of liability, "[t]he actions of a single official can only create liability for the local government where that official has final policymaking authority." *Gomez v. City of Memphis, TN*, 2023 WL 7287100, at *7 (6th Cir. Aug. 4, 2023) (citing *Tlapanco v. Elges*, 969 F.3d 638, 658 (6th Cir. 2020)).  "Whether an individual is a final policymaker for purposes of § 1983 liability is a question of state or local law, and a showing of policymaking authority typically requires specific evidence that the official's decisions were not subject to review or that the official could set policy related to broad goals." *Tlapanco*, 969 F.3d at 658.

In a recent opinion, the Sixth Circuit reiterated that "Ohio law states that final decision-making authority is vested in the county prosecuting attorneys …"[46] *Smith v. Silvernail*, 2025 WL 80370, at *11 (6th Cir. Jan. 13, 2025).  In *Smith*, the plaintiff had been wrongfully convicted in a criminal case brought by one of the county's assistant prosecutor attorneys. *Id.* at *1–2.  The plaintiff later brought a *Monell* claim against the county, alleging that the assistant prosecutor attorney had final policymaking authority, and that the assistant prosecutor's actions in his prosecution established policy. *Id.* at *10–11.  The Sixth Circuit rejected this argument, however, because it concluded that the plaintiff had "not identified any Ohio statute that vests policymaking authority in *assistant* prosecutors." *Id.* at *11 (emphasis added).  Rather, the court found that under Ohio law, "final decision-making authority is vested in the county *prosecuting* attorneys."[47] *Id.* (emphasis added).

---

[46] The Sixth Circuit references the Ohio Revised Code to support this conclusion, and the Court has found nothing to suggest that this was not the case at the time the Corrigan Letter was drafted.

[47] This conclusion is further supported by the Sixth Circuit's discussion regarding the assistant prosecutor's "ascension to the office of Fairfield County Prosecuting Attorney" eleven years later. *See Smith*, 2025 WL 80370, at *10–11.  The plaintiff alternatively argued that the assistant prosecutor in his case later became the county prosecutor and thus "ratified his own [previous] conduct by opposing [the plaintiff's] post-trial efforts to obtain a new trial." *Id.* at *10.  The Court rejected this theory, however, solely because the municipality's actions had to have been "the *moving force* behind the violation," and thus, the assistant prosecutor's "later conduct as County Prosecutor [in 2011] cannot have been the moving force behind his Brady violations in 2000." *Id.* at *11.  Nonetheless, this discussion suggests that had the County

63

The Court concludes that County Prosecutor John T. Corrigan, as the County Prosecuting Attorney, could have established County policy as a final decision-maker for the County.  Buehner's Complaint alleges that Corrigan, in his letter, created a policy that "prosecutors not disclose certain 'evidence favorable to the defendant,' including 'reports' made by 'police departments' and 'statements made by witnesses.'"  (Doc. No. 1 at PageID #31.)  Buehner further alleges that such policy "continued after Corrigan's tenure, into the 1990s, the 2000s, when the Prosecutor Defendants withheld and destroyed exculpatory evidence in violation of Plaintiff's rights."  (*Id.* at PageID #32.) These allegations are sufficient at this preliminary stage to plausibly allege a policy that was the "moving force" behind Buehner's prosecution.  (*See* Doc. No. 1 at PageID #12 (Buehner's allegations regarding similar types of information being withheld in his case, including "the identities of … witnesses who possessed exculpatory information").)

The County's arguments to the contrary are unavailing.  First, the Court is not convinced that, Corrigan could not have created County policy simply because a prosecutor acts on behalf of the state while prosecuting a case.  As explained above, Buehner is not contending that Corrigan created policy *through* actions taken in any specific prosecution, but instead that he created policy in his capacity as the County Prosecutor, a policymaking official under Ohio law.  *See Smith*, 2025 WL 80370, at *11; *see also Smith v. Silvernail*, 2024 WL 665571, at *10 (S.D. Ohio Feb. 16, 2024) (recognizing that the responsibility of being "the 'final policymaker' for the County with respect to *Brady* issues" lies with

_____

Prosecutor *back in 2000* ratified similar conduct which thus became the "moving force" behind the violations at-issue, that could have supported a claim for *Monell* liability.

the County Prosecutor).[48]  Such policy need not have been the product of formal legislation, as "formal rules or understandings—*often but not always committed to writing*," are sufficient.  *Jackson*, 925 F.3d at 829; *see also Jackson*, 586 F. Supp.3d at 752 (finding that plaintiff sufficiently pled the "existence of an official policy" of the prosecutor's office and that such "unwritten policy, practice, or custom was well established").  The Court also rejects the argument that the Corrigan Letter could not have been part of the "moving force" in Buehner's litigation years later.  Buehner alleges that the Corrigan Letter merely *established* such policy, but that the County has continued to maintain such policy until the present day.  Such an allegation is sufficient at this stage.  *See, e.g.*, *Jackson*, 586 F. Supp.3d at 753 ("In the current procedural posture, Plaintiff as the non-moving party enjoys the benefit of the inference that such conduct occurring in more than one case amounted to a persistent and widespread policy, practice, or custom.").[49]  Finally, the Court rejects the County's argument that Corrigan could not have created illegal official policy or ratified illegal conduct simply because there is "no discretion" to commit a *Brady* violation under Ohio law.[50]

---

[48] *See also Whitfield v. Muskingum County, Ohio*, 2024 WL 4227040, at *8 (S.D. Ohio Sept. 18, 2024) ("[I]n Ohio, a county prosecutor has final decision-making authority with regard to the operation of their offices and discharge of their duties.") (citing cases); *Phillips*, 2019 WL 2289277, at *11 (same).

[49] Moreover, Buehner has alleged numerous examples of cases to this effect, indicating that these cases are only a few examples of the widespread policy.  (Doc. No. 1 at PageID #30–36.)  The Court declines to find at this early stage that such examples are not sufficient to proceed past the motion to dismiss stage.

[50] In support of this argument, the County compares two cases to demonstrate that whether an official acts on behalf of the municipality as opposed to the state depends on if they had discretion.  *See Brotherton v. Cleveland*, 173 F.3d 552 (6th Cir. 1999); *Ermold v. Davis*, 936 F.3d 429 (6th Cir. 2019).  In *Brotherton*, the court evaluated whether a coroner functioned as an agent of the state versus the county with respect to a policy of corneal harvesting.  *See* 173 F.3d at 555–58.  The court determined that "[w]here county officials are sued simply for *complying* with state mandates that afford no discretion, they act as an arm of the State."  *Id.* at 566.  Thus, the court concluded that the coroner was acting on behalf of the county, because while Ohio law allowed him to harvest corneas, it did not dictate a method.  *Id.*  Two decades later, in *Ermold v. Davis*, the court revisited the issue and reached the opposite conclusion.  936 F.3d at 434–35.  There, the court encountered a county clerk who refused to issue marriage licenses, despite Kentucky statutes requiring county clerks to "issue marriage licenses to eligible couples."  *Id.* at 435.  The court distinguished the case from *Brotherton*, contending that the plaintiffs "conflate[d] discretion with insubordination."  *Id.*  Because "Kentucky controls every aspect of how

Accordingly, the Court finds that Buehner, at this preliminary stage, has plausibly alleged a claim for relief under the first and second *Monell* theories of liability.

---

county clerks issue marriage licenses," the court concluded that "if a county official acting on the State's behalf fails to do her job, that failure [does not] transform[] the source of her power from the State to the county." *Id.* at 434–35.

The County argues that the present case is analogous to *Ermold* (rather than *Brotherton*) because prosecutors have no discretion to withhold exculpatory evidence from criminal defendants. (Doc. No. 30 at PageID #314.)  Thus, because Ohio law requires prosecutors to turn over exculpatory evidence, the County asserts that County officials would be treated as an arm of the state even when they blatantly disregard state law, because the law "only attributes a county official's acts to their county when state law affords some discretion, and the official uses that discretion." (*Id.*)  Accordingly, the County contends that it cannot be sued even if the Corrigan Letter created an illegal policy because Corrigan did not have "discretion" to create policy that blatantly disregarded Ohio law and thus acted on behalf of the state. (*Id.*)

The Court finds *Ermold* and *Brotherton* distinguishable from the present case.  First, as Buehner notes, these cases involved official capacity claims against individuals who sought to invoke sovereign immunity—which is distinguishable from the present case against the County based on actions taken pursuant to its own alleged policies.

Moreover, the Court finds the "state mandates" in *Brotherton* and *Ermold* to be distinguishable from the present case. Here, the "state mandate" that the County asserts applies is that Ohio law does not allow prosecutors to withhold exculpatory evidence—citing to and relying upon an Ohio Supreme Court case remanding for a new trial where a *Brady* violation occurred.  (Doc. No. 30 at PageID #314–15.)  But the mere fact that Ohio courts have determined that doing something would be illegal does not mean that any county which creates an official policy to act illegally would automatically be exempt from *Monell* liability under the guise of acting contrary to a "non-discretionary" "state mandate." Indeed, this would be a slippery slope, as the first *Monell* theory in-fact *requires* an "*illegal* official policy." *Burgess*, 735 F.3d at 478 (emphasis added).  Thus, under the County's view, the fact that an act is illegal—such as a *Brady* violation—would mean that any official policy permitting such illegal act would really be a state policy, because the County would not have "discretion" to permit that illegal act.  But following that rationale, a municipality could *never* be sued for an "illegal official policy" because there is *never* discretion to "act illegally" under state law if the term "discretion" is defined merely as not taking illegal action.

In other words, the County's reasoning would mean that the mere fact that an illegal policy is illegal under state law— obviously so, as no "illegal" act is permissible under law by definition—requires such policy to be construed under *Ermold* as a failure to comply with a non-discretionary state mandate, which would thus prohibit *Monell* liability as to that policy. Simply put, this line of reasoning would effectively eliminate the first *Monell* theory of liability against municipalities. The Court is not convinced to adopt such a drastic reading of *Ermold*—indeed, the Sixth Circuit just recently reiterated that "Ohio law states that final decision-making authority is vested in the county prosecuting attorneys" and suggested that a *Monell* claim against a county would survive if the county prosecutor had ratified *Brady* violations committed by assistant prosecutors.  *See Smith*, 2025 WL 80370, at *10–11.

Accordingly, the Court finds that a "state mandate" requiring a county clerk to issue marriage licenses pursuant to statute is distinguishable from an illegal official policy that happens to run contrary to the "due process right of the defendant under the Fourteenth Amendment to a fair trial"—i.e., a *Brady* violation—as to the issue of "discretion."  *Ermold*, 936 F.3d at 435; *State v. Johnston*, 529 N.E.2d 898, 911 (Ohio 1988).  This conclusion is consistent with the case law previously discussed in this Opinion, which has either explicitly held or suggested that a municipality can be liable under *Monell* for illegal official policies under the right circumstances.  *See supra* Section IV.B.1; *see also Andrews*, 112 F.4th at 443 ("But a city will face liability under § 1983 if it implements an unconstitutional policy that causes a *Brady* violation.").

### b.  Policy of Inadequate Training or Supervision

The Court next turns to the third *Monell* theory of liability: the existence of a policy of inadequate training or supervision.

In his Opposition, Buehner contends that he has pled that the "County's failure to train and supervise its prosecutors caused violations of the *Brady* rule."  (Doc. No. 28 at PageID #291.) Buehner further asserts that the County did not address this theory in its Motion and thus "forfeited the argument."  (*Id.*)

In its Reply, the County asserts that it has not waived any argument because the Complaint did not clearly allege this theory.  (Doc. No. 30 at PageID #317.)  However, the County contends that to the extent Buehner proceeds under this theory, his failure-to-train claim fails for two reasons.  (*Id.*) First, the County argues that Buehner "did not allege with any level of clarity" that Prosecutor Defendants were inadequately trained.  (*Id.*)  Second, the County asserts that the Supreme Court has held that "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training" because attorneys are trained in law and must satisfy continuing-education requirements."[51]  (*Id.* at PageID #318.)

Under the third *Monell* theory of liability, a plaintiff can "seek to establish that a municipality followed an unofficial custom of inadequately training or supervising the employees who caused the harm."  *Gambrel v. Knox County, Kentucky*, 25 F.4th 391, 408 (6th Cir. 2022).  To do so, "the Supreme Court has required plaintiffs to prove two demanding elements."  *Id.* (citing *Bd. of Cnty.*

---

[51] On this point, the County indicates that Prosecutor Defendants "went to law school and kept up on their continuing legal education credits."  (Doc. No. 30 at PageID #318.)  Buehner alleges nothing to the contrary in his Complaint.  (*See generally* Doc. No. 1.)

*Comm'rs of Bryan Cnty. V. Brown*, 520 U.S. 397, 405 (1997)).  First, "a municipality must have acted with 'deliberate indifference' to the fact that its inadequate training or supervision would lead its agents to violate constitutional rights."  *Id.*  "To show this deliberate indifference, a plaintiff must prove that the violation of a clearly established right was a 'known or obvious consequence' of the lack of training or supervision."  *Id.* (citing *Connick*, 563 U.S. at 61).  "This standard usually requires proof that a municipality's employees engaged in a 'pattern of similar constitutional violations' separate from the conduct that harmed the plaintiff."  *Id.*  Second, "a municipality's improper training or supervision must have 'actually caused' the plaintiff's injury."  *Id.*  "This element requires proof of causation from the common law of torts: but-for (or factual) causation and proximate causation."  *Id.*

The Sixth Circuit has noted that "[m]unicipalities generally have no duty to provide their legal personnel with adequate training."  *Orta v. Repp*, 2023 WL 8525590, at *3 (6th Cir. Dec. 8, 2023) (citing *Connick*, 563 U.S. at 64–67).  This is because "lawyers … receive this knowledge through a 'regime of legal training and professional responsibility' overseen by law schools, state bars, and professional organizations."  *Connick*, 563 U.S. at 64–67.  For example, the Supreme Court has found that to prove deliberate indifference, a plaintiff needed to show that the district attorney "was on notice that, absent additional specified training, it was 'highly predictable' that the prosecutors in his office would be confounded by [*Brady's*] gray areas and make incorrect *Brady* decisions as a result," and that it "was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights."  *Id.* at 71.

The Court finds that Buehner has failed to allege both requirements described above.  First, a review of Buehner's Complaint reveals no allegations regarding the failure-to-train prosecutors on

*Brady* violations.[52]  Further, Buehner fails to overcome the high bar of alleging a failure-to-train claim against prosecutors, particularly considering the Supreme Court's acknowledgment that prosecutors already undergo a "regime of legal training and professional responsibility" and have "continuing-education requirements."  *Connick*, 563 U.S. at 65–67; *see also Orta*, 2023 WL 8525590, at *3.  Second, Buehner also fails to allege that improper training or supervision "actually caused" his injury.  *Gambrel*, 25 F.4th at 408–09.  Specifically, Buehner does not allege that Prosecutor Defendants were inadequately trained or supervised, or that their alleged misconduct was the result of inadequate training or supervision.  *Id.*; *see also Jackson*, 586 F. Supp.3d at 753.  In short, "[t]his particular allegation is wholly lacking in factual support, as Rule 8 requires."  *Jackson*, 586 F. Supp.3d at 753.

Accordingly, the Court concludes that Buehner has failed to state a *Monell* claim under a theory of inadequate training or supervision.

### c.  Custom of Tolerance or Acquiescence

Finally, the Court turns to the fourth *Monell* theory of liability: the existence of a custom of tolerance of or acquiescence to federal rights violations.

In its Motion, the County submits that Buehner cannot establish that the County has a custom or practice of withholding exculpatory evidence.  (Doc. No. 22 at PageID #179.)  First, the County contends that "ten instances, spanning multiple decades" is insufficient to demonstrate a "persistent" and "widespread" "County-wide policy to suppress exculpatory evidence."[53]  (*Id.* at PageID #180.)

---

[52] Buehner's Complaint contains numerous allegations involving training as to the City's alleged municipal policy with respect to its officers. (*See generally* Doc. No. 1 at PageID #19–29, 47–48.)  However, Buehner does not allege the same with respect to the County's alleged municipal policy regarding *Brady* violations.  Rather, the allegations of the Complaint associated with claims of *Monell* liability against the County focus on the other three *Monell* theories of liability.

[53] The County also challenges an eleventh case cited by Buehner, *see Andrews v. City of Cleveland*, No. 22-cv-250 (N.D. Ohio Apr. 20, 2023), because the court there concluded that the plaintiff's attempt to amend its complaint against

69

The County asserts that this small sample of cases are "an insignificant fraction of the vast number of cases handled by the Cuyahoga County Prosecutor's office" and thus merely represent "isolated instances that cannot be linked to a broader scheme." (*Id.*)  Further, the County argues that Buehner's attempt to place *Monell* liability upon it by alleging that the County had an "ongoing pattern of withholding criminally exculpatory evidence in public records requests after trials" fails because "Ohio law at the time classified investigatory work product and trial preparation material as non-public records." (*Id.* at PageID #181.)

In his Opposition, Buehner maintains that he has sufficiently pled that the County maintained a custom of tolerance to *Brady* violations so persistent that it made the misconduct he suffered predictable.  (Doc. No. 28 at PageID #292.)  Buehner asserts that in referencing a "dozen specific examples of wrongful conviction cases," he "pleaded this was a non-exhaustive list" and "alleged that the County's custom was so entrenched for so long that it caused the violations at issue here." (*Id.* at PageID #293.)  Buehner thus rejects the County's characterization of these examples as a "handful," arguing that the County is "top ten in the entire nation" for wrongful convictions and that "[t]here are still more wrongful convictions that are not yet uncovered." (*Id.*)  Accordingly, Buehner contends that at this stage, he "need not prove [the custom], but only allege it." (*Id.*)

In its Reply, the County reiterates that Buehner has failed to plead the "existence of a clear and persistent pattern." (Doc. No. 30 at PageID #321.)  The County also contends that Buehner has failed to allege that "the County knew or should have known the alleged misconduct was illegal or

---

Cuyahoga County was "futile" given that no details were provided surrounding the alleged violations or how they were "connected to the policies or training that Cuyahoga County failed to implement."  (Doc. No. 22 at PageID #179–80.)  Further, the County asserts that Buehner cannot rely on numerous other cases because they did not specifically address or establish the existence of a County-wide policy of suppressing exculpatory evidence.  (*See id.* at PageID #180.)

unconstitutional," and that this lack of notice is fatal.[54]  (*Id.*)  Thus, the County argues that Buehner has failed to sufficiently plead the first two elements under this theory.  (*Id.*)

"To sustain a *Monell* claim and hold a municipal entity liable for a custom of tolerance or acquiescence, a plaintiff must show: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation."  *Wallace v. Coffee County, Tennessee*, 852 Fed. App'x. 871, 876 (6th Cir. 2021); *see also D'Ambrosio*, 747 F.3d at 387–88.

The Court finds that Buehner has sufficiently pled the first two elements challenged by the County.[55]

First, at this stage, Buehner has sufficiently alleged the existence of a clear and persistent pattern of illegal activity.  According to Buehner, the County "maintained a policy that prosecutors not disclose certain evidence 'favorable to the defendant,' including 'reports' made by 'police departments' and 'statements made by witnesses.'"  (Doc. No. 1 at PageID #30.)  Buehner alleges that County prosecutors, pursuant to such policy, "regularly withheld and/or suppressed exculpatory evidence" from the 1970s through Buehner's prosecution and beyond.  (*Id.* at PageID #31.)  To

---

[54] On this point, the County argues that only one of the instances identified by the Complaint "involve[d] a court questioning prosecutorial conduct *prior* to their trial in 2001," and that "one case over a three-decade period" was not enough to place the County on notice.  (Doc. No. 30 at PageID #321.)

[55] The County does not explicitly challenge the third and fourth elements with respect to this particular theory under *Monell*.  (*See* Doc. No. 30 at PageID #321 ("Plaintiff fails to sufficiently plead the first two elements.").)  To the extent that the County does challenge these other elements, the Court finds that Buehner has plausibly alleged that the County's alleged custom was the "moving force" behind his constitutional deprivation, and that the County's deliberate indifference in their failure to act amounted to a policy of inaction.  (*See* Doc. No. 1 at PageID #30–37.)

71

demonstrate this, Buehner cites to numerous examples of cases where exculpatory evidence was withheld, including but not limited to "police reports" and "witness statements."  (*See id.* at PageID #31–34.)  Importantly, Buehner alleges that these cited cases are "mere examples," and that other cases involving similar misconduct exist.  (*Id.* at PageID #34.)  At the pleading stage, this is sufficient. *See Jackson*, 586 F. Supp.3d at 753.

Second, Buehner has also sufficiently alleged notice or constructive notice on the part of the County.  In his Complaint, Buehner alleges that this custom of misconduct began with the Corrigan Letter, which instructed prosecutors not to disclose certain evidence favorable to the defendant, and "continued after Corrigan's tenure" into the 1990s and 2000s.  (Doc. No. 1 at PageID #30–31.)  As such, the County would have had "notice" of this alleged custom of misconduct because such custom was set into motion by the County itself, beginning during Corrigan's tenure and continuing after. (*See id.*)  In other words, it is not simply the cases cited in Buehner's Complaint that put the County on notice—rather, according to Buehner, the County explicitly instructed its prosecutors to take such actions.  (*See id.* at PageID #30.)  Unlike *D'Ambrosio*, which found that "[t]he county cannot have tacitly approved an unconstitutional policy of which it was unaware," Buehner here maintains that the County itself triggered the custom through its explicit instructions to the prosecutors.  747 F.3d at 388.  Accordingly, taking Buehner's allegations as true, the County must have had "notice" of a custom that *it* put into effect pursuant to explicit instructions from the County Prosecutor.

The County's arguments to the contrary are unconvincing.  First, the Court rejects the argument that Buehner has not pled a "persistent" and "widespread" policy.  The cases cited as examples by Buehner are pled as a non-exhaustive list, and "[i]n the current procedural posture, [Buehner] as the non-moving party enjoys the benefit of the inference that such conduct occurring in

more than one case amounted to a persistent and widespread policy, practice, or custom." *Jackson*, 586 F. Supp.3d at 753. Next, the Court disagrees with the County's assertion that Buehner cannot rely on certain cases merely because those cases themselves did not "establish the existence of a County-wide policy of suppressing exculpatory evidence." (Doc. No. 22 at PageID #180.) Buehner does not reference these cases to show that other courts have *recognized* such a County-wide policy—rather, Buehner references these cases to demonstrate *examples* of the alleged County-wide policy that Buehner maintains existed.[56] To be sure, Buehner will bear the burden of producing evidence on summary judgment to support his allegations. However, at this early stage, the Court concludes that Buehner has met his burden to survive 12(b)(6) dismissal.

As a final note, the Court agrees with the County regarding Buehner's allegations of the County's "ongoing pattern of withholding exculpatory evidence in public records requests after trials." (Doc. No. 22 at PageID #181.) The Sixth Circuit recently addressed this issue and concluded that a "reasonable official could conclude that … they had no special obligation to provide

_____

[56] For example, the County contends that Buehner cannot rely on *Andrews v. City of Cleveland*, 2023 WL 2607081 (N.D. Ohio Mar. 23, 2023), to support his claim that the County has a policy or practice of withholding exculpatory evidence. Again, however, Buehner does not attempt to rely on *Andrews* as having *recognized* that a County policy existed—rather, Buehner merely includes *Andrews* as one of many examples showcasing such misconduct.

Moreover, the circumstances in which the court in *Andrews* denied the plaintiff's motion to amend to add Cuyahoga County to the complaint are distinguishable from the present case. In *Andrews*, the plaintiff sought leave to amend his complaint to include a *Monell* claim against the County. However, the plaintiff's proposed amended complaint only included the following allegation as to the County: "[Cuyahoga County did not] implement sufficient policies or training on reliance on profoundly flawed investigations, fabricated and suppressed evidence, engaging in unconstitutional investigatory, non-advocacy functions, and overlooking and acting in concern and conspiracy with police misconduct, even though the need for such policies and training was obvious." *Andrews*, 2023 WL 2607081, at *7. Based on this single paragraph, the court determined, correctly so, that the plaintiff "[did] not provide any details surrounding the alleged violations or show how they are connected to the policies or training that Cuyahoga County arguable failed to implement." *Id.* Here, by contrast, Buehner has alleged: (i) the alleged misconduct taken by Prosecutor Defendants pursuant to County policy; and (ii) details surrounding the creation of such policy. (*See* Doc. No. 1 at PageID #12–13, 30–37.) Given these stark pleading differences, the Court declines to interpret *Andrews* as having concluded that the County does not have a policy or practice of withholding exculpatory evidence.

exculpatory information outside of ordinary state procedures for obtaining postconviction relief." *Jackson v. City of Cleveland*, 64 F.4th 736, 752 (6th Cir. 2023). This was particularly true in light of the Supreme Court having "held that defendants do not have a *Brady* right to exculpatory evidence in the postconviction context." *Id.* As such, it was not "clearly established that redacting exculpatory information from a response to a public-records request constituted 'actions that effectively cover-up evidence' and thus actions that violate the right of access to the courts." *Id.* Moreover, and notably, Buehner does not address this argument in his Opposition. (*See* Doc. No. 28.) Accordingly, to the extent that Buehner raises a claim that the County has a custom of "withholding criminally exculpatory evidence in public records requests after trials," (*see* Doc. No. 1 at PageID #34), that claim is dismissed.

Accordingly, for the foregoing reasons, the Court finds that Buehner has sufficiently pled a claim under three of the four methods *Monell* provides for pursuing liability on the part of the County.

**C.    Officer Defendants' Motion (Counts One through Eight, Eleven)**

The Court next turns to the Officer Defendants' Motion. (Doc. No. 27.)

**1.    Threshold Issues**

Before turning to the arguments specific to each particular claim, the Court first addresses the threshold issues generally applicable to Buehner's claims.[57]

---

[57] In addition to qualified immunity and group pleading, Buehner asserts that many of Officer Defendants' arguments (and the City's arguments) are based upon misreading the Complaint. (Doc. No. 31 at PageID #342.) The Court finds that these concerns are better addressed on a claim-by-claim basis and will address them as such.

### a. Qualified Immunity

As a preliminary matter, the Court briefly addresses the issue of qualified immunity.  In their Motion, Officer Defendants contend that they are entitled to qualified immunity with respect to Buehner's claims.[58]  (*Id.* at PageID #239, 244, 250–52, 255, 259, 264–65, 268.)  In his Opposition, Buehner argues, among other things, that under Sixth Circuit precedent "'it is generally inappropriate' to find an officer is entitled to qualified immunity at the 'early' stage of Rule 12 briefing" and that the issue is better addressed at summary judgment.[59]  (Doc. No. 31 at PageID #338–39.)

As explained previously, the Court concludes that it is appropriate to address the issue of qualified immunity at this stage.  *See supra* Section IV.A.2.a.  Accordingly, the Court will address the doctrine on a claim-by-claim basis as raised by the parties.

### b. Group Pleading

Next, the Court turns to the parties' dispute regarding "group pleading."

Throughout their Motion, Officer Defendants assert that Buehner has engaged in impermissible "group pleading."  (*See, e.g.*, Doc. No. 27-1 at PageID #251, 259, 261.)  Specifically, Officer Defendants contend that Beaman and Hasan are entitled to judgment on the pleadings because Buehner "fails to allege specific individual and independent actions by Beaman and Hasan," and thus fails to plausibly allege a claim under *Iqbal*.  (*Id.* at PageID #251.)

---

[58] Contrary to Buehner's assertions, the Court declines to find at this juncture that Officer Defendants have failed to preserve the issue of qualified immunity.  (*See, e.g.*, Doc. No. 27-1 at PageID #244 (noting that in the alternative to Buehner failing to have plausibly alleged a constitutional violation, "[Officer Defendants] have qualified immunity").)  As explained below, the Court will address qualified immunity to the extent that it is raised in connection with each claim.

[59] Officer Defendants do not respond to Buehner's assertions in their Reply.  (*See generally* Doc. No. 36.)

In his Opposition, Buehner maintains that there is no "group pleading" defect in the Complaint. (Doc. No. 31 at PageID #341.) Buehner asserts that such pleading is permissible "[w]here a small group of officers committed wrongdoing together," and that Buehner "need not plead which officer committed precisely which *part* of a deprivation of rights." (*Id.*) In this case, Buehner argues that "Beaman and Hasan worked in tandem, wrote reports together, conducted identifications together, and were jointly responsible for this investigation," while "Petkac supervised and approved all those actions." (*Id.* at PageID #342.) Thus, Buehner asserts that each officer is on notice of the personal allegations against him. (*Id.*)

When asserting a constitutional violation under § 1983, "[e]ach defendant's liability must be assessed individually based on his own actions." *Fazica v. Jordan*, 926 F.3d 283, 289 (6th Cir. 2019); *Batson v. Hoover*, 788 Fed. App'x. 1017, 1020 (6th Cir. 2019). However, the Sixth Circuit has consistently held in the summary judgment context that "where a plaintiff who was unable to identify clearly which officers committed specific acts during the incident produces evidence that places an individual defendant in a small group of officers that committed allegedly unconstitutional acts within each other's presence, the plaintiff's claim against that defendant may survive summary judgment." *Fazica*, 926 F.3d at 292; *Batson*, 788 Fed. App'x. at 1020. This is because "[p]laintiffs who are unable to pinpoint precisely which named defendant did what, even where the defendants did not intentionally conceal their identities, still have an interest in the vindication of their constitutional rights." *Fazica*, 926 F.3d at 293. Thus, while "the victim must ultimately carry her burden to prove each defendant's individual liability by a preponderance of the evidence at trial," a plaintiff may survive summary judgment even if "unable to definitively identify which officer committed allegedly

unconstitutional acts … [if] he introduces sufficient evidence to place the officer at the scene." *Id.*; *Batson*, 788 Fed. App'x. at 1020.

The Court finds that Buehner's Complaint adequately places Hasan and Beaman on notice of the allegations against them. First, Buehner alleges that Hasan and Beaman were partners and jointly "directed the investigation as the lead detectives." (Doc. No. 1 at PageID #5.) Buehner further alleges that Hasan and Beaman conducted the investigation together in numerous respects, including interviewing witnesses and bringing suspects into custody. (*Id.* at PageID #5–11.) Thus, even if "unable to pinpoint precisely which [officer]"—i.e., Hasan or Beaman—did what during the joint investigation and joint interviews, Buehner has limited his allegations to a "small group of officers that committed allegedly unconstitutional acts within each other's presence." *Fazica*, 926 F.3d at 292. Additionally, this case is still at the motion to dismiss stage, which affords Buehner even more leniency than at the summary judgment stage. *See Thompson v. Jenkin*, 2022 WL 3705002, at *4 (W.D. Ky. Aug. 26, 2022).

The Court also finds Officer Defendants' authority to be distinguishable. *See Robertson v. Univ. of Akron School of Law*, 2022 WL 1836922 (6th Cir. 2022). In *Robertson*, the court evaluated allegations that grouped multiple deans at a university and four officers all together to assert a § 1983 claim. *Id.* at 3. The court concluded that the complaint "grouped defendants together in such a way that it failed to place individual defendants on notice of their liability." *Id.* Specifically, the allegations did not "connect specific facts or events with the cause[] of action [the plaintiff] assert[ed]," and instead broadly alleged that "[d]efendant individuals … under color of state law, violated [the plaintiff's] federally protected rights, privileges, and immunities …" *Id.* Here, however, Buehner's allegations are specific to the investigation jointly conducted by partners Hasan and

Beaman, including witness interviews that were jointly conducted, and alleges specific facts or events related to the alleged violations.  (*See, e.g.*, Doc. No. 1 at PageID #5–11.)  This is not a situation like *Robertson* where the defendants—who did not even hold the same job positions—could not have been on notice of their liability.  While Buehner must "ultimately carry [his] burden to prove each defendant's individual liability by a preponderance of the evidence at trial," he has met his low burden at this stage as to Hasan and Beaman.  *Fazica*, 926 F.3d at 293.

Finally, the Court addresses the allegations related to Petkac's involvement as differentiated from Hasan and Beaman.  In Buehner's Complaint, the only allegations directly naming Petkac are those appearing under Count Eleven[60] for Supervisory Liability, and paragraph 24 alleging that "Petkac was the Lieutenant over Hasan and Beaman who approved and signed off on their reports of the investigation … [and] knew about and approved all of Hasan and Beaman's misconduct described in this Complaint."[61]  (Doc. No. 1 at PageID #5, 48–49.)  Unlike Hasan and Beaman, whose liability is based on their alleged constitutional violations committed while jointly directing the investigation, Petkac's alleged liability appears to be premised on his role supervising Hasan and Beaman.  (*See id.*)  Buehner's Opposition confirms this as he does not contest Officer Defendants' assertions that Petkac was not involved in the misconduct directly[62]—rather, Buehner argues that for supervisory liability to attach, Petkac need not have been "physically present for every moment of every bad act his underlings committed" and instead simply must have "knowingly" "approved" the "conduct of the

---

[60] *See supra* note 1.

[61] Unlike Petkac, Hasan and Beaman are named extensively throughout the Complaint with respect to their personal involvement in each step of the investigation.  (*See generally* Doc. No. 1 at PageID #4–11.)

[62] (*See, e.g.*, Doc. No. 27-1 at PageID #250 ("The Complaint fails to allege that Petkac was involved in creating or administering any of the photo arrays or lineups.").)

offending subordinate." (Doc. No. 31 at PageID #349–50.) Accordingly, to the extent that Buehner uses the term "Officer Defendants" throughout his Complaint, the Court construes that term as alleging Petkac's liability only under a supervisory theory (as described in the allegations specific to Petkac) rather than as alleging that Petkac himself was present alongside Hasan and Beaman and directly engaging in the violations himself.

Accordingly, the Court declines to dismiss Buehner's claims for "group pleading." However, with respect to Petkac, the Court will evaluate his liability solely under the supervisory theory pled under Count Eleven. *See infra* Section IV.C.10.

### 2.  Count One: Unduly Suggestive Identification

The Court next turns to Count One alleging unconstitutional identification procedures.

### a.  Whether Claim is Actionable Under § 1983[63]

The Parties first dispute whether Buehner's claim for unduly suggestive identification is actionable under § 1983 in light of recent precedent.

---

[63] The Court acknowledges the parties' dispute regarding the manner in which this issue was raised. Specifically, in their Motion, Officer Defendants contend that an "unduly suggestive identification of a criminal suspect is not, in and of itself, a constitutional violation actionable under Section 1983," and assert that it is the "right to a fair trial, and it is only the violation of that core right and not the prophylactic rule that should be actionable under § 1983." (Doc. No. 27-1 at PageID 244–45.) Officer Defendants also included a footnote citing *Vega v. Tekoh*, 597 U.S. 134 (2022), for the proposition that a violation of the *Miranda* rules does not provide a basis for a claim under § 1983. (*Id.* at PageID #245.) In his Opposition, Buehner argues that his right to a fair trial was violated. (Doc. No. 31 at PageID #343–45.) However, in their Reply, Officer Defendants then more fully discuss *Vega*, seemingly arguing that the rule regarding unduly suggestive identification procedures is a prophylactic rule and that following *Vega*, a plaintiff "may not sue officials under section 1983 for that violation." (Doc. No. 36 at PageID #388.) This led to Buehner filing a Motion for Surreply, in which Buehner seeks to address this "new[] argu[ment] that there is no such thing as a suggestive identification claim at all." (Doc. No. 39.) The Officer Defendants responded with an Opposition to Motion for Surreply, contending that this argument was always raised in their original Motion. (Doc. No. 50.) The Court will consider all of the arguments, including those contained in Buehner's Motion for Surreply and in Officer Defendants' Opposition thereto.

In their Motion, Officer Defendants argue that "even if the photographic lineups were unnecessarily suggestive, the flawed lineups do not violate a constitutionally protected interest sufficient to merit damages under Section 1983." (Doc. No. 27-1 at PageID #245.) In a footnote, Officer Defendants reference a recent Supreme Court decision, *Vega v. Tekoh*, 597 U.S. 134 (2022), which concluded that a violation of *Miranda*—a prophylactic rule—does not provide a basis for a claim under § 1983. (*Id.* at PageID #245.) Officer Defendants also assert that the "rule regarding unduly suggestive identification procedures 'is a prophylactic rule' …" (*Id.*) In their Reply, Officer Defendants expand on this argument, asserting that *Vega* instructs that a plaintiff may seek to suppress evidence obtained in violation of a "prophylactic trial right," but "they may not sue officials under section 1983 for that violation." (*Id.*)

In his Opposition, Buehner contends that "[p]olice are liable for an unconstitutional witness identification procedure if they 'should have known that the use of the identification would lead to a violation of [the plaintiff's] right to a fair trial." (Doc. No. 31 at PageID #343.) In his Surreply, Buehner asserts that *Vega*'s holding does not extend to suggestive identification claims, and that Sixth Circuit cases since *Vega* have continued to allow § 1983 actions for unduly suggestive identifications. (Doc. No. 39 at PageID #406.) Buehner also argues that none of the Officer Defendants' authorities "stand for the proposition that when a suggestive identification procedure interferes with the right to a fair trial, this is not actionable." *Id.*

The Sixth Circuit recently reiterated that "suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Ramsey v. Rivard*, 110 F.4th 860, 868–69 (6th Cir. 2024) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006)).

"It is true that an unduly suggestive identification does not, in and of itself, violate constitutional rights."  *Salter v. City of Detroit*, 133 F.4th 527, 540 (6th Cir. 2025) (citing *Gregory*, 444 F.3d at 747).  "But the admission at trial of such an identification, unless harmless, can violate a criminal defendant's core due process rights."  *Id.*; *see also Gregory*, 444 F.3d at 746 ("Plaintiff has a due process right which includes the right to be free from unduly suggestive and unreliable identification procedures.").

Notwithstanding the Supreme Court's decision in *Vega*, the Sixth Circuit has continued to permit plaintiffs to bring § 1983 actions based on unduly suggestive identifications used at trial.  *See Ramsey*, 110 F.4th at 869 (denying qualified immunity regarding § 1983 claim for unduly suggestive identification); *Salter*, 133 F.4th at 542 (same).  While the Sixth Circuit has recently, in a concurring opinion, questioned whether "recent Supreme Court precedent fatally undermines 42 U.S.C. § 1983 suits based on unduly suggestive identification procedures," *see Salter*, 133 F.4th at 542 (Nalbandian J., concurring), it has not formally departed from its longstanding rule that a plaintiff may bring a §1983 claim based on unduly suggestive identifications that were used at trial.[64]  *See, e.g., Gregory*, 444 F.3d at 746–47.

The Court finds that Buehner is not barred under *Vega* from pleading a § 1983 claim based on unduly suggestive identifications.  While the Court recognizes the recent scrutiny of this result as set forth in Judge Nalbandian's concurrence, *see Salter*, 133 F.4th at 542, "this Court is bound by Sixth Circuit precedent."  *West Bend Mutual Ins. Co. v. Osmic, Inc.*, 2024 WL 2784341, at *7 n.10 (N.D.

---

[64] The Court acknowledges that the plaintiff in *Salter* did not raise the argument that suggestive identification is a prophylactic trial measure.  However, the fact remains that binding Sixth Circuit precedent, as it currently stands, continues to permit plaintiffs to bring § 1983 claims for unduly suggestive identifications.

Ohio May 30, 2024) (Barker, J.). And as the law stands today, Sixth Circuit precedent mandates a finding that Buehner is not barred from attempting a claim under § 1983. The Court does not find it appropriate to depart from this longstanding rule to instead conclude, as Officer Defendants insist, that the only "appropriate remedy is one at trial: exclusion of wrongfully obtained evidence." (Doc. No. 50 at PageID #689.)

Nor is the Court convinced by Officer Defendants' argument that it is "prosecutors who introduce evidence at trial and judges who decide what evidence to admit, not police officers." (*Id.*) Indeed, Officer Defendants point to a recent Seventh Circuit case that rejected police officer liability for this very reason. *See Blackmon v. Jones*, 2025 WL 869045, at *3 (7th Cir. Mar. 20, 2025). Yet Officer Defendants fail to acknowledge that the Sixth Circuit, a mere one day later, held just the opposite. *See Salter*, 133 F.4th at 541 n.4 (citing *Gregory*, 444 F.3d at 747) ("The prosecutor's decision to use the identification does not shield [the officer] from liability if he reasonably should have known that use of the identification would lead to a violation of Plaintiff's right to a fair trial."); *see also Ramsey*, 110 F.4th at 869 ("Nor does the prosecutor's decision to move forward shield [the police sergeant] from liability.").

Accordingly, the Court finds that Buehner is not prohibited, as a matter of law, from bringing a § 1983 claim based on unduly suggestive identifications that were used at trial.

### b. Whether Buehner Has Pled Unduly Suggestive Identification

The Court next turns to whether Buehner has adequately pled his unduly suggestive identification claim.

In their Motion, Officer Defendants argue that Buehner has failed to state a suggestive identification claim. (Doc. No. 27-1 at PageID #244.) Officer Defendants contend that an unduly

suggestive identification is not, in and of itself, a constitutional violation actionable under § 1983, but that the constitutional violation is that the plaintiff's "right to a fair trial was impaired" by such unreliable identification.[65]  (*Id.* at PageID #244–45.)  Officer Defendants thus assert that a complaint must allege that the identification procedure was: (i) unduly suggestive; (ii) unreliable; and (iii) resulted in a criminal defendant not having a fair trial.  (*Id.* at PageID #246.)  According to Officer Defendants, Buehner has failed to allege all three requirements.  (*Id.* at PageID #246–50.)

In his Opposition, Buehner contends that he has sufficiently alleged that Officer Defendants violated his right to a fair trial using coercive witness identification tactics.  (Doc. No. 31 at PageID #343.)  Buehner does not appear to dispute the three requirements described above.[66]  (*Id.*)  Rather, Buehner maintains that his Complaint clearly pleads all of them.  (*See id.* at PageID #343–45.)

The Court will address each requirement, below.

### i.  Unduly Suggestive

The first issue is whether Buehner has alleged that Officer Defendants' identification procedures were unduly suggestive.

In their Motion, Officer Defendants contend that it is not unduly suggestive for the same suspect to appear in multiple arrays.  (Doc. No. 27-1 at PageID #246.)  On this point, Officer Defendants submit that it was "not unduly suggestive for Buehner to appear in a photo array and then

---

[65] Officer Defendants appear to assert this argument in the alternative to their above contention that, in light of *Vega*, a claim for unduly suggestive identification can never be brought under § 1983.  *See supra* Section IV.C.2.a.

[66] Buehner characterizes the test as a "two-part analysis," listing the first and second requirements described above.  (Doc. No. 31 at PageID #343.)  However, Buehner also relies on *Gregory*, which recognized that "the prosecution's use of the identification at trial is a necessary intervening act for injury to occur and liability for any party to attach."  444 F.3d at 747.

a physical lineup." (*Id.*)  Next, Officer Defendants assert that Buehner's remaining allegations fail under *Iqbal*.  (*Id.* at PageID #247.)  For example, Officer Defendants argue that Buehner's allegations of other men being "different heights and ages" and not "look[ing] like [him]" fail because "[n]o one looks exactly like Buehner" and "many people are" different in height and age.  (*Id.*)  Similarly, Officer Defendants contend that Buehner's allegations of "coercion," "threats," and "coaching" during the identifications are conclusory.  (*Id.* at PageID #247–48.)

In his Opposition, Buehner maintains that he "does not solely allege that the lineup procedures police used were unlawfully suggestive, but also that the officers affirmatively manipulated Lawone Edwards's and Randy Price's identifications."  (Doc. No. 31 at PageID #344.)  Specifically, Buehner contends that Officer Defendants "show[ed] Lawone a photo spread and then an in-person lineup of which only [Buehner] was a repeat appearance, months after the crime, while threatening, when he already had multiple prior conflicting descriptions of the shooter, and he could not choose [Buehner] until forced," all of which made the identification unreliable.  (*Id.*)  Moreover, Buehner points to his allegations that Officer Defendants "conducted the Price and Lawone identifications solely through coaching, bullying, promising deals on trumped-up charges, and inventing a third-party tape recording to manipulate their statements."  (*Id.*)  Buehner thus argues that "threatening and bribing witnesses to identify accused persons from a lineup" is sufficient to state a claim.  (*Id.* at PageID #345.)   Finally, Buehner asserts that his allegations regarding "different heights and ages," "coercion," "coaching," and "threatening" are sufficiently pled, and that Officer Defendants "seek to falsely heighten the Rule 12 standard."  (*Id.* at PageID #342, 344–45.)

In their Reply, Officer Defendants do not address Buehner's assertions regarding the alleged coercion and improper tactics used during the identifications.[67] (Doc. No. 336 at PageID #388.)

When analyzing a suggestive identification claim, courts first "assess whether the identification procedure was 'unnecessarily suggestive.'" *Salter*, 133 F.4th at 538 (citing *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007)). "A pretrial identification procedure is unduly suggestive if it 'steered the witness to one suspect or another, independent of the witness's honest recollection.'" *Ramsey v. Rivard*, 694 F. Supp.3d 955, 988 (E.D. Mich. 2023) (citing *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001)). Courts have indicated that an officer fabricating and coercing testimony can be actionable under § 1983. *See, e.g.*, *Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993) (indicating that a cause of action under § 1983 based solely[68] on unduly suggestive identifications might be stated in extraordinary circumstances, "such as coercion or other police misconduct"); *Jackson*, 925 F.3d at 814–15; *see also Howard v. Collins*, 2025 WL 429916, at *8 (6th Cir. Feb. 7, 2025) (discussing denial of qualified immunity as to allegations of fabricated and coerced confessions) (citing cases).

The Court finds that Buehner has sufficiently alleged an unduly suggestive identification. Indeed, Buehner's allegations extend beyond simply the methodology of the identification procedures

---

[67] Officer Defendants instead argue that Price knowing Buehner as his cousin rendered his identification reliable. (Doc. No. 36 at PageID #388–89.) The Court addresses this in its discussion regarding unreliability. *See infra* Section IV.C.2.b.ii.

[68] Importantly, the Court in *Hutsell* evaluated this issue even where the suggestive identification was never used at trial, as the plaintiff was never tried criminally. 5 F.3d at 1005. And even then—without the right to a fair trial being implicated—the Sixth Circuit indicated that "coercion or other police misconduct" could support a cause of action under § 1983 based solely on the unduly suggestive identification obtained improperly. *Id.* In this case, Buehner's case is much stronger than *Hutsell* because he not only alleges coercion or police misconduct, but also alleges that such unconstitutional identification procedures "caused a violation of Plaintiff's due process rights and interfered with his right to a fair trial." (Doc. No. 1 at PageID #38.)

used, i.e., his repeat appearance or the differing depictions of other individuals in the lineup. Rather, Buehner alleges that Officer Defendants actively coerced the identifications.[69] (*See* Doc. No. 1 at PageID #9–10.) For example, Buehner alleges that when "Lawone could not choose someone" out of the lineup, "Hasan coached him to identify [Buehner]" and "threatened Lawone to obtain the identification of [Buehner], making clear that Lawone needed to choose [Buehner] and say that he was positive about the identification." (*Id.*) Similarly as to Price, Buehner alleges that Officer Defendants "[fabricated] a tape … [and] represented [to Price that it] was a recorded witness statement inculpating [Price] and Buehner in the shooting," "charged [Price] with capital murder, without probable cause, as though he was the shooter" despite Price having "maintained his innocence through multiple interviews so far," and proceeded to "promise[] [Price] a plea deal with a much shorter sentence if he said he was there and identified [Buehner] as the shooter." (*Id.* at PageID #10.) It is difficult to imagine a scenario that more drastically "steer[s] the witness to one suspect or another, independent of the witness's honest recollection.'" *Ramsey*, 694 F. Supp.3d at 988 (citing *Wilson*, 250 F.3d at 397).

Moreover, the Court rejects Officer Defendants' argument that Buehner's allegations are conclusory and finds that the cases cited by Officer Defendants are distinguishable. For example, in *Mauceri v. Rubinton*, 20010 WL 286641, at *2 (S.D.N.Y. Jan. 15, 2010), the complaint did not contain the allegation of coercion. Instead, the assertion only appeared in the plaintiff's opposition brief, and the fact section did not even mention the defendant's name. *Id.* The sole allegation came from a one sentence allegation in the brief that the defendant at-issue "coerced accident victims …

---

[69] Buehner further alleges that "both Lawone and Randy completely recanted their inculpatory testimony in sworn affidavits," and that at Buehner's retrial, "Lawone Edwards testified as to how Hasan and Beaman coerced his testimony." (Doc. No. 1 at PageID #15–16.)

into requesting qualifying information from DMVs prohibited by DPPA from providing it."  *Id.*  The

court found, rightfully so, that this was conclusory and "not entitled to the assumption of truth."[70]  *Id.*

Similarly, Officer Defendants cite to *U.S. v. Watson*, 540 Fed. App'x. 512, 516 (6th Cir. 2013), for

the proposition that "coaching" is permissible.  That case, however, merely involved an instruction

that the array "may or may not contain a picture of the person who committed the crime now being

investigated."  *Id.*  In fact, the court expressly found that "[n]o evidence in the record suggests that

[the detective] attempted to influence [the witness's] selection."  *Id.*  Whereas here, "attempting to

influence [the witness's] selection" is precisely what Buehner alleges.[71]

Accordingly, the Court finds that Buehner provides sufficient detail at this early stage, as set

forth above, regarding the Officer Defendants' alleged misconduct in securing the identifications.

### ii.    Unreliable

Next, in their Motion, Officer Defendants assert that even if the identification process was

unduly suggestive, the identifications were nonetheless reliable under the five *Biggers* factors.  (Doc.

No. 27-1 at PageID #248–49.)   In his Opposition, Buehner references the alleged coercion and

misconduct involved in securing such identifications, *see supra* Section IV.C.2.b.i, and submits that

"such practices alone are sufficient to render the lineup procedures unreliable."  (Doc. No. 31 at

---

[70] Officer Defendants similarly cite to *El Mokhamad v. Kelly*, 2018 WL 488953 (E.D. Mich. Jan. 19, 2018).  There, the "crux of Plaintiffs' argument [was] that [the plaintiff] was coerced into withdrawing her I-130 petition."  *Id.* at *3.  Aside from this, however, the "complaint lack[ed] any factual basis necessary to support such a legal conclusion."  *Id.*  The present case is distinguishable, in that Buehner has alleged that such coercion occurred by way of threats following Lawone's initial inability to identify Buehner, and by "inventing a third-party tape recording to manipulate their statements" and "promising [Price] deals on trumped up charges."

[71] Additionally, the Court notes that in *Watson*, the Sixth Circuit evaluated the denial of a motion to suppress which thus required an evaluation of evidence in the record, whereas here, Buehner is entitled to have his Complaint construed "in the light most favorable to [him] as the non-moving part[y]."  *DG Gas, LLC v. TA Franchise Systems LLC*, 2025 WL 814928, at *1 n.1 (N.D. Ohio Mar. 14, 2025) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009)).

PageID #344–45.)  In their Reply, Officer Defendants argue that Price's "suggestive identification" was reliable based on his familiarity with Buehner as his cousin, and that such identification alone was sufficient to support a criminal conviction.  (Doc. No. 36 at PageID #388–89.)

As a general matter, courts evaluate the reliability of a suggestive pre-trial identification by considering five factors: (1) the witness's opportunity to view the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the witness's level of certainty; and (5) the length of time between the crime and the identification.  *See Steiner v. King*, 2023 WL 11758789, at *2 (6th Cir. Nov. 20, 2023).

These factors, however, are not relevant here because Buehner does not allege that Lawone and Price's identifications are unreliable simply because of some risk of misidentification—e.g., based on the witness's faulty memory, inattentiveness, or view of the crime.  Rather, Buehner alleges that the identifications were unreliable as the product of coercion and threats.  *See supra* Section IV.C.2.b.i.  If a witness is threatened or coerced into making a false identification, that identification is unquestionably unreliable.

Officer Defendants miss the mark.  In both their Reply and Response to Plaintiff's Citation of Supplemental Authority, they focus on the fact that Price was Buehner's cousin, arguing that "the chance of misidentification from a … suggestive photo display is virtually non-existent" because it is unlikely for Price to have misidentified someone he knew closely.  (Doc. No. 36 at PageID #388–89; *see also* Doc. No. 59 at PageID #776.)  That is beside the point.  Buehner alleges that Price was coerced into providing a false identification, under threat of false criminal charges corroborated by a fabricated recording.  (Doc. No. 1 at PageID #10.)  Additionally, Buehner alleges that Price has since "completely recanted [his] inculpatory testimony in [a] sworn affidavit[]."  (*Id.* at PageID #15.)  These

88

allegations have nothing to do with how intimately Price knew Buehner or how likely it was that Price would have misidentified Buehner by mistaking him for someone else.

Accordingly, the Court concludes that Buehner has alleged that Lawone and Price's identifications were unreliable.

### iii.    Violating Right to Fair Trial

Finally, in their Motion, Officer Defendants argue that even if Lawone's identification was unduly suggestive and unreliable, there was no impact on the trial's outcome because Price's testimony—as Buehner's cousin—was independently sufficient to convict.  (Doc. No. 27-1 at PageID #249–50.)  Specifically, Officer Defendants assert that "[a] conviction may rest solely on the testimony of a single witness," and that "[b]ecause Price testified against Buehner, even if [Lawone's] identification was flawed, it did not impact the outcome of the trial."[72]  (*Id.* at PageID #250.)

In his Opposition, Buehner contends that the "unreliable witness identifications demonstrably affected his right to a fair trial."  (Doc. No. 31 at PageID #345.)  Buehner indicates that the "state's entire case relied upon these two witnesses," and that "[e]ven at the original trial, jurors questioned each witness's testimony."  (*Id.*)  Buehner also argues that "[a]fter [Lawone and Price] recanted, the retrial jury acquitted [Buehner]."  (*Id.*)

The Court finds Buehner's arguments well-taken.  Buehner's Complaint alleges that the "jury that convicted [Buehner] had almost no physical or forensic evidence to rely upon, and instead relied chiefly on the false and coerced testimony of [Lawone] and [Price]."  (Doc. No. 1 at PageID #14.)  Further, Buehner's Complaint alleges that "[j]urors expressed concern multiple times about these two

---

[72] In their Reply, Officer Defendants do not address the point further other than to argue that Price's testimony was independently sufficient to support Buehner's conviction.  (Doc. No. 36 at .PageID #388–89.)  The Court has addressed this argument above and need not do so again here.  *See supra* Section IV.C.2.b.ii.

witnesses' credibility … [but] had to continue to deliberate without accurate testimony or impeachment evidence," and that this "caused a violation of [Buehner's] due process rights and interfered with his right to a fair trial." (*Id.* at PageID #14, 38.)  And even setting that aside, Officer Defendants fail to appreciate that Buehner is not solely challenging Lawone's testimony, but also challenges Price's testimony—thereby completely undermining Officer Defendants' argument.

Accordingly, the Court finds that Buehner has plausibly alleged that the identification procedures employed by Officer Defendants were unduly suggestive, unreliable, and violated his right to a fair trial.

### c.  Qualified Immunity

Finally, in their Motion, Officer Defendants contend that they are shielded by qualified immunity even if Buehner has plausibly alleged a claim of unduly suggestive identification.  (Doc. No. 27-1 at PageID #251–52.)  Officer Defendants focus their arguments on the allegations regarding Buehner appearing in both a photo array and lineup, and thus assert that it was not clearly established in 2001 that such an identification procedure was improper.  (*Id.* at PageID #292.)

In his Opposition, Buehner argues that it is clear "in the Sixth Circuit that every constitutional violation that [Buehner] alleged was clearly established in 2001."  (Doc. No. 31 at PageID #341.) Buehner cites to various Sixth Circuit cases to demonstrate this.  (*See id.*)

In their Reply, Officer Defendants do not address qualified immunity further other than claiming that "Defendants are entitled to qualified immunity."  (Doc. No. 36 at PageID #390.)

As set forth more fully above, *see supra* Section IV.A.2, courts evaluating qualified immunity at the pleading stage must determine whether the complaint plausibly alleges facts showing that: (1) the government official violated a plaintiff's constitutional rights, and (2) that this right was clearly

established at the time of the violation.  *Siefert*, 951 F.3d at 762.  If the plaintiff plausibly alleges facts satisfying these two requirements, the qualified immunity defense is defeated at this stage.

The Sixth Circuit has opined that "[i]t is difficult to countenance any argument that a law-enforcement officer in 1975 would not be 'on notice [his] conduct [was] unlawful' when coercing a witness into perjuring himself in a capital trial."[73]  *Jackson*, 925 F.3d at 825.  Indeed, "as far back as 1935, the Supreme Court recognized that the introduction of fabricated evidence violates 'the fundamental conceptions of justice which lie at the base of our civil and political institutions.'"  *Id.* (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  "And in 1942, the Supreme Court held that when a witness perjures himself because of threats from police officers, the defendant suffers a 'deprivation of rights guaranteed by the Federal Constitution.'"  *Id.* (citing *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)); *see also Gillispie v. Miami Township, Ohio*, 18 F.4th 909, 918 n.2 (6th Cir. 2021) (summarizing clearly established law).

Moreover, the Sixth Circuit found that such unlawful conduct was clearly established in 1975. *See id.* at 826.  For example, in *Burks*, 512 F.2d at 224, the Sixth Circuit stated that *Mooney* "made it clear that the Fourteenth Amendment right to due process prohibits a knowing and deliberate use by a state of perjured evidence in order to obtain a conviction."  *See also Jackson*, 925 F.3d at 826.  In 1999, the Sixth Circuit also concluded that a defendant officer could not "seriously contend that a reasonable police officer would not know that [his] actions [including fabricating evidence] were inappropriate and performed in violation of an individual's constitutional … rights."  *Id.* (citing *Spurlock*, 167 F.3d at 1005–06.)  Based on these cases, the court in *Jackson* denied qualified immunity

---

[73] The Court finds it insignificant that *Jackson* involved a "capital trial" as opposed to Buehner's case involving life in prison.  That distinction does not make the alleged conduct any less of a constitutional violation.

91

to officers who were accused of, in 1975, "coerc[ing] [a witness] into signing a false statement about [a] line-up" by "threaten[ing] to send [his] parents to jail" even after the witness said that he did not see anyone in the line-up (which included the plaintiffs) commit the shooting.  *Id.* at 804–05, 814, 826.

The Court concludes that Buehner has satisfied both prongs sufficient to defeat qualified immunity at this stage.  Buehner has plausibly alleged that Officer Defendants coerced witnesses into providing false (and thus unreliable) identifications to be used in his trial.  *See supra* Section IV.C.2.b.i.  This alleged misconduct violated Buehner's constitutional rights and runs contrary to the clearly established precedent above.  *See also Gregory v. City of Louisville*, 444 F.3d at 746–47;[74] *Howard*, 2025 WL 429916, at *8 (Readler, J. concurring) (citing similar cases involving coerced confessions).  Accordingly, the Court declines to grant Officer Defendants summary judgment at this stage and will revisit the issue at summary judgment if raised again upon a more complete record.

---

[74] The Court notes that while *Gregory* was decided in 2006, it is still applicable to this case.  In *Gregory*, the Sixth Circuit reviewed the district court's denial of qualified immunity regarding a suggestive show-up procedure.  444 F.3d at 745.  In doing so, the Sixth Circuit concluded that, based upon Supreme Court precedent from 1967, the "[p]laintiff ha[d] a due process right which includes the right to be free from unduly suggestive and unreliable identification procedures."  *Id.* at 746 (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).  Further, the Court explicitly found that "[t]he prosecutor's decision to use the identification does not shield [an officer] from liability if he reasonably should have known that use of the identification would lead to a violation of Plaintiff's right to a fair trial."  *Id.* at 747 (citing cases).  Most importantly, however, is the fact that based upon these Supreme Court cases, the Sixth Circuit found that the "district court correctly denied [the officer] qualified immunity for Plaintiff's claim of suggestive identification."  *Id.*  In other words, the Sixth Circuit's decision in *Gregory* did not *itself* clearly establish these principles—but rather agreed that they were *already clearly established* by longstanding Supreme Court precedent.  Indeed, had this not been the case, the Sixth Circuit could not have found that the district court correctly denied summary judgment—for the district court could not have done so had the unconstitutional conduct not already have been clearly established in the first place.  For this reason, the Court concludes that the principles discussed in *Gregory*, including the right to be free from unduly suggestive and unreliable identification procedures, are applicable to the present case notwithstanding that the alleged misconduct occurred in 2001.  Accordingly, the Court rejects Officer Defendants' argument to the contrary contained in their Amended Response to Buehner's Citation of Supplemental Authority. (*See* Doc. No. 59 at PageID #777.)

### 3.      Count Two: Fabrication of Evidence

The Court next turns to Count Two alleging fabrication of evidence.

#### a.  Whether Buehner has Pled Fabrication of Evidence

In their Motion, Officer Defendants contend that Buehner has failed to allege that they "knowingly" fabricated evidence.  (Doc. No. 27-1 at PageID #253.)  According to Officer Defendants, it is not enough that an "officer is mistaken or negligent in determining witness credibility," as this would expose an officer to liability "any time a suspect provided conflicting stories."  (*Id.*)  Rather, Officer Defendants assert that a complaint must allege that the testimony is "invariably false" because it is "made up by the officer, who knows he is making it up."  (*Id.*)  Officer Defendants thus argue that while the Complaint "concludes that the identifications of Buehner and Price were fabricated," "there are no allegations that these identifications were known to be false by the officers."  (*Id.*)

In his Opposition, Buehner maintains that he has plainly stated a fabrication claim.  (Doc. No. 31 at PageID #346.)  Specifically, Buehner points to his allegations that Officer Defendants fabricated both Lawone and Price's identifications, fabricated the recording used to secure the Price testimony, and that such testimony affected the decision of the jury.  (*Id.*)  Buehner also contends that he alleged that Officer Defendants fabricated the identifications and fake video tape "on purpose," and that "[i]t is not too far a leap for *Iqbal* that pleading somebody did something on purpose is sufficient to plead that they knew about it."  (*Id.*)

In their Reply, Officer Defendants address a Sixth Circuit case, *Monson v. City of Detroit, Michigan*, 2024 WL 84093 (6th Cir. Jan. 8, 2024), wherein the court opined that "[a] plaintiff may raise a fabrication of evidence claim where 'the statement coerced [a witness] to testify in conformance with it.'"  (Doc. No. 36 at PageID #390.)  Officer Defendants argue that this case

93

required Buehner to allege that the "[p]rosecutor used a prior coerced statement at the original trial, then forced Price or Edwards to testify in conformance with that coerced statement," which Officer Defendants maintain Buehner failed to do.  (*Id.*)

A fabrication of evidence claim has two elements: (1) an officer "knowingly fabricates evidence"; and (2) a "reasonable likelihood exists that the false evidence would have affected the jury's decision." *Monson*, 2024 WL 84093, at *6.  "It is well established that a person's constitutional rights are violated" when these two elements are met.  *Id.* (quoting *Gregory*, 444 F.3d at 737) (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997); *see also id.* at *7 (noting that this standard has been recognized "[u]nder law that was clearly established in 1994").

The Court finds that Buehner has plausibly alleged that Officer Defendants knowingly fabricated evidence.  As explained above, Buehner alleges that Lawone and Price were coerced and threatened by Officer Defendants, using a fabricated recording and under threat of fabricated murder charges, to identify Buehner—despite Lawone and Price having already failed to identify him.  (*See* Doc. No. 1 at PageID #9–10); *see also supra* Section IV.C.2.b.i.  The Court declines to find it implausible that Officer Defendants did not know that the fabricated testimony obtained by coercion was false.[75]

The Court also rejects Officer Defendants' reading of *Monson*.  2024 WL 84093, at *8.  The court in *Monson* referenced this language originally appearing in *Jackson*.  *Id.* (citing *Jackson*, 925 F.3d at 817).  In *Jackson*, however, the court did not hold that it was a requirement of a fabrication of evidence claim that the "statement coerced [the witness] to testify in conformance" with the falsified

---

[75] Indeed, one of the definitions of the word "fabricate" is "[t]o invent, forge, or devise *falsely*."  *See* FABRICATE, Black's Law Dictionary (12th ed. 2024) (emphasis added).

statement.  925 F.3d at 817.  Rather, the court merely listed that as one example in which the falsified testimony could have "impacted the juries' decisions in the criminal trial …"  *Id.* at 816.  This is supported by the other example given in *Jackson*, in which the court found that the fabricated evidence could have impacted the juries' decision based on the prosecutor's testimony that he would have never pursued the charges from the outset—a theory completely removed from the witness testifying in conformance with a previously established false statement.  *Id.*  Moreover, and notably, Officer Defendants do not contest this element of whether the fabricated evidence "would have affected the jury's decision," and to the extent they do, the Court rejects that argument for the same reasons as previously discussed in relation to Count One.  *See supra* Section IV.C.2.b.iii.

Accordingly, the Court concludes that Buehner has adequately pled a claim for fabrication of evidence.

### b.  Qualified Immunity

Notwithstanding the above, Officer Defendants maintain that they have qualified immunity because it was not "clearly established in 2001 for an officer to rely on eyewitness testimony … when the witnesses fail to communicate that their testimony is false."  (Doc. No. 27-1 at PageID #255.)

The Court finds that its discussion of qualified immunity in relation to Count One adequately addresses this argument, *see supra* Section IV.C.2.c, and rejects Officer Defendants' qualified immunity defense for the same reasons.  The Court will revisit the issue, if raised again, on summary judgment.

### 4.    Count Three: *Brady* Violation

The Court next turns to Count Three alleging a *Brady* violation.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Jackson*, 925 F.3d at 813–14 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Prosecutors are not the only state actors bound by *Brady*, and police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Id.* at 814 (citing *Moldowan v. City of Warren*, 578 F.3d 351, 349 (6th Cir. 2009)).

*Brady* claims have three elements: "[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Jackson*, 925 F.3d at 814.

Officer Defendants contend that Buehner has failed to allege all three elements. (Doc. No. 27-1 at PageID #255.) The Court will address each element, below.

### a. Whether Buehner has Pled a *Brady* Violation

### i. Favorable Evidence

In their Motion, Officer Defendants assert that Buehner fails to allege specific favorable evidence. (*Id.* at PageID #256.) First, Officer Defendants reiterate that the "coercion" allegations should be disregarded because they are not plausibly pled under *Iqbal*. (*Id.*) Second, Officer Defendants argue that Buehner fails to allege how the recording that was not produced is favorable to him. (*Id.*) Third, Officer Defendants contend that the "alleged alternate suspects" are not considered "favorable" under Sixth Circuit precedent. (*Id.*) Finally, Officer Defendants submit that

96

Buehner's allegation that "unspecified evidence was 'withheld and/or destroyed and/or failed to [be] preserved" fail under *Iqbal*. (*Id.*)

In his Opposition, Buehner argues that he plausibly alleged that the "Officer Defendants failed to produce exculpatory and impeachment evidence to the Prosecutor's Office or to Buehner's defense." (Doc. No. 31 at PageID #347.) Buehner points to specific evidence "hid[den] from the defense and prosecution," including the "facts of their coerced witness statements as well as a host of exculpatory witness statements, identities of impeachment witnesses, information pointing to alternate suspects, and other exculpatory impeachment material." (*Id.*) Buehner also maintains that he has pled such claims with a sufficient level of detail, referencing his allegations that the "officers covered up their own fabrications and unlawful identification procedures; the fabricated tape; the content of multiple witness statements which would have impeached the fabricated testimony; the identity of a witness whose statement would have been impeaching; the identities of a specific information about alternate suspects; and additional evidence still unknown." (*Id.*) Finally, Buehner contends that "state courts have already held as a matter of law that in [Buehner's] case these violations occurred and were material." (*Id.*)

In their Reply, Officer Defendants assert that a complaint must "state what was suppressed and when." (Doc. No. 36 at PageID #391.) Officer Defendants also contend that this Court should take judicial notice of Buehner's state court appeal, in which the Eighth District referenced the state's argument that, in relevant part, the "testimony presented at the *Brady* hearing demonstrated that (1) these individuals were named in the witness list, (2) the subject statements were provided to the prosecutor's office, [and] (3) the statements were within the state's file …" (*Id.* at PageID #392.)

In his Surreply, Buehner argues that this final argument related to Buehner's state court appeal should be rejected as being raised for the first time on reply.  (Doc. No. 39 at PageID #406–07.) Further, Buehner asserts that the claim does not make sense, as the state appellate court found that Buehner's *Brady* rights were violated.  (*Id.* at PageID #407.)

The Court finds that Buehner has sufficiently pled this element.  First, the coercive nature of the statements of Lawone and Price implicating Buehner (after having already told Officer Defendants otherwise), and fabricated recording related thereto, constitute favorable evidence sufficient to support a *Brady* claim.  *See, e.g.*, *Clark v. Abdallah*, 131 F.4th 432, 456 (6th Cir. 2025) (citing *Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019)) (holding that *Brady* "require[s] disclosure to the plaintiffs of the coercive tactics used to obtain [a witness's] statement").  Similarly, the identities of Sonny and Eric "County" Grant, and information obtained that could point to their involvement (*see* Doc. No. 1 at PageID #7–9), is "favorable to [Buehner] and material to his defense because it showed someone else may have committed the murder."  *Andrews*, 112 F.4th at 444. Fourth, the Court rejects Officer Defendants' argument that Buehner's allegations regarding physical and forensic evidence is conclusory merely because it contains the phrase "and/or."  (Doc. No. 1 at PageID #12.)  Buehner has pointed to specific evidence, including the "GMC truck involved in the murder" and "at least one other truck which [Officer Defendants] investigated, as well as any contents of those vehicles or trace evidence left inside."  (*Id.*)  The mere fact that Buehner does not know at this early stage the exact reason why such evidence was never presented, i.e., whether that is because it was withheld, destroyed, or was not preserved—and thus, pled all three in the alternative—does not render his allegations conclusory.

Finally, the Court rejects Officer Defendants' argument regarding the state appellate court. First, this argument was raised for the first time on Reply and is therefore waived. *See Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 595 n.4 (6th Cir. 2008). Nonetheless, the argument fails even if this Court were to consider it. Officer Defendants cite to a paragraph from the state appellate court's opinion asking this Court to take "judicial notice of state court online dockets." (Doc. No. 36 at PageID #391–92.) Yet the paragraph cited is merely the court's summary of the state's argument—specifically, what the state believed that the testimony presented at the *Brady* hearing demonstrated. *See State v. Buehner*, 2021 WL 5984472, at *9 (8th Dist. Dec. 16, 2021). A court's summary of certain arguments asserted by a party is not the type of information that warrants judicial notice of state court online dockets. *See Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008) ("[O]n a motion to dismiss, we may take judicial notice of another court's opinion not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.").

Accordingly, the Court finds that Buehner has sufficiently pled this element.

### ii. Suppression by the State

In their Motion, Officer Defendants next argue that Buehner fails to allege "what was suppressed and when." (Doc. No. 27-1 at PageID #256.) Officer Defendants contend that Buehner's Complaint makes it unclear whether the "Prosecutor's Office 'or' Buehner's criminal defense attorneys" failed to receive the evidence, and that such lack of clarity renders the allegations implausible. (*Id.* at PageID #257.) Officer Defendants also assert that there are "no specific allegations that they knew about and then withheld allegedly exculpatory evidence." (*Id.* at PageID #259.) For example, they argue that for the Jenkins statement, "she provided her statement to the

officers at the scene, not Beaman," while for the Powell statement, "there are no specific allegations that either [Beaman or Hasan] failed to provide this statement to the prosecutor."  (*Id.*)

In his Opposition, Buehner reiterates that he has adequately pled his *Brady* claims with sufficient detail.  (Doc. No. 31 at PageID #347.)

The Court rejects Officer Defendants' argument.  First, Buehner is entitled to plead in the alternative. *See generally* Fed. R. Civ. P. 8(d).  Specifically, Buehner alleges that "Officer Defendants failed to produce exculpatory and impeachment evidence to the Prosecutor's Office or to Buehner's defense." (Doc. No. 1 at PageID #11.)  The mere fact that Officer Defendants may have withheld the evidence from the Prosecutor's Office does not, however, require a finding that Buehner's defense team must have received such evidence.  This is because "[p]olice officers must turn over evidence with 'apparent' exculpatory value to the prosecutor, *who must then disclose that evidence to the defendant*."  *Salter*, 133 F.4th at 535 (citing *Moldowan*, 578 F.3d at 381) (quoting *California v. Trombetta*, 467 U.S. 476, 489 (1984)) (emphasis added).  In other words, it is entirely plausible to read Buehner's allegations as either of two interpretations:[76] (i) Officer Defendants did not provide Prosecutor Defendants with the exculpatory evidence (who in-turn, could not have provided it to Buehner); or (ii) Officer Defendants provided Prosecutor Defendants the exculpatory evidence, but Prosecutor Defendants failed to turn it over to Buehner.  At this stage, Buehner is entitled to plead these theories in the alternative.

---

[76] Indeed, Officer Defendants effectively seek to redefine the 12(b)(6) standard with this argument.  They contend that because "it is unclear who failed to receive this evidence"—in other words, that Buehner's Complaint is open to multiple interpretations—that the Complaint must be implausible.  However, at the motion to dismiss stage, the opposite is true.  At this stage, Buehner is entitled to have his Complaint construed in the light most favorable to him as the non-moving party. *See supra* note 71.

Further, Officer Defendants' cited authority, *Morin v. Erway*, 2013 WL 1875998 (E.D. Mich. Mat 3, 2013), is distinguishable.  In *Morin*, the plaintiff did not allege any facts permitting an inference "that there was evidence, that it was material, or that it was suppressed," and merely repeated the same conclusory allegation that the officers "suppress[ed] material exculpatory evidence."  *Id.* at *8.  The court found such allegations to be conclusory.  *Id.*  Yet here, Buehner specifies that Officer Defendants allegedly withheld exculpatory evidence, including the coercion of Lawone and Price, the fabricated recordings used to obtain such coerced testimony, the information related to Sonny and Eric "County" Grant that could point to their involvement, and the GMC truck involved in the murder.  *See supra* Section IV.C.4.a.i.  These allegations, at the motion to dismiss stage, are sufficient to plead that *Brady* evidence was suppressed by Officer Defendants.

Finally, the Court rejects the arguments relating to the Jenkins and Powell statements.  With respect to the Jenkins statement, Buehner's Complaint alleges that Hasan was the *lead* investigating homicide detective at the scene, but that "other CDP officers act[ed] at his discretion."  (Doc. No. 1 at PageID #4.)  Construing this in the light most favorable to Buehner, it is plausible that Beaman, as Hasan's partner, was one of these "other CDP officers."  (*Id.*)  However, even if Beaman was not at the scene, that is of no consequence.  Hasan and Beaman were partners who jointly "directed the investigation as the lead detectives," and Buehner alleges that Hasan and Beaman later brought Jenkins in to see a photo array.  (*Id.* at PageID #5, 8.)  It is not implausible under *Iqbal* to assume that Hasan shared this information with Beaman in the course of "direct[ing] the investigation as the lead detectives," particularly in light of Beaman playing an active role in Jenkins' later participation in the case.  (*Id.*)  As for the Powell statement, Buehner explicitly pleads that "Officer Defendants failed to produce exculpatory and impeachment evidence to the Prosecutor's Office … [including] the content

of the statements of Gail Jenkins and Debbie Powell." (*Id.* at PageID #11.) This argument is meritless.

### iii. Prejudice

Next, Officer Defendants argue that the allegedly exculpatory evidence failed to impact the outcome of the case. (Doc. No. 27-1 at PageID #257–58.) Officer Defendants assert that "[t]he significant testimony by Price and [Lawone] would not have been overcome by the Jenkins and Powell statements." (*Id.* at PageID #258.)

The Court rejects this argument. First, Buehner alleges that a host of exculpatory evidence was withheld, including evidence that Price and Lawone's testimony was fabricated through coercion—thus directly undermining Officer Defendants' argument. *See supra* Section IV.C.4.a.i. Moreover, as explained above at-length, jurors were already skeptical of Price and Lawone's testimony, who were the sole two identification witnesses in the case. Accordingly, evidence undermining the credibility of Price and Lawone's testimony is undoubtedly prejudicial. *See Clark*, 131 F.4th at 456 ("And a defendant undoubtedly 'suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness.'"). The Court reaches a similar conclusion with respect to the alternative suspects. *See also Andrews*, 112 F.4th at 444 (finding page in police report that contained evidence suggesting that "someone else may have committed the murder" constituted favorable material *Brady* evidence).[77] The Court need not belabor this point further.

---

[77] Although Buehner's case hinged on the testimony of two witnesses, Price and Lawone, Buehner alleges the failure to disclose *Brady* evidence that would undermine both sets of testimony. Such evidence was arguably "critical," particularly because "no physical evidence ever inculpated" Buehner. *Clark*, 131 F.4th at 456.

### b.  Qualified Immunity

Finally, the Court turns to Officer Defendants' qualified immunity defense.  Officer Defendants assert that it was not "clearly established in 2001 that a witness statement relating to an alternate suspect needed to be turned over to the prosecutor."  (Doc. No. 27-1 at PageID #259.)  In response, Buehner contends that the right against *Brady* violations was clearly established.  (Doc. No. 31 at PageID #340.)

The Court reincorporates the qualified immunity test set forth above.  *See supra* Section IV.A.2.

The Sixth Circuit recently evaluated this issue with respect to the alleged withholding of a statement pointing to an alternative suspect.  *See Siggers v. Alex*, 2023 WL 5986603 (6th Cir. Sept. 12, 2023).  In *Siggers*, the court evaluated a qualified immunity claim related to a police officer failing to disclose a witness statement that pointed to an alternative suspect.  *Id.* at *5–6.  Specifically, the witness had informed the officer that after the victim was murdered, he "saw a white man walking around with a long gun and thought that it was his neighbor, Roy Garland."[78]  *Id.* at *2.  After receiving this information, the officer "interviewed Garland and eliminated him as a suspect, but he never disclosed this information of [the witness's] statement."  *Id.*

At the summary judgment stage, the court evaluated whether it was clearly established that the officer was required to turn over this evidence.  *See id.* at *5–6.  The court first "agree[d] as a general matter" that "it was clearly established by 1984 that evidence of a legitimate alternative suspect is 'favorable' under *Brady* and thus had to be disclosed."  *Id.* at *5.  However, the court then

---

[78] Notably, the plaintiff, who was later wrongfully convicted for the murder, was a "dark-skinned African-American man."  *Siggers*, 2023 WL 5986603, at *1 n.2.

narrowed the issue to whether it was clearly established that a "statement implicating someone *who was cleared as a suspect of the crime*, but who might have been mistaken for a second suspect, was *Brady* material"—and determined that was not clearly established.  *Id.* at *5–6 (emphasis added).  In contrasting its decision with another Sixth Circuit case[79] that found otherwise, the court distinguished the cases because "[t]here was no evidence in *Moldowan* that the police investigation had eliminated any of the undisclosed persons as suspects, as there was here with respect to the suspect, Garland, who was referenced in the [witness statement]."  *Id.* at *6 n.7.

Accordingly, qualified immunity in this specific context appears to hinge, in part, on whether the alternate suspect was "cleared as a suspect of the crime."  *Id.* at *5.  It appears that "it was clearly established by 1984 that evidence of a *legitimate* alternative suspect" must be disclosed under *Brady*.  *Id.* (emphasis added).  But, if officers have investigated that "alternate suspect" and cleared them as a suspect, that would fall outside clearly established law requiring disclosure.  *See id.* at *6 n.7.

Having set forth the above principles, the Court cannot find that Officer Defendants are entitled to qualified immunity at this juncture.  A review of Buehner's Complaint reveals that his allegations extend beyond simply the non-disclosure of the Jenkins and Powell statements, but also include that "Hasan and Beaman never investigated the alternate suspects …"  (Doc. No. 1 at PageID #11; *see also id. at* PageID #8 ("Despite all this, Hasan and Beaman never meaningfully investigated the involvement of Robert 'Sonny' Allen or Victor.").)  Construing these facts in the light most favorable to Buehner, this failure to investigate means that these other suspects could not have been

---

[79] *See Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).

"cleared as a suspect of the crime," and thus, may have fallen within the clearly established precedent requiring disclosure.  *Siggers*, 2023 WL 5986603, at *5–6.

Therefore, the Court declines to grant qualified immunity at this time.  Rather, given the highly fact-sensitive nature of this inquiry, the Court will revisit the issue at summary judgment.  *See Hart*, 973 F.3d at 635 ("It is often perilous to resolve a 12(b)(6) motion on qualified immunity grounds because development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law.") (internal quotation marks omitted).

### 5. Count Four: Malicious Prosecution

The Court next turns to Count Four alleging malicious prosecution.

### a. Whether Buehner has Pled Malicious Prosecution

Malicious prosecution claims have four elements: "(1) the defendant made, influenced, or participated in the decision to prosecute; (2) the government lacked probable cause; (3) the proceeding caused the plaintiff to suffer a deprivation of liberty; and (4) the prosecution ended in the plaintiff's favor."  *Lester v. Roberts*, 986 F.3d 599, 606 (6th Cir. 2021) (citing *Jones v. Clark County*, 959 F.3d 748, 756 (6th Cir. 2020)); *see also France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016).

Officer Defendants challenge only the first two elements.  The Court will address each separately, below.

### i. Lack of Probable Cause

In their Motion, Officer Defendants first contend that probable cause existed to prosecute Buehner, as evidenced by the grand jury indictment and identifications by Lawone and Price.  (Doc. No. 27-1 at PageID #260–61.)  Officer Defendants next assert that Buehner has failed to allege any "deliberate or reckless falsehoods" sufficient to sustain a malicious prosecution claim.  (*Id.* at PageID

#262–63.)  In this regard, Officer Defendants reiterate their argument that while "[t]he Complaint concludes that the identifications of Buehner and Price were fabricated," "there are no allegations that these identifications were known to be false by the officers."  (*Id.* at PageID #263.)

In his Opposition, Buehner argues that there is no probable cause where a police officer, "in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements or falsifies or fabricates evidence" and the fabrication "together with any concomitant misleading omissions" are material.  (Doc. No. 31 at PageID #348.)  According to Buehner, Officer Defendants did just that by fabricating Price and Lawone's testimony and suppressing evidence including the exculpatory non-identifications of Buehner.  (*Id.*)  Buehner thus contends that "Defendants' arguments depend upon assuming the fabrication did not occur."  (*Id.* at PageID #349.)

Federal malicious-prosecution claims require a plaintiff to "show, at a minimum, that there is no probable cause to justify an arrest or a prosecution."  *Bickerstaff v. Lucarelli*, 830 F.3d 388, 397 (6th Cir. 2016).  "[T]he finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause."  *Id.* at 398 (citing *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006)).

However, "an exception to this rule exists 'when the defendants knowingly present false testimony to the grand jury' to obtain an indictment, or when they 'testify with a reckless disregard for the truth.'"  *Id.* (citations omitted).  In other words, the "presumption of probable cause" created by a grand jury indictment is rebuttable by showing that:

> (1) A law enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly made false statements (such as in affidavits or investigative reports) or falsified or fabricated evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, were material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions did not consist solely of grand-jury

106

testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*Jackson*, 925 F.3d at 821 (citing *King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017)).

The Court finds that Buehner has plausibly alleged facts sufficient to rebut this presumption. As explained at length, the Court concludes that Buehner has pled that Officer Defendants *knowingly*[80] "falsified or fabricated evidence" through the fabrication of Lawone and Price's identifications.  *See supra* Section IV.C.3.a.  Moreover, these fabricated identifications, along with the omissions of their coerced nature, were material to the ultimate prosecution of Buehner.[81] Accordingly, Buehner has rebutted the presumption of probable cause at this stage.[82]

### ii.    Presentation to Grand Jury

Notwithstanding the above, Officer Defendants, in their Reply, contend that Buehner fails to allege that the fabricated evidence was ever presented to the grand jury.  (Doc. No. 36 at PageID

---

[80] The Court concludes that Buehner's allegations surrounding the fabrication of Lawone and Price's testimony plainly meets the standard of "deliberate—i.e., given with knowledge of, or reckless disregard for, its falsity."  *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015).  Such allegations, *see supra* Section IV.C.2.b.i, extend well beyond mere "negligence or innocent mistake."  *Id.*

[81] Indeed, in their Motion, Officer Defendants argue that even beyond the grand jury's indictment, probable cause existed. (Doc. No. 27-1 at PageID #260.)  In support of this assertion, Officer Defendants primarily rely on Lawone and Price's identifications—which have been properly challenged by Buehner at this stage.  (*Id.* at PageID #261.)  Aside from this, the only other basis for probable cause referenced in Officer Defendants' Motion is evidence that "there was a shooting by a white man in a small black truck."  (*Id.*)  This lone allegation of a shooting by a "white man in a small black truck" is wholly insufficient, standing on its own and without the identifications of Lawone and Price, to have established probable cause that Buehner committed the murder.  The Court notes this for the limited purpose of underscoring the materiality of Lawone and Price's allegedly fabricated testimony in Buehner's prosecution, as it relates to the second consideration for rebutting the grand jury presumption of probable cause.  At this stage of the proceedings, there is nothing in the Complaint to suggest that probable cause existed without these two identifications.

[82] In their Reply, Officer Defendants address two of Buehner's cited cases, arguing that they are both distinguishable because they did not involve a grand jury indictment like the present case.  (Doc. No. 36 at PageID #392–93) (discussing *Akima v. Peca*, 85 F.4th 416, 422–23 (6th Cir. 2023) and *Harris v. City of Saginaw, Michigan*, 62 F.4th 1028, 1035 (6th Cir. 2023)).  The Court finds these arguments irrelevant because even recognizing the grand jury presumption here, Buehner has sufficiently rebutted the presumption of probable cause at this stage.

#393.)  Officer Defendants submit that this deficiency dooms Buehner's attempt to rebut the grand jury presumption, citing *Smith v. Silvernail*, 2025 WL 80370, at *6 (6th Cir. Jan. 13, 2025).  (*Id.*)

In his Surreply, Buehner asserts that "[n]o court … has ever articulated that as a pleading requirement," "a plaintiff must specifically allege in the complaint that fabricated evidence was presented at a grand jury proceeding."  (Doc. No. 39 at PageID #407.)  Buehner argues that this includes Officer Defendants' cited authority, which Buehner notes was decided at the summary judgment stage.  (*Id.*)

The Court finds that Officer Defendants' arguments fail for numerous reasons.  First, the Court finds that *Smith* is distinguishable.  *Smith* discussed what "evidence" a plaintiff was required to show at the summary judgment stage, not pleading standards.  2025 WL 80370, at *6.  The Court has also reviewed *Gonzalez v. Kovacs*, 687 Fed. App'x. 466 (6th Cir. 2017), a decision relied upon by *Smith*, and finds it distinguishable as well.[83]

Second, to the extent that *Smith* imposes such a requirement, the Court finds it to be inconsistent with published Sixth Circuit precedent:

> "[F]abricated evidence can be material to a grand jury's determination of probable cause without being presented to the grand jury … Instead, plaintiffs can show that a fabrication was material to the grand jury's determination by showing 'that the officer has made knowing or reckless false statements or has falsified or fabricated evidence *in the course of setting a*

---

[83] First, in *Gonzalez*, the court indicated that the grand jury "presumption *can* be rebutted" by showing that the defendant "knowingly present[ed] false testimony to the grand jury to obtain an indictment"—not that a plaintiff *must* do so to rebut this presumption.  687 Fed. App'x. at 469.  Second, the court noted that the plaintiff had not alleged anything to suggest that the "chang[ed] stories" were relayed to the grand jury, whereas the Court here finds (as explained more fully in this Opinion) that Buehner has alleged so.  Third, to the extent that *Smith* seeks to impose a strict requirement to plead that the evidence was presented before the grand jury, the Court finds that to be inconsistent with published Sixth Circuit precedent.  *See Jackson*, 925 F.3d at 821.

> *prosecution in motion*' … [The officer's] fabrication was therefore material to the grand jury's
> determination because it 'was material to the ultimate prosecution' of Plaintiffs."[84]

*Jackson*, 925 F.3d at 821–22 (emphasis added) (citations omitted).  A "published panel decision

remains controlling authority unless an inconsistent decision of the United States Supreme Court

requires modification of the decision or [the Sixth Circuit] sitting en banc overrules the prior

decision."  *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009); *see also Hodges v. May*,

2025 WL 460900, at *15 (N.D. Ohio Feb. 11, 2025) (Barker, J.) (citing cases).  *Jackson* is a published

decision that was decided before *Smith*, an unpublished opinion.  Thus, "[f]orced to choose between

conflicting precedents, we must follow the first one."  *U.S. v. Jarvis*, 999 F.3d 442, 445–46 (6th Cir.

2021).

     Third, even if required to allege that the fabricated evidence was presented to the grand jury,

the Court finds that Buehner's Complaint sufficiently pleads as much.  Buehner alleges with sufficient

detail the Officer Defendants' fabrication of the witness statements.  (*See* Doc. No. 1 at PageID #9–

10); *see supra* Section IV.C.2.b.i.  More importantly, however, is that Buehner alleged that "Hasan

and Beaman … caused the … *indictment* … of [Buehner] *based upon* fabricated witness statements."

(Doc. No. 1 at PageID #11) (emphasis added).  This allegation is crucial because "[t]he sole entity

responsible for making accusation of felony criminal conduct is the grand jury."  *State v. Napier*, 108

N.E.3d 788, 797 (Ohio C.P. 2018).[85]  In other words, if Officer Defendants caused the *indictment* of

Buehner *based upon* fabricated evidence, that would imply that such fabricated evidence was

---

[84] The Court finds that its previous discussion adequately addresses how Lawone and Price's identifications were material to the ultimate prosecution of Buehner.  *See supra* Section IV.C.2.b.iii.

[85] *See also State v. Rodano*, 86 N.E.3d 1032, 1037 (8th Dist. 2017) ("Both Section 10, Article I of the Ohio Constitution and the Fifth Amendment to the United States Constitution provide that prosecution for capital offenses or felonies shall be instituted by grand jury indictments.").

presented to the grand jury—as it is *only* the grand jury who could have returned such an "indictment" that was "based upon fabricated witness statements." (Doc. No. 1 at PageID #11.)  Buehner is entitled to this plausible construction of his Complaint at the motion to dismiss stage.[86]  *See Gunasekera*, 551 F.3d at 466.

Accordingly, for the foregoing reasons, the Court rejects Officer Defendants' claim that Buehner has failed to rebut the grand jury presumption.[87]

### b.  Qualified Immunity

Finally, the Court turns to Officer Defendants' qualified immunity defense.

In their Motion, Officer Defendants argue that it was not "clearly established that it would violate someone's constitutional right to investigate someone identified by multiple eyewitnesses which was also supported by corroborating evidence." (Doc. No. 27-1 at PageID #264.)

It is well settled that individuals have a clearly established right "from malicious prosecution based on knowing or reckless misidentification." *Sanders v. Jones*, 728 Fed. App'x. 563, 565 (6th Cir. 2018) (citing *Gray v. Cuyahoga Cty. Sheriff's Dep't*, 150 F.3d 579, 582–83 (6th Cir. 1998)). "While a law enforcement officer is generally entitled to rely on another's eyewitness identification

---

[86] Buehner's Complaint contains other allegations that similarly support this construction. (*See, e.g.*, Doc. No. 1 at PageID #10 ("No real evidence supported [Buehner]'s arrest, let alone an indictment …"); *id.* at PageID #42 ("Defendants knowingly fabricated and suppressed evidence and this evidence was material to the … charging … of Plaintiff."); *id.* at PageID #39 ("[Defendants'] fabrications included but were not limited to the witness statements and identifications … to justify the arrest … of Plaintiff.").)

[87] Finally, in their Motion, Officer Defendants submit that there are no specific allegations that they "had direct contact with the prosecutor, significantly impacted the decision [to] prosecute, nor are there any allegations about what the prosecutor knew as a result of contact with a particular police officer Defendant … [or] how a specific officer here actually influenced the prosecutor." (Doc. No. 27-1 at PageID #261.)  The Court rejects Officer Defendants' argument for the same reasons already discussed and agrees that Buehner has sufficiently alleged that Officer Defendants fabricated evidence and suppressed other evidence "as a basis to seek charges for arrest and pursue indictment at the grand jury" and "set in motion [his] prosecution without probable cause." (Doc. No. 31 at PageID #348–49.)

to establish probable cause, he cannot rely on eyewitness identification where he has serious reason to doubt the identification based on other evidence within his knowledge." *Id.* (citing *Ahlers v. Schebil*, 188 F.3d 365, 370–71 (6th Cir. 1999)); *see also Gillispie*, 18 F.4th at 918 n.2 (summarizing clearly established law and finding such "rights were clearly established by 1990").

Buehner has alleged that Officer Defendants knowingly fabricated the Lawone and Price identifications. *See supra* Section IV.C.2.b.i. In light of such allegations, and under the clearly established law set forth above, qualified immunity must be denied at this stage.

### 6.    Count Five: Reckless Breach of Duty (Ohio Law)

The Court next turns to Count Five alleging reckless breach of duty under Ohio law.

Officer Defendants assert two arguments in relation to this claim. First, they contend that they are entitled to governmental immunity. (Doc. No. 27-1 at PageID #265.) Second, they maintain that the statute of limitations has expired. (*Id.* at PageID #265–66.) The Court addresses each argument, below.

### a.  Governmental Immunity

First, Officer Defendants argue they are entitled to governmental immunity. (*Id.* at PageID #265.) They contend that to overcome such immunity, Buehner was required to allege how "each officer acted with malicious purpose, in bad faith, or in a wanton or reckless manner," and assert that he has failed to do so. (*Id.*) In his Opposition, Buehner submits that Ohio's immunity statute does not shield liability where officers recklessly breached their duty of care. (Doc. No. 31 at PageID #350.)

The Court finds that Officer Defendants are not entitled to governmental immunity at this stage. "To be entitled to immunity under R.C. Chapter 2744 et seq., an employee of a political

111

subdivision must not act with malicious purpose, in bad faith, or in a wanton or reckless manner in connection with the performance of a governmental or proprietary function." *Moore v. City of Cleveland*, 87 N.E.3d 858, 867 (8th Dist. 2017); *see also Phillips v. City of Cincinnati*, 2019 WL 2289277, at *9 (S.D. Ohio May 29, 2019).  Buehner's Complaint includes allegations that Officer Defendants fabricated witness identifications through coercion.  Such allegations, entitled to an inference of truth at this stage, arise to the level of "malicious purpose," "bad faith," or acting "in a wanton or reckless manner." *Id.*  Accordingly, governmental immunity is not warranted.

### b.  Statute of Limitations

Next, in their Motion, Officer Defendants contend that the statute of limitations has expired because "[a]ny claim for a breach of duty accrued in 2001 when the investigation took place."  (Doc. No. 27-1 at PageID #265–66.)  Thus, Officer Defendants assert that the statute of limitations expired in 2003, while Buehner did not file suit until July 17, 2024.  (*Id.* at PageID #266.)

In his Opposition, Buehner argues that a damages claim for a wrongful criminal conviction or sentence does not accrue until the conviction is invalidated.  (Doc. No. 31 at PageID #351.)  Citing *Heck v. Humphrey*, 512 U.S. 447 (1994), Buehner submits that the claims began to accrue at his acquittal.[88]  (*Id.*)

In their Reply, Officer Defendants assert that *Heck* does not apply to Buehner's state law claims except for malicious prosecution.  (Doc. No. 36 at PageID #395.)  Officer Defendants contend that "[u]nlike malicious prosecution, 'termination of the prosecution in favor of the accused' is not a necessary element" of Buehner's other state law claims.  (*Id.*)  Thus, Officer Defendants argue that

---

[88] Buehner was acquitted on July 19, 2023.  *See State v. Buehner*, Cuyahoga County No. CR-02-417994-ZA, J.E. dated July 19, 2023.  Buehner filed the present suit within a year of his acquittal on July 17, 2024.  (*See* Doc. No. 1.)

both Ohio courts and federal courts have declined to apply the *Heck* delayed accrual rule outside of malicious prosecution claims.  (*Id.*)

The Supreme Court has found that the statute of limitations for claims challenging an invalid conviction or sentence "does not accrue until the conviction or sentence has been invalidated."  *See Heck v. Humphrey*, 512 U.S. 477, 490 (1994).  *Heck* involved a state prisoner who filed a § 1983 action in federal court seeking damages for various constitutional violations that he alleged had occurred during his prosecution.  *Id.* at 479.  The Supreme Court concluded that a "§ 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated" because "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence."  *Id.* at 487, 490; *see also Harrison v. Michigan*, 722 F.3d 768, 771–72 (6th Cir. 2013).

The Supreme Court reached a different conclusion when evaluating a claim for false arrest.  *See Wallace v. Kato*, 549 U.S. 387 (2007).  There, the court reasoned that unlike a challenge to the validity of a conviction or sentence, a claim for false arrest accrues at the time of the arrest.  *Id.* at 388.  This was because the plaintiff "could have filed suit as soon as the allegedly wrongful arrest occurred, subjecting him to the harm of involuntary detention."  *Id.*; *see also Harrison*, 722 F.3d at 772. At the time that an action for false arrest could be brought, however, there would be "in existence no criminal conviction that the cause of action would impugn; indeed, there may not even have been an indictment."  *Id.* at 393.

The distinction between *Heck* and *Wallace* thus hinges on whether a favorable judgment would "impugn the validity of an outstanding conviction."  *See Harper v. Jackson*, 293 Fed. App'x. 389, 391–92 (6th Cir. 2008).[89]  The Supreme Court recently reiterated as much:

> "A false-arrest claim, *Wallace* explained, has a life independent of an ongoing trial or putative future conviction—it attacks the arrest only to the extent it was without legal process, even if legal process later commences.  That feature made the claim analogous to common-law false imprisonment.  By contrast, a claim like McDonough's centers on evidence used to secure an indictment and at criminal trial, so it does not require 'speculat[ion] about whether a prosecution will be brought.'  It directly challenges—and thus necessarily threatens to impugn—the prosecution itself."

*McDonough v. Smith*, 588 U.S. 109, 122 (2019) (citations omitted).  In *McDonough*, the Supreme Court evaluated a plaintiff's "fabrication of evidence" claim, analogizing the claim to *Heck*'s discussion of malicious prosecution.  *Id.* at 116.  The court indicated that *Heck*'s favorable termination requirement "applies whenever 'a judgment in favor of the plaintiff would necessarily imply' that his prior conviction or sentence was invalid."  *Id.* at 119; *see also Allen v. Fait*, 2025 WL 488681, at *4 (6th Cir. Feb. 13, 2025) ("What matters is whether the claims present a collateral attack on state court judgments or ongoing criminal proceedings.").  Thus, "[o]nly once the criminal proceeding has ended in the defendant's favor,[90] or a resulting conviction has been invalidated within the meaning of *Heck*, will the statute of limitations begin to run."[91]  *McDonough*, 588 U.S. at 119–20 (citation omitted).

---

[89] *See also Lee v. Heath Underwood*, 2024 WL 1175185, at *9 (N.D. Ohio Mar. 18, 2024) ("Lee's claims under Count Four do not necessarily impugn the validity of his underlying conviction."); *see id.* (citing *Reynolds v. Jamison*, 488 F.3d 756, 767 (7th Cir. 2007)) ("[F]alse-arrest claims survive *Heck* because such claims do not, by their own nature, call into question the validity of a conviction.").

[90] Although the plaintiff in *McDonough* was ultimately acquitted rather than convicted, the Supreme Court found that distinction immaterial because his "claims challenge[d] the validity of the criminal proceedings against him in essentially the same manner as the plaintiff in *Heck* challenged the validity of his conviction."  *McDonough*, 588 U.S. at 119.

[91] Moreover, the Supreme Court concluded that this result was unaffected by the fact that the plaintiff "suffered harm prior to his acquittal," indicating that "the injury caused by a classic malicious prosecution likewise first occurs as soon as legal process is brought to bear on a defendant, yet favorable termination remains the accrual date."  *McDonough*, 588 U.S. at 123.  In similar fashion, the Sixth Circuit has concluded that in a wrongful conviction case, the "[p]laintiffs'

The Court finds that Buehner's claim for reckless breach of duty "would necessarily imply that his prior conviction or sentence was invalid." *Id.* at 119 (citing *Heck*, 512 U.S. at 487). In his Complaint, Buehner alleges that Officer Defendants recklessly breached their duties to him by "committing *Brady* violations, fabricating evidence, coercing witness testimony, [and] failing to meaningfully investigate a crime, causing the malicious prosecution of [Buehner]." (Doc. No. 1 at PageID #43.) Buehner has also alleged that following this reckless breach of duty in which Officer Defendants fabricated Lawone and Price's testimony, the jury relied "chiefly on the false and coerced testimony of [Lawone] and [Price]." (Doc. No. 1 at PageID #14.) Thus, any truth to Buehner's allegations "would necessarily imply that his prior conviction or sentence was invalid" because the crucial evidence supporting his conviction would be the direct result of such reckless breach of duty. *McDonough*, 588 U.S. at 119 (citing *Heck*, 512 U.S. at 487).

Officer Defendants' authority is distinguishable. In *Daly v. Certo*, 2025 WL 352639 (8th Dist. Jan. 31, 2025), the court explicitly found that "[n]one of the remaining causes of action would have invalidated Daly's conviction had they been successful such that Daly would have had to wait until his conviction was dismissed in the trial court before filing suit." *Id.* at *9. The same cannot be said here, as explained above. Officer Defendants' references to *Moore v. Moore*, 2019 WL 6683171 (N.D. Ohio Dec. 6, 2019) and *Ware v. County of Wayne*, 2024 WL 4148636 (E.D. Mich. Sept. 11, 2024) fare no better, as both cases involved false arrest claims. As explained above, a false arrest

---

injury—being wrongfully convicted—was therefore not known until the charges against them were dismissed." *Ruff v. Runyon*, 258 F.3d 498, 503 (6th Cir. 2001); *see also Harrison*, 722 F.3d at 776 ("[E]ven though he learned that he was being held unlawfully while still in prison, Harrison did not 'have knowledge of his injury,' as a matter of law, until … the Michigan Court of Appeals established that he had suffered such an injury [by reversing his sentence].") Thus, despite knowing about the challenged conduct leading to a wrongful conduct, there is no knowledge of injury "as a matter of law" until the conviction is overturned. *See Harrison*, 722 F.3d at 776.

claim is distinguishable because the claim "has a life independent of an ongoing trial or putative future conviction" as it "attacks the arrest only." *McDonough*, 588 U.S. at 122.  By contrast, Buehner's reckless breach of duty claim "centers on evidence used to secure an indictment and [used] at a criminal trial," and thus "directly challenges—and thus necessarily threatens to impugn—the prosecution itself." *Id.*  Indeed, a finding of "*Brady* violations, fabricating evidence, [and] coercing witness testimony" that was chiefly relied upon by the jury would directly undermine Buehner's conviction. *Id.*; (Doc. No. 1 at PageID #43.)

Finally, Officer Defendants cite to *Lee v. Heath Underwood*, 2024 WL 1175185 (N.D. Ohio Mar. 18, 2024), where the court found that a search contested under the Fourth Amendment did "not necessarily impugn the validity of his underlying conviction." *Id.* at *9.  However, in *Lee*, the court expressly indicated that "[t]he *Heck* rule for delayed accrual does apply in cases … where the contested search produced the *only* evidence supporting the conviction," but found that rule ultimately did not apply because there was "no indication or allegation that the only evidence supporting Lee's conviction came from the [contested search]." *Id.* at *9 n.9.  Yet here, Buehner does make such allegations.[92]

The Court thus finds that "malicious prosecution is the most analogous" to Buehner's reckless breach of duty claim here.  *See McDonough*, 588 U.S. at 116.  Accordingly, the Court concludes that Buehner's claim did not begin to accrue until his acquittal on July 19, 2023, and is therefore timely.

### 7.    Count Six: Civil Liability for Criminal Acts (O.R.C. § 2307.60(A)(1))

The Court next turns to Count Six alleging civil liability for criminal acts.

---

[92] (*See, e.g.*, Doc. No. 1 at PageID #14 ("The jury that convicted [Buehner] had almost no physical or forensic evidence to rely upon, and instead relied chiefly on the false and coerced testimony of Lawone Edwards and Randy Price.").)

In their Motion, Officer Defendants maintain that Buehner's claim under O.R.C. § 2307.60(A)(1) is untimely.  (Doc. No. 27-1 at PageID #266.)  Officer Defendants acknowledge that courts disagree regarding whether a one-year statute of limitations or six-year statute of limitations applies.  (*Id.*)  However, they contend that Buehner's claim is untimely under either limitations period because the criminal act under O.R.C. § 2921.45 "happens when the right is 'deprived,' which allegedly happened in 2001, if at all," and was thus "well more than six years ago."  (*Id.*)

In his Opposition, Buehner raises the same arguments regarding timeliness as discussed above in relation to his claim for reckless breach of duty—namely, that the claims did not accrue under *Heck.*  (Doc. No. 31 at PageID #351); *see supra* Section IV.C.6.b.

In their Reply, Officer Defendants reiterate that *Heck* does not apply.  (Doc. No. 36 at PageID #395–96.)  Further, Officer Defendants assert that Buehner was "aware that exculpatory evidence was allegedly withheld as early as 2014[93] … [and] no later than November 2018, when the Eighth District reversed the trial court's judgment denying [Buehner's] motion for a new trial" and found the undisclosed witness statements to be exculpatory.  (*Id.* at PageID #397.)  Thus, Officer Defendants contend that Buehner "either had one (1) year, or at most two (2) years, to bring suit," but did not file suit until July 17, 2024.  (*Id.*)

Ohio Rev. Code § 2307.60 provides, in relevant part, that:

(A)(1) Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the

---

[93] Officer Defendants cite to the facts section of one of the state appellate court's decisions involving Buehner's case, where the state appellate court indicates that a public-records request revealed the exculpatory witness statements, which led to Buehner filing his motions for a new trial and for postconviction relief.  (Doc. No. 36 at PageID #397.)

> common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

Ohio Rev. Code § 2307.60(A)(1).  Pursuant to this statute, Buehner alleges that Officer Defendants are civilly liable for violating Ohio Rev. Code § 2921.45(A), which provides, in relevant part, as follows:

> No public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive or conspire or attempt to deprive any person of a constitutional or statutory right.

Ohio Rev. Code § 2921.45(A).  Under these two statutory provisions, Buehner alleges that Officer Defendants are liable for willfully depriving him of his rights secured by the Constitution and laws of the United States, resulting in his wrongful conviction.  (Doc. No. 1 at PageID #43–44.)

In light of recent precedent, courts have disagreed as to whether § 2307.60 is subject to a one-year or six-year statute of limitations period.  *See, e.g.*, *Niederst v. Minuteman Capital, LLC*, 2024 WL 3522413, at *13–16 (N.D. Ohio July 24, 2024) (discussing split); *see also Barens v. Parma City School District et al.*, Docket No. 1:22-cv-00103-PAB, Doc. No. 35, at *49–53 (N.D. Ohio Feb. 27, 2023) (Barker, J.) (same).  Today, however, this Court need not decide this issue because it concludes that Buehner's claim did not accrue until his acquittal.

The Sixth Circuit's decision in *Ruff v. Runyon*, 258 F.3d 498 (6th Cir. 2001), is instructive. In *Ruff*, the plaintiffs were indicted by a grand jury based upon fabricated evidence of drug purchases that never occurred.  *Id.* at 499.  The plaintiffs, although believing themselves innocent, pleaded guilty to lesser charges and fewer counts.  *Id.*  Years later, in April of 1994, an article appeared in the newspaper reporting that the "key informant" in the plaintiffs' investigation admitted to wrongly implicating them in drug purchases that never occurred.  *Id.*  This led to the plaintiffs discovering, based on the article, that the indictments were based on false information presented to the grand jury.

118

*Id.* at 500.  Thus, on April 4, 1995, a year after the newspaper article was published, the plaintiffs filed motions to withdraw their guilty pleas and/or for a new trial, which were granted by the state court. *Id.* at 499–500.  Then, on March 26, 1996—nearly one year after the plaintiff's motions—the county prosecutor elected not to further prosecute plaintiffs and dismissed all charges against them.  *Id.* at 500.  The plaintiffs subsequently brought constitutional tort claims under *Bivens*[94] against the government inspectors who fabricated the evidence.  *Id.* at 499–500.

In evaluating whether the plaintiffs' claims were timely, the Sixth Circuit concluded that the claims did not accrue until the charges against them were dismissed—i.e., March 26, 1996—because "prior to that point in time, plaintiffs did not 'know' of their injury for purposes of the statute of limitations."  *Id.* at 502.  Although the plaintiffs may have learned about the fabricated testimony earlier by way of the newspaper article publication date in April of 1994 or their motions for new trial filed on April 4, 1995, the court reasoned that the "[p]laintiffs' injury—being wrongfully convicted—was … not known until the charges against them were dismissed."  *Id.* at 503.  Because the plaintiffs' claims challenged their wrongful convictions, the court found the claims most analogous to a claim of malicious prosecution and found that "like a malicious prosecution claim, the statute does not begin to run until the charges are dismissed."  *Id.*  Courts within the Sixth Circuit have reached similar conclusions in other cases.[95]

---

[94] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Investigation*, 403 U.S. 388 (1971).

[95] *See, e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 776 (6th Cir. 2013) ("[E]ven though he apparently learned that he was being held unlawfully while still in prison, Harrison did not have 'have knowledge of his injury,' as a matter of law, until September 16, 2008, when the Michigan Court of Appeals [held that Harrison had been improperly sentenced and ordered that a corrected judgment be issued]."); *Nelson v. Royal*, 2017 WL 6811995, at *4 (W.D. Tenn. Oct. 6, 2017) ("Although Nelson filed the writ to overturn his conviction based on the newly discovered evidence on April 25, 2012, his cause of action in this case did not accrue until his conviction was overturned."); *Williams v. Taylor*, 2025 WL 410095, at *10 n.23 (S.D. Ohio Feb. 6, 2025) (recognizing that the plaintiff's "due process claims related to events occurring during trial

The Court finds Buehner's claim to be analogous to *Ruff*.  Like the *Bivens* claim asserted in *Ruff* (and as discussed above for Buehner's reckless breach of duty claim), Buehner's allegations related to Count Six "necessarily imply the invalidity of a criminal conviction."  *Heck*, 512 U.S. at 487.  Just as in *Ruff*, Buehner may have "discovered" the fabrication prior to his charges being disposed of.  However, Buehner did not know of his injury—"being wrongfully convicted"—until his acquittal.  *Ruff*, 258 F.3d at 503; *see also Harrison*, 722 F.3d at 776.  Because Buehner was acquitted on July 19, 2023, and filed his claim within a year from that date, his claim is not time-barred.

### 8. Count Seven: Malicious Prosecution

The Court next turns to Count Seven alleging malicious prosecution under Ohio law.

In their Motion, Officer Defendants contend that they cannot be held liable for malicious prosecution because they did not make the decision to prosecute Buehner.  (Doc. No. 27-1 at PageID #266.)  Specifically, Officer Defendants assert that a "prosecutor's independent charging decision typically breaks the causal chain for malicious-prosecution purposes."  (*Id.*)

In his Opposition, Buehner argues that his claim should survive for all the same reasons as his federal malicious prosecution claim.  (Doc. No. 31 at PageID #352.)  Specifically, Buehner contends that the government lacked probable cause, and that a police officer can be liable for setting a prosecution in motion when he "knowingly or recklessly makes false statements or falsifies or fabricates evidence" and the fabrication "together with any concomitant misleading omissions" are material.  (*Id.* at PageID #348.)

---

almost certainly would receive the benefit of *Heck's* deferred-accrual rule" in the event that the plaintiff's conviction was expunged).

In their Reply, Officer Defendants reiterate that an informer who "merely provides a statement of his belief of criminal activity and leaves the decision to prosecute entirely to the uncontrolled discretion of the prosecutor … is not regarded as having instituted the criminal proceedings."  (Doc. No. 36 at PageID #398.)  Thus, Officer Defendants maintain that the prosecutor's decision to prosecute broke the causal chain for malicious-prosecution purposes.  (*Id.* at PageID #399.)

Under Ohio law, "if an informer merely provides a statement of his belief of criminal activity and leaves the decision to prosecute entirely to the uncontrolled discretion of the prosecutor, or if the prosecutor conducts an independent investigation or prosecutes for an offense other than the one charged by the informer, the informer is not regarded as having instituted the criminal proceedings." *Bacon v. Kirk*, 2000 WL 1648925, at *18 (3d Dist. Oct. 31, 2000) (citing *Robbins v. Fry*, 594 N.E.2d 700, 702 (3d Dist. 1991)).  "The protected status of informer can be lost, however, when * * * the informer demonstrates a desire, direction, request or pressure for the initiation of criminal proceedings." *Id.* (citing *Robbins*, 594 N.E.2d at 702).

Ohio courts have permitted malicious prosecution claims to be brought against police officers where an officer acts with "malicious purpose, in bad faith, or in a wanton or reckless manner" in failing to disclose exculpatory evidence and such failure sets in motion a malicious prosecution.  *See Mayes v. Columbus*, 664 N.E.2d 1340, 1348–49 (10th Dist. 1995); *see also Ohio ex rel. Faulkner v. City of Middletown, Ohio*, 688 Fed. App'x. 377, 381 (6th Cir. 2017) ("*Mayes* makes clear that [malicious prosecution] claims are viable so long as the plaintiff sues the police officers involved *individually* and is able to show that they acted 'with malicious purpose, in bad faith, or in a wanton or reckless manner.'"); *Howell v. Cox*, 758 Fed. App'x. 480, 483 (6th Cir. 2018) (collecting cases

121

where causal chain was not broken in light of officer's fabricated or false evidence triggering malicious prosecutions).

The Court declines to dismiss Buehner's claim for malicious prosecution.  As explained previously, Buehner has alleged that Officer Defendants knowingly falsified or fabricated evidence through the fabrication of Lawone and Price's identifications.  *See supra* Section IV.C.5.a.i.  These allegations are sufficient under *Mayes* to allege that Officer Defendants acted with "malicious purpose, in bad faith, or in a wanton or reckless manner" such as to fall outside the bounds of Ohio's statutory immunity.  *See* O.R.C. § 2744.03(A)(6).

Officer Defendants cite to *Novak v. City of Parma, Ohio*, 33 F.4th 296, 307 (6th Cir. 2022), for the proposition that a "prosecutor's independent charging decision typically breaks the causal chain for malicious-prosecution purposes."  *Id.*  But they conveniently omit the next sentence of that opinion, which provides that "[t]he only exception is when an officer could 'reasonably foresee that his misconduct'—read, false statements—would result in an independent decision to prosecute the plaintiff."[96]  *Id.*  Buehner has sufficiently alleged as much at this stage.  Accordingly, the Court declines to dismiss Count Seven against Officer Defendants.

### 9.    Count Eight: Abuse of Process

The Court next turns to Count Eight alleging abuse of process.

---

[96] *See also Mills v. Barnard*, 869 F.3d 473, 482 (6th Cir. 2017) ("Investigators are deemed to have participated in a prosecution where 'misstatements and falsehoods in their investigatory materials … ultimately influence a plaintiff's continued detention.") (alterations omitted); *Hoskins v. York*, 2024 WL 2894648, at *2 (6th Cir. June 10, 2024) ("But if the police knowingly or intentionally fabricated the evidence that misled the grand jury into finding probable cause, they would remain liable.").

In their Motion, Officer Defendants contend that Buehner has failed to demonstrate that the proceeding had been perverted to accomplish an "ulterior purpose" for which it was not designed. (Doc. No. 27-1 at PageID #267.)  Officer Defendants assert that being charged, arrested, tried by a jury, and exonerated are all "anticipated by-products of a criminal prosecution and within the ambit of the judicial process," and that abuse of process does not "occur when a party uses the court to pursue a legal remedy that the court is empowered to give." (*Id.* at PageID #267–68.)  Thus, Officer Defendants maintains that Buehner fails to allege that the process was used to obtain a collateral advantage apart from the proceeding itself, or that the trial court was powerless to issue orders within the context of the prosecution. (*Id.* at PageID #268.)

In his Opposition, Buehner argues that even if a jury found that probable cause existed to support an indictment, it could still find that Officer Defendants "wrongfully manipulated the legal process to cause the wrongful conviction." (Doc. No. 31 at PageID #351.)  Further, Buehner responds to Officer Defendants' collateral advantage argument, asserting that "[w]hat [Buehner's] wrongful conviction gained them was another expediently-closed file in conformity with their police department's expectations for its officers." (*Id.* at PageID #351–52.)

"The elements of an Ohio abuse-of-process claim are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Bickerstaff v. Cuyahoga County*, 2022 WL 6252835, at *19 (N.D. Ohio Apr. 26, 2022) (Barker, J.) (citing *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 626 N.E.2d 115, 118 (Ohio 1994)).

"Abuse of process differs from malicious prosecution in that the former connotes the use of process properly initiated for improper purposes, while the latter relates to the malicious initiation of a lawsuit which one has no reasonable chance of winning." *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 662 N.E.2d 9, 14 (Ohio 1996) (internal quotation marks omitted).  In an abuse of process case, the "improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Id.*  In other words, "abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order." *Id.*

As such, "[t]here is no liability for abuse of process where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Bickerstaff*, 2022 WL 6252835, at *20 (citing *Yaklevich*, 626 N.E.2d at 118 n.2).  "Bad faith alone is not enough to establish that the proceedings were instituted for an ulterior purpose." *Id.*  Rather, the plaintiff must demonstrate that "criminal proceedings were initiated against her in 'an attempt to gain an advantage outside the proceeding, such as payment of money or surrender of a claim, using the process itself as a threat.'" *Id.* (citing *Omran v. Lucas*, 2021 WL 6134820, at *7 (7th Dist. Dec. 13, 2021)).

Courts have rejected abuse of process claims where the allegedly "ulterior purpose" of a criminal prosecution was simply to obtain the conviction.  *See, e.g.*, *Ruff v. Runyon*, 60 F.Supp.2d 738 (N.D. Ohio 1999); *Rodriguez v. City of Cleveland*, 619 F. Supp.3d 461 (N.D. Ohio 2009), *rev'd on other grounds*, 439 Fed. App'x. 433 (6th Cir. 2011).  In *Ruff*, the plaintiffs alleged that postal inspectors instigated criminal charges against them for ulterior motives, including "career advancement and conversion of government funds." 60 F. Supp.2d at 749.  Specifically, the success

124

of the investigation impacted how much funding the postal inspectors received in the following year's budget—in other words, "the higher the arrest/conviction rate, the higher the budget would become." *Id.* at 749 n.12.  The plaintiffs thus argued that the abuse of process was the "improper continuation of unfounded proceedings against them, despite defendant's knowledge that plaintiffs were not dealing drugs." *Id.* at 749.

The court concluded that even if probable cause existed, the claim would still fail because the plaintiffs did not demonstrate an "ulterior purpose involved by showing a direct demand for collateral advantage." *Id.* at 750.  In so holding, the court found that "[e]ven if the inspectors sought career advancement or more government funding for their department, there is no evidence the [p]ostal [i]nspectors used the charges to achieve a collateral advantage *as against plaintiffs*" or that they "attempted to extract anything *from the plaintiffs* by failing to report their alleged knowledge of plaintiffs' innocence." *Id.* (emphasis added).  Accordingly, the abuse of process claim failed.  *See also Rodriguez*, 619 F. Supp.3d at 486 (rejecting abuse of process claim against officers because "[a]lthough the [officers] may not have had probable cause to arrest [plaintiff] or to seize his property, they initiated the legal proceeding against him to obtain his conviction for offenses that he allegedly committed and not for any other collateral or improper purpose."); *Palivoda v. Felix*, 2011 WL 4790982, at *7 (11th Dist. Oct. 7, 2011) (Trapp, J., concurring) ("While [plaintiff] was indeed charged by the state, arrested, tried by a jury, and exonerated, … these are all anticipated by-products of a criminal prosecution and within the ambit of the judicial process.").

The Court finds that Buehner has failed to plead a claim for abuse of process.  It is clear that Buehner has pled that the "proceeding[s] ha[d] been perverted," for example, by the Officer Defendants' fabrications of Lawone and Price's identifications.  *Bickerstaff*, 2022 WL 6252835, at

*19 (citing *Yaklevich*, 626 N.E.2d at 118).  However, a claim for abuse of process requires more—an "ulterior purpose" beyond "carry[ing] out the process to its authorized conclusion, even though with bad intentions."  *Id.* at *20.  On this point, just as in *Ruff*, Buehner argues that such ulterior purpose was to meet employer expectations of higher conviction rates.  *Compare Ruff*, 60 F. Supp.2d at 749, *with* (Doc No. 31 at PageID #351–52.)  But even if a criminal prosecution is advanced "despite defendant's knowledge that [the] plaintiff[] w[as] not" guilty to secure a criminal conviction, that does not, without more, establish ulterior purpose.  *Ruff*, 60 F. Supp.2d at 749–50.

Accordingly, the Court hereby dismisses Count Eight against Officer Defendants.[97]

### 10.      Count Eleven: Supervisory Liability[98]

Finally, the Court turns to Count Eleven alleging supervisory liability against Defendant Petkac.

Throughout their Motion, Officer Defendants argue that Petkac has no liability for Buehner's claims.  (*See generally* Doc. No. 27-1.)  Addressing supervisory liability, Officer Defendants contend that "[t]o hold a supervisor liable, the plaintiff must show that the defendant was personally responsible for or actively participated in the unconstitutional activity," and that liability "must be

---

[97] Because the Court concludes that Buehner has failed to plausibly allege a claim for abuse of process against Officer Defendants, it is unnecessary to address Buehner's statute of limitations argument as to Count Eight.  However, the Court notes that, while Buehner raised statute of limitations in his initial Motion as to Counts Five and Six, he did not raise it with respect to Count Eight until his Reply Brief.  (*See* Doc. No. 27-1 at PageID #267–68.)  And "[i]f a party raises an argument for the first time in its reply brief, the party has waived the argument."  *Larrick v. Tuscarawas County*, 2023 WL 6311396, at *16 (N.D. Ohio Sept. 28, 2023) (Barker, J.) (citing *Bridgeport Music, Inc.*, 520 F.3d at 595 n.4).

Finally, the Court notes that while Officer Defendants moved to dismiss Count Eight on the basis of plausibility, Prosecutor Defendants did not.  Accordingly, the Court's dismissal is limited to Officer Defendants only.  Prosecutor Defendants will have the opportunity to address the claim again at summary judgment.

[98] *See supra* note 1.

126

based on active unconstitutional behavior and cannot be based on a mere failure to act." (*Id.* at PageID #254.)  Thus, Officer Defendants assert that Buehner fails to allege that Petkac "had a role in the Jerry Saunders homicide investigation."  (*Id.* at PageID #264.)  Finally, Officer Defendants argue that Petkac is entitled to qualified immunity.  (*See generally* Doc. No. 27-1.)

In his Opposition, Buehner contends that a supervising police officer may be liable if he "encouraged" or "in some other way directly participated in" the violation—i.e., if he "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."[99]  (Doc. No. 31 at PageID #349.)  Buehner points to his allegations that "Petkac as the supervising officer over this homicide investigation assigned Hasan and Beaman to their work, approved and signed each of their reports, and was responsible for supervising and disciplining them."  (*Id.*)  Thus, Buehner maintains that Petkac "not implicitly but explicitly approved their conduct," arguing that "it is reasonable to infer that a detective who signs a report was involved in the events recounted in that report."  (*Id.*)

In their Reply, Officer Defendants first submit that Buehner has waived any opposition that Petkac actively participated in the various alleged misconduct by not separately responding to that argument in each count.  (*See generally* Doc. No. 36.)  Further, Officer Defendants assert that Buehner's supervisory liability claim fails because he "did not plausibly allege *any specific conduct* on the supervisor's part that he implicitly authorized, approved, or knowingly acquiesced in the allegedly unconstitutional conduct at issue."  (*Id.* at PageID #394.)  Finally, Officer Defendants

---

[99] Rather than address Petkac's liability separately with respect to each count, Buehner discusses his liability for all claims in one section based on supervisor liability.  (*See* Doc. No. 31 at PageID #349–50.)

contend that merely approving and signing reports is not enough to establish supervisory liability under Section 1983.  (*Id.* at PageID #394–95.)

In his Surreply, Buehner contests Officer Defendants' assertion that he forfeited opposition to Petkac's liability.  (Doc. No. 39 at PageID #405.)  Buehner indicates that he opposed the entire motion as to Petkac in one section addressing supervisory liability, arguing that it is inaccurate to say he failed to oppose the motion simply "because he made the drafting choice to address Petkac's liability all in one place in his brief … rather than repeating himself each time he addressed the merits of each claim."  (*Id.*)

In their Opposition to Surreply, Officer Defendants reiterate that supervisory liability "requires some 'active unconstitutional behavior' on the part of the supervisor" rather than a "mere failure to act."  (Doc. No. 50 at PageID #687–88.)  They argue that in Buehner's Opposition, the sole premise for supervisory liability against Petkac is that he "allegedly signed and approved reports" authored by Hasan and Beaman, which is insufficient.  (*Id.* at PageID #688.)  Finally, Officer Defendants contend that Buehner's cited authority is distinguishable because the supervising officer there "did far more than just sign reports authored by subordinates" and instead "was actively involved in an attempted cover up."  (*Id.*)

As a preliminary matter, the Court finds that Buehner has not waived opposition to Petkac's liability simply by choosing to address it in one section of his brief.  Accordingly, the Court will consider the merits of the parties' arguments.

It is well established that personal liability under § 1983 cannot be imposed on supervisors solely on the basis of *respondeat superior*.  *See Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (stating that it is "well settled that 'government officials may not be held liable for the

128

unconstitutional conduct of their subordinates under the theory of *respondeat superior*") (quoting *Iqbal*, 556 U.S. at 676)); s*ee also Heyerman*, 680 F.3d at 648; *Shehee v. Lutrell*, 199 F.3d 295, 300 (6th Cir. 1999). As the Sixth Circuit has explained:

> For individual liability on a failure-to-train or supervise theory, the defendant supervisor must be found to have "'encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). **A plaintiff must demonstrate that the defendant supervisor "'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'"** *Id.* (quoting *Shehee*, 199 F.3d at 300). A mere failure to act will not suffice to establish supervisory liability. *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).

*Essex v. Cty. of Livingston*, 518 Fed. App'x. 351, 355 (6th Cir. 2013) (emphasis added); *see also Miller v. Gettel*, 2023 WL 2945340, at *8 (6th Cir. Apr. 14, 2023) (similar). Because "[s]upervisors are often one step or more removed from the actual conduct of their subordinates . . . the law requires more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct." *Peatross*, 818 F.3d at 241.

The Sixth Circuit addressed pleading standards relating to individual-capacity supervisory liability claims in *Moderwell v. Cuyahoga Cty.*, 997 F.3d 653 (6th Cir. 2021). In that case, the plaintiff brought individual-capacity supervisory liability claims, among others, against several jail executives on behalf of the estate of a detainee who committed suicide while held in the jail. *Id.* at 658. The district court denied the executives' motion for judgment on the pleadings with respect to the plaintiff's supervisory liability claims. *Id.* at 659. On appeal, the executives argued that they could not be held liable via *respondeat superior* simply because their subordinates violated the decedent's constitutional rights. *Id.* The Sixth Circuit rejected the CCCC executives' argument and affirmed the decision of the district court. *Id.* Central to the Sixth Circuit's reasoning was the fact that, in

129

the complaint, the plaintiff specifically alleged that the executives "*personally* devised and implemented the regionalization plan—an unconstitutional policy that created an unreasonable risk of suicide, . . . *knowingly acquiesced* in unconstitutional policies, including the use of solitary confinement as a punishment for minor infractions, the conditions of the Red Zone, and the denial of food as a punishment, . . . and [ ] abandoned their duties by failing to enact policies to prevent suicide, to provide adequate healthcare, to ensure appropriate supervision, and to train CCCC's correctional officers . . . ." *Id.* (internal citations omitted) (emphasis added).  According to the Sixth Circuit,

> As to whether they knowingly acquiesced in the unconstitutional conduct of a subordinate, the Executive Defendants argue that Warden Ivey acted unconstitutionally without their knowledge. However, the Executive Defendants' involvement in, and knowledge of, Ivey's unconstitutional conduct requires "facts to be fleshed out during discovery." *Guertin*, 912 F.3d at 927. Drawing all inferences in Plaintiff's favor, the Amended Complaint alleges that, in response to the severe overcrowding knowingly caused by the Executive Defendants, Ivey implemented unconstitutional policies. The Amended Complaint further alleges that the Executive Defendants were on notice of the "insufficient and inedible food" and the "life-or-death" conditions at CCCC. (R. 55 at PageID## 293, 295-296.) They also allegedly "knew of a custom, propensity, and pattern" of prison officials "failing and/or refusing to provide prompt and competent access to and delivery of medical and mental health assessment, evaluation, care, intervention, referral, and treatment, to detainees." (*Id.* at PageID## 304-05.) At summary judgment, Plaintiff's burden will be to present facts showing that the Executive Defendants knew about the unconstitutional conduct and "did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006); *Peatross*, 818 F.3d at 243. But this burden is not on Plaintiff at the pleading stage. *See Hart*, 973 F.3d at 638 n.4 (explaining that "[a] complaint need not set down in detail all the particularities of a plaintiff's claim against the defendant." (quoting *Dunn v. Tennessee*, 697 F.2d 121, 125 (6th Cir. 1982))).

*Id.*

By contrast, in the instant case, Buehner does not plausibly allege any specific conduct on Petkac's part that he implicitly authorized, approved, or knowingly acquiesced in the allegedly unconstitutional conduct at issue.  *Heyerman*, 680 F.3d at 648.  Rather, Buehner's allegations are

130

wholly conclusory aside from paragraph 24, in which Buehner alleges that "Petkac was the Lieutenant over Hasan and Beaman who approved and signed off on their reports of the investigation … [and] knew about and approved all of Hasan and Beaman's misconduct described in the Complaint."  (Doc. No. 1 at PageID #5.)  However, merely approving and signing off on reports is not alone sufficient to establish supervisory liability.  *See, e.g.*, *McRae v. Lendsey*, 2023 WL 4826294, at *6 (S.D. Ohio July 27, 2023) (concluding that shift supervising officer reviewing incident report was insufficient to establish supervisory liability); *Zawada v. Hogan*, 2021 WL 3709628, at *4–5 (E.D. Mich. Aug. 20, 2021) (finding that allegations of sergeant reviewing, approving, and signing off on reports related to unlawful arrest were insufficient to establish supervisor liability); *Blake v. Tennessee Dep't of Correction*, 2018 WL 1427119, at *5 (M.D. Tenn. Mar. 22, 2018) (rejecting supervisor liability because "the record reflects that Defendants Rosson and Genovese did nothing more than approve reports or forms prepared by other people").

Buehner cites to *Jackson* for the proposition that "it is reasonable to infer that a detective who signs a report was involved in the events recounted in that report."  925 F.3d at 814–15.  However, *Jackson* is distinguishable in numerous respects.  First, *Jackson* did not involve a theory of supervisory liability.  Rather, the issue in *Jackson* was whether the officer at-issue had been directly involved in the unconstitutional conduct of coercing a false witness statement, despite no testimony *explicitly* stating that he was present.  *See id.*  The victim had testified that the officer's partner "*and another officer*" led him into a room and coerced him into signing a false statement about the line-up.  *Id.* at 814.  In addition, the officer's partner testified both that: (i) the officer at-issue was indeed his partner; and (ii) the officer at-issue *was present* for the line-up.  *Id.*  Thus, looking at all the testimony in totality—combined with the fact that the officer at-issue had *signed* the false statement—the court

concluded that a jury *could* find that the officer was present when the victim signed his false statement. *Id.* The circumstances in *Jackson* are thus significantly distinguishable from those presented in the present case, where Petkac's supervisory liability is supported only by his alleged approvals of investigation reports and conclusory allegations of "facilitat[ing], condon[ing], and overs[eeing]" the unconstitutional measures used. (Doc. No. 1 at PageID #5, 48–49.)

Finally, Buehner chiefly relies upon *Coley v. Lucas Cty., Ohio*, 799 F.3d 530 (6th Cir. 2015), which is also distinguishable. In *Coley*, the defendant sheriff was accused of failing to train and supervise officers: (i) to avoid the use of excessive force; (ii) to ensure that the medical needs of persons in custody were met; and (iii) regarding the proper use of force. *Id.* at 542. The defendant sheriff was also accused of failing to properly investigate allegations of excessive force. *Id.* Moreover, the plaintiffs alleged specific misconduct including a failure to train on "the use of a chokehold and the injuries derived therefrom" which resulted in the victim's "injuries and death." *Id.* Finally, and critically, the plaintiffs alleged that the sheriff had "full knowledge of the assault on [the victim] … but nonetheless intentionally and deliberately made false statements to federal officials about [his] knowledge of [officer-1's] assault and [officer 2's] chokehold and the deliberate failure to provide medical attention to [the victim]." *Id.* These allegations were sufficient to demonstrate that the sheriff "helped [the officers] to cover up their unconstitutional actions," thereby creating supervisory liability. *Id.* Once again, these allegations are notably distinguishable from the present case.

As explained in *Moderwell*, while Buehner "need not set down in detail" all of the particularities of his claims against Petkac, Buehner must at least allege *some* facts related to his individual capacity supervisory liability claims against Petkac. 2021 WL 1897949, at *8. As written,

Buehner's Complaint fails to do so.  Accordingly, the Court hereby dismisses Buehner's supervisory liability claims against Petkac.

### D.  City's Motion (Count Ten: *Monell* Claim Against the City)

Finally, the Court turns to the City's Motion.  (Doc. No. 26.)

#### 1.  State Law Claims and Punitive Damages

As a preliminary matter, the Court briefly addresses the parties' discussion regarding Buehner's state law claims and punitive damages.  In its Motion, the City raises numerous arguments against Buehner's federal and state law claims (excluding Count Ten for *Monell* liability).  (*See id.* at PageID #225–26.)  The City also argues that punitive damages are not available against the City.  (*See id.* at PageID #227.)  In his Opposition, Buehner clarifies that the only claim asserted against the City is his *Monell* claim under Count Ten, and that he only seeks punitive damages against the individual defendants and not the City.  (Doc. No. 31 at PageID #358–59.)  In light of Buehner's clarification, the Court construes Buehner's Complaint as not raising such claims against the City and therefore need not address the City's arguments further.

#### 2.  Count Ten: *Monell* Claim Against the City

The Court turns to the primary arguments relating to Count Ten for *Monell* liability against the City.[100]

---

[100] In addition to the four *Monell* theories of liability, the City contends that Buehner's claim fails because there was no underlying constitutional violation, incorporating all the arguments made by Officer Defendants.  (Doc. No. 26-1 at PageID #213.)  Buehner similarly responds by incorporating by reference his Opposition to Officer Defendants' Motion. (Doc. No. 31 at PageID #352.)  As explained at-length, the Court concludes that Buehner has sufficiently alleged underlying constitutional violations caused by Officer Defendants, and accordingly rejects the City's argument here.  *See supra* Section IV.C.

133

As explained previously, a plaintiff can allege a *Monell* claim in one of four ways: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess*, 735 F.3d at 478; *see also D'Ambrosio*, 747 F.3d at 386.

The parties dispute whether Buehner has plausibly alleged a claim under all four ways. (*See generally* Doc. No. 26-1, 31.)  The Court will thus address each *Monell* theory in-turn, below.

### a.  Illegal Official Policy

The Court begins with whether Buehner has alleged an official policy under the first *Monell* theory.

In its Motion, the City contends that Buehner fails to identify an official policy by making no references to any "acts by a legislative body, formal rules or understandings, or fixed plans of actions to be followed." (Doc. No. 26-1 at PageID #214–15.)  Next, the City asserts that any such policy is not connected to the City because Buehner's Complaint uses the term "official policy" in reference to the County, and "Cuyahoga County's official policies are not connected to Cleveland." (*Id.* at PageID #215.)  For similar reasons, the City argues that Buehner fails to allege factual and proximate causation because "the official policies alleged were adopted by Cuyahoga County, not Cleveland." (*Id.* at PageID #216.)  Finally, the City contends that Buehner fails to allege deliberate indifference as there is "no Cleveland official policy alleged" and thus "no allegations that this unidentified policy was adopted despite the known or obvious consequences of adoption." (*Id.* at PageID #216–17.)

In his Opposition, Buehner begins by referencing the historical allegations contained in his Complaint as related to the City's police, including decades-long Department of Justice

134

investigations, third-party studies, and dozens of wrongful conviction exonerations.  (Doc. No. 31 at PageID #353–54.)  Buehner then asserts that multiple courts within the Sixth Circuit have "approved near-identical *Monell* allegations from exonerees suing the City and its officers for similar misconduct …"[101]  (*Id.* at PageID #354.)

Next, Buehner addresses his claim of an "official custom."  (*Id.* at PageID #354–55.)  Specifically, Buehner points to his allegations of a "decades-long official policy … in which police regularly used unconstitutional measures to secure wrongful convictions."  (*Id.*)  Buehner also maintains that he alleged such "measures" to include "withholding, suppressing, or destroying exculpatory evidence, fabricating evidence … engaging in unduly suggestive identification and lineup procedures" and "coerc[ing] witnesses," and that such violations were the same as those done to him.  (*Id.* at PageID #355.)  Finally, Buehner references his allegations that this at-issue official policy was in part written, but largely unwritten "though with the force of a rule."  (*Id.*)  Accordingly, Buehner argues that the City misreads his Complaint.  (*Id.*)

In its Reply, the City reiterates that Buehner has failed to allege an official policy.  (Doc. No. 35 at PageID #371.)  The City first asserts that Buehner fails to allege that a particular written policy was then in place.[102]  (*Id.*)  Next, the City argues that Buehner's "'unwritten' pattern of action" fails to demonstrate an "official policy" as a pattern of activity is better understood as a "custom" under the fourth theory of *Monell* liability.  (*Id.*)  On this point, the City asserts that cases within this circuit

---

[101] *See, e.g., Jackson*, 622 F. Supp.3d at 639; *Sailor v. City of Cleveland*, 2022 WL 405346 (N.D. Ohio Feb. 10, 2022); *Jackson*, 925 F.3d at 828; *Andrews*, 112 F.4th at 444.

[102] On this point, the City argues that Buehner cites to "¶ 83(e)" of the Complaint, but that such paragraph does not exist. (Doc. No. 35 at PageID #371.)  In his Surreply, Buehner clarifies that his Complaint contains a typographical error, and that "¶ 83(e)" should refer to the last subparagraph of ¶ 83 in the Complaint.  (Doc. No. 39 at PageID #408.)

"look[] to written policies dictating future action under the 'official policy' theory of *Monell*, not a pattern of activity."  (*Id.* at PageID #372.)  The City also contends that Buehner fails to allege causation, and that Buehner has waived argument on this issue by failing to respond.  (*Id.* at PageID #373.)  Finally, the City maintains that Buehner fails to allege deliberate indifference, which it asserts is required.  (*Id.* at PageID #373–74.)

In his Surreply, Buehner contends that he has alleged both a "written and unwritten official policy of the City."  (Doc. No. 39 at PageID #408.)  Buehner also disputes that he "waived" opposition to the causation element.  (*Id.*)  Finally, Buehner argues that the same facts can support both a theory of "official policy" and "custom" under *Monell*, and that there will inevitably be overlap.  (*Id.* at PageID #408–09.)

In its Opposition to Surreply, the City asserts that Buehner fails to identify "fixed plans of action" that dictate future behavior.  (Doc. No. 40 at PageID #413.)  The City also contends that "custom" and "official policy" are separate theories.  (*Id.*)

To establish *Monell* liability, a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Jackson*, 925 F.3d at 829 (citing *Garner*, 8 F.3d at 364).  As previously explained, "[w]hen proceeding under the first theory of *Monell* liability, under which a plaintiff must show an official policy or legislative enactment, the plaintiff must show that there were 'formal rules or understandings—*often but not always committed to writing*—that were intended to, and did, establish fixed plans of actions to be followed under similar circumstances consistently and over time.'"  *Id.* (citing *Pembaur*, 475 U.S. at 480–81) (alterations omitted) (emphasis in original); *see also id.* at 830 ("[A] city may be

136

liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written …").

The Court finds that Buehner has plausibly alleged an official policy under the first *Monell* theory. First, Buehner alleges that the "City, through CDP, maintained a decades-long official policy and custom in which police regularly used unconstitutional measures to secure wrongful convictions." (Doc. No. 1 at PageID #17.) Contrary to the City's assertions, this references a separate policy from that of the County.[103] (*Compare* Doc. No. 1 at PageID #17–30 (allegations of City policy), *with id.* at PageID #30–37 (allegations of County policy).) Buehner also alleges that such measures included "withholding, suppressing, or destroying exculpatory evidence, fabricating evidence, feeding information to witnesses, engaging in unduly suggestive identification and lineup procedures, and engaging in leading, coerce, and unduly suggestive questioning of and contact with witnesses." (*Id.*) Buehner alleges that this official policy existed in the form of official written policy, (*see* Doc. No. 1 at PageID #19), and further alleges facts that imply unwritten "formal rules or understandings" within CDP (*see id.* at PageID #17–30.) Further, Buehner alleges that the unconstitutional conduct which

---

[103] The City specifically argues that Buehner's Complaint does not allege City policy because "[t]o the extent the Complaint uses the term 'official policy,' it is in reference to Cuyahoga County." (Doc. No. 26-1 at PageID #215.) The City bases this assertion on the fact that Buehner's Complaint includes allegations such as "Cuyahoga County maintained a decades-long official policy" and "[t]he County's official policy." (*Id.*) Yet, incredibly, the City omits from its Motion the fact that these allegations appear under a section of Buehner's Complaint explicitly titled "[f]actual allegations summarizing *Cuyahoga County's* policy," (*see* Doc. No. 1 at PageID #30) (emphasis added), and that Buehner separately includes these same kinds of allegations—across fourteen pages of his Complaint—under a section titled "[f]actual allegations summarizing *Cleveland's* policy …" (*Id.* at PageID #17) (emphasis added); (*see, e.g., id.* at PageID #17 ("The City, through CDP, maintained a decades-long official policy and custom …"); *id.* ("the City's policy …"); *id.* at PageID #19 ("CDP's official written policy …").) It is disingenuous to argue that Buehner's Complaint only alleges County policy merely because it includes certain allegations referencing the County's "decades-long official policy," while simultaneously overlooking Buehner's allegations that the "City, through CDP, maintained a decades-long official policy and custom" of its own. And it is difficult to believe that the City could not differentiate between these two separately alleged sets of policies or recognize that the allegations relating to the County were separate from those relating to the City—indeed, they appear under entirely different sections of the Complaint, each with its own heading explicitly noting which alleged policy is being discussed. (*Compare* Doc. No. 1 at PageID #17, *with id.* at PageID #30.)

allegedly occurred in his case—the details of which have been addressed at-length—were not isolated events but instead were taken pursuant to (and thus caused by) the City's official policy.  (*Id.* at PageID #29–30.)  Finally, while not necessarily required,[104] Buehner alleges "how indifferent the CDP was to its own obvious shortcomings" as shown by historical materials.  (*See, e.g.*, *id.* at PageID #21–22.)  These allegations are sufficient at this stage to plausibly allege an official policy, and other courts have found the same with respect to similar allegations.  *See, e.g.*, *Jackson*, 622 F. Supp.3d at 642–43; *Sailor v. City of Cleveland*, 2022 WL 405346, at *1–3 (N.D. Ohio Feb. 10, 2022).

The City's arguments to the contrary are unavailing.  First, Buehner alleges that the official policies described above exist as part of a "CDP[] official written policy."  (Doc. No. 1 at PageID #19.)  Moreover, the City is incorrect that the binding case law requires "written policies" under the "official policy" theory of *Monell*."  (Doc. No. 35 at PageID #372.)  Although the Sixth Circuit evaluated a written policy in *Jackson*, the court explicitly noted that "formal rules or understandings— *often but not always committed to writing*" are sufficient to demonstrate official policy under the first *Monell* theory.  *Jackson*, 925 F.3d at 829 (emphasis in original).  Finally, the Court declines to find

---

[104] The City contends that the Sixth Circuit has held that when considering a "policy," a plaintiff *must* show the municipal action was "taken with 'deliberate indifference' as to its known or obvious consequences."  (Doc. No 35 at PageID #373– 74.)  This assertion misconstrues the case law.  The Sixth Circuit cases cited by the City indicate that a city's custom or policy can be unconstitutional in two ways: (1) facially unconstitutional as written or articulated; or (2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers.  *See Gregory*, 444 F.3d at 752.  The Sixth Circuit cases then indicate that only in the *second* scenario— i.e., where the identified policy is itself facially lawful—must the plaintiff demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.  *Id.*; *see also Winkler v. Madison County*, 893 F.3d 877, 901 (6th Cir. 2018) (first concluding that the policy was not facially unconstitutional but instead facially lawful, and then proceeding to analysis of whether municipal action was taken with "deliberate indifference" in light of facially lawful policy).  In this case, the City does not address whether the alleged official policies are facially unconstitutional or facially lawful, and the Court finds that the nature of Buehner's allegations, if true, appear to allege that any such policies are facially unconstitutional.  Finally, even if Buehner's claims were construed as challenging facially lawful policies being consistently implemented in an unconstitutional manner, the Court concludes that Buehner has sufficiently pled deliberate indifference.

that the history of misconduct alleged in Buehner's Complaint is only relevant to the fourth theory of *Monell* liability.  While it is true that such patterns of activity could be construed as *developing* a "custom" under the fourth *Monell* theory, they can also be construed as evidence of the City *implementing* its already-established official policies under the first *Monell* theory.  In other words, Buehner has alleged that an official policy exists, and his allegations of previous similar misconduct simply demonstrate examples of that official policy in use.

Accordingly, the Court concludes that Buehner has plausibly alleged an official policy under the first theory of *Monell* liability.

### b.  Ratification by Final Decision-Making Authority

The Court next turns to whether Buehner has alleged ratification by final decision-making authority under the second *Monell* theory.

In its Motion, the City next argues that Buehner fails to plausibly allege that an official with final decision-making authority ratified illegal actions.  (Doc. No. 26-1 at PageID #217.)  The City contends that Buehner fails to identify a specific decision-maker with "final decision-making authority" and a "duty to know and act" upon alleged unconstitutional conduct.  (*Id.*)  The City asserts that Buehner's "single allegation about ratification" falls short of this standard.[105]  (*Id.*)

In his Opposition, Buehner submits that he sufficiently alleged that CDP officials with final decision-making authority ratified the officer misconduct at issue.  (Doc. No. 31 at PageID #355.)  First, Buehner asserts that the Officer Defendants themselves were "delegated 'massive authority' to

---

[105] Specifically, the City references ¶ 97 of Buehner's Complaint alleging that "[t]he City's policymakers and officers to whom massive authority was delegated ratified these violations."  (Doc. No. 26-1 at PageID #217–18.)  The City contends that this allegation does not identify any specific final decision-maker, and that "by combining 'policymakers and officers,' it is clear that neither were final-decision makers."  (*Id.* at PageID #218.)

act without review and thus possessed *de facto* final authority to approve one another's unconstitutional policing measures and did so." (*Id.* at PageID #355–56.)  Buehner also maintains that CDP officers facilitated a code of silence with the CDP and refused to investigate and remedy unconstitutional conduct despite knowing wrongful convictions would continue to result, including his own conviction. (*Id.* at PageID #356.)

In its Reply, the City argues that Buehner's allegations fail because "no person with a specific duty to know and act on alleged unconstitutional conduct is alleged." (Doc. No. 35 at PageID #375.) The City also contends that Buehner's allegations of culpability "trickling up the chain of command suggests *respondeat superior*, 'which is specifically prohibited by *Monell*.'" (*Id.*)  Next, the City argues that Buehner's allegations relating to the delegation of "massive authority" to homicide detectives are distinguishable from case law because no authorized policymakers approved the subordinate's decision. (*Id.*)  Finally, the City asserts that Officer Defendants lacked the "unfettered discretion" discussed in *Monistere v. City of Memphis*, 115 Fed. App'x. 845 (6th Cir. 2004),[106] as they were supervised by Petkac and because Cleveland's municipal code indicates that line homicide detectives do not have such unfettered discretion. (*Id.* at PageID #376.)

"The Sixth Circuit has held that 'official toleration, … concealment … [and] a complete failure to initiate and conduct any meaningful investigation,' into complaints of constitutional violations may establish municipal liability." *Knowlton v. Richland County, Ohio*, 2017 WL 5649597, at *13 (N.D. Ohio Apr. 5, 2017) (citing *Ragsdale v. Sidoti*, 2015 WL 10986350, at *5 (N.D.

---

[106] Although not raised by Buehner, the City raises *Monistere* as an unpublished Sixth Circuit decision finding that ratification may be shown based on evidence that a detective acted with "unfettered discretion." 115 Fed. App'x. at 853. The City argues that even if this narrow exception exists as a matter of law (and is not contrary to *respondeat superior*), the present case is distinguishable. (Doc. No. 35 at PageID #376.)

140

Ohio June 5, 2015)) (quoting *Marchese v. Lucas*, 758 F.2d 181, 187–88 (6th Cir. 1985)).  In other words, "[a] plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct."  *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020); *see also Davis v. City of Columbus, Ohio*, 2021 WL 4399755, at *6 (S.D. Ohio Sept. 27, 2021).

The Court finds that Buehner has plausibly alleged ratification by the City.  For example, in his Complaint, Buehner points to examples demonstrating an "entrenched history of failing to supervise, investigate, and discipline allegations of officer misconduct like that at issue here," and that the "widespread pattern and practice of using unconstitutional measures to secure convictions was so well settled … [and] was allowed to exist" because of these failures to investigate due to "City policy makers and CDP supervisors faclitat[ing] a code of silence within the CDP."  (Doc. No. 1 at PageID #24–28.)  These allegations viewed in totality are sufficient, at this stage, to allege the City and CDP's "fail[ure] to meaningfully investigate and punish allegations of unconstitutional conduct" such as to have created official policy[107] pursuant to which Officer Defendants acted.  *Wright*, 962 F.3d at 882; *cf. Ragsdale*, 2015 WL 10986350, at *5 (reaching opposite conclusion at summary judgment stage because the plaintiff presented "no evidence to suggest that the City of Akron failed to investigate … prior incidents of force [or] that such investigations were inadequate").  Further, Buehner's Complaint alleges a longstanding policy of "massive power delegated to subordinate

---

[107] *See also Davis*, 2021 WL 4399755, at *6 ("The question, however, is not whether the ratification caused the injury. It is whether the misconduct that caused the injury was ratified through a failure to investigate, such that it may be considered official policy."); *id.* at *7 (finding that large number of complaints against officers with lack of discipline permitted a "reasonable inference that there were at least some instances of actual wrongdoing that went unpunished and even were approved"); *id.* at *7 n.5 (referencing 1999 pattern or practice investigation by the Department of Justice, which resulted in a finding that the City had tolerated excessive force, and concluding that "[w]hat weight to give this investigation is a matter for the jury").

officers," to such an extent that it "encourage[d] tendencies to build small empires," "create sinecure positions," and created "various policymakers within the CDP."  (Doc. No. 1 at PageID #22–23.) Other courts within this district have found identical allegations to fall within the exception discussed in *Monistere*.[108]  Finally, Buehner alleges that policymakers for the City and CDP knew of and allowed these issues to continue which led to CDP officers "believ[ing] that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences," and more specifically, "caused the Officer Defendants to believe that they could abuse [Bueher's] rights and cover up what they did without fear of discipline."  (Doc. No. 1 at PageID #27–29.)

Accordingly, the Court concludes that Buehner has plausibly alleged ratification under the second theory of *Monell* liability.

---

[108] *See Jackson*, 622 F. Supp.3d at 643 (citing *Monistere*, 115 Fed. App'x. at 852) ("To the contrary, the Sixth Circuit recognizes that, in certain circumstances, police officers may have final, unreviewable authority to act, effectively, as a final policymaker unconstrained by the official policies of superiors.").

Further, the Court finds the City's cited authority distinguishable.  For example, the City cites to *Robertson v. Taylor*, 2024 WL 519891 (N.D. Ohio Feb. 8, 2024), where the court rejected a ratification claim based on the failure to investigate other officer conduct.  However, the court did so because those decisions not to discipline officers occurred after the plaintiff's incident and therefore could not "form the basis for prior ratification of an illegal act"—whereas here, Buehner points to numerous instances of failing to investigate similar officer misconduct that occurred *prior* to his case.  *See id.* at *4.  *Compare Wright*, 962 F.3d at 882 ("Wright points us to Chief Meyer's lack of investigation and discipline in the other high-profile use-of-force cases involving Euclid police officers, but those instances occurred after [the plaintiff's] encounter with [the officers] and cannot show that Meyer's failure to investigate and punish officers involved in those uses of force led in any way to Wright's injuries."), *with* (Doc. No. 1 at PageID #24 "[D]espite having knowledge of news reports and complaints against a detective for false testimony and beating confessions out of detainees, the City failed to investigate or take disciplinary action …").  Similarly, in *Glaser v. Smith*, 2023 WL 4052470 (N.D. Ohio June 16, 2023), the analysis focused on a single incident, and the plaintiff did not allege any failures to investigate that incident.  *See id.* at *10.

142

### c. Inadequate Training or Supervision

The Court next turns to whether Buehner has alleged inadequate training or supervision under the third *Monell* theory.

In its Motion, the City contends that Buehner fails to allege that any training was inadequate. (Doc. No. 26-1 at PageID #219.)  While the City acknowledges that the Complaint alleges that "in 1975 a report concluded that in CDP there was no ongoing in-service training and little formal training," it argues that Buehner fails to allege that these officers were trained before 1975, and that a subsequent "1977 Cleveland ordinance requir[ed] an in-service training program by Division of Police."  (*Id.* at PageID #219–20.)  Next, the City asserts that Buehner fails to allege deliberate indifference because there are no allegations of a "pattern" of specific violations "such that the [C]ity was 'clearly on notice' that the training 'in this particular area' was deficient and likely to cause injury." (*Id.* at PageID #220.)  Finally, the City reiterates that Buehner has failed to allege causality. (*Id.* at PageID #221.)

In his Motion, Buehner maintains that he has plausibly pled the failure to train and discipline under *Monell*.  (Doc. No. 31 at PageID #356.)  Buehner points to his allegations regarding the need to implement policies, train, and supervise police officers to remedy known misconduct, and references "at length the history of, nature of, and results of these failures." (*Id.* at PageID #356–57.)

In its Reply, the City contends that Buehner's references to training before 1975 "go to the training delivery type, not the substance, contrary to binding precedent."  (Doc. No. 35 at PageID #378.)  The City also asserts that Buehner has failed to plausibly allege deliberate indifference because he has failed to show a pattern that sufficiently puts the City on notice that a constitutional violation is likely to occur.  (*Id.* at PageID #379.)

143

To show that a municipality is liable for a failure to train its employees, a plaintiff must establish that: (1) the City's training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.  *Jackson*, 925 F.3d at 834.  "When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'"  *Id.*  Further, "a plaintiff most commonly demonstrates a municipality's deliberate indifference by pointing to a failure to act 'in response to repeated complaints of constitutional violations by its officers.'"  *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023); *see also Jackson*, 925 F.3d at 836 (indicating that a plaintiff can show deliberate indifference through "prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it").

The Court finds that Buehner has plausibly alleged a failure-to-train theory.  In his Complaint, Buehner alleges that policymakers for the City and the CDP knew of widespread issues pertaining to: (i) officers repeatedly accused of the same kinds of serious misconduct; (ii) failing to properly investigate cases in which the police are implicated in fabricating or suppressing evidence; (iii) failing to discipline officers accused of such unlawful conduct; and (iv) facilitating a code of silence within the CDP.  (Doc. No. 1 at PageID #27.)  Buehner further alleges that despite this knowledge, policymakers for the City and the CDP "made decisions not to implement adequate policies, training, or supervision, even though the need for a legitimate mechanism for new or different policies, training, oversight, or punishment of officers was obvious."  (*Id.*)  Finally, Buehner alleges causation in that the failure to train, supervise, and discipline officers effectively condoned, ratified and

144

sanctioned the kind of misconduct that Officer Defendants committed against Buehner which "encourage[d] constitutional violations such as those that occurred in this case." (*Id.* at PageID #29.) Other courts within this circuit have recognized *Monell* failure-to-train claims based on similar allegations. *See, e.g.*, *Jackson*, 622 F. Supp.3d at 643; *Jackson*, 925 F.3d at 834–37.

Moreover, the Court is not persuaded by the City's arguments. First, the City contends that the 1975 report is inapplicable because Buehner does not allege that Officer Defendants were trained in 1975. (Doc. No. 26-1 at PageID #219–20.) Viewing in totality the historical examples alleged in Buehner's Complaint, however, it is not too far a leap for *Iqbal* to presume, at this stage, that such severe lack of training procedures continued beyond 1975. Moreover, the existence of a "1977 Cleveland ordinance requiring an in-service training program" does not change this conclusion. (*Id.* at PageID #220.) To the contrary—Buehner points to similar misconduct continuing "in the early 1980s" and later, giving rise to the reasonable conclusion that such an ordinance did *not* remedy the failures described in the 1975 report. (Doc. No. 1 at PageID #24–25.)

Further, the Court rejects the City's argument that no "ongoing in-service training" and "little formal training" cannot be considered. In *Howell*, the court indicated that "failure-to-train liability is concerned with the substance of the training, not the particular instructional format." 67 F.4th at 320. However, the facts of that case indicated that training was offered, including "initial training" and "on-the-job training" that was ongoing. *Id.* Further, the officers displayed knowledge of and familiarity with the relevant policies at issue, and expert testimony indicated that level of familiarity was reasonable and appropriate.[109] *Id.* Thus, the court concluded that the county "did not wholly fail

---

[109] Notably, *Howell* was decided at the summary judgment stage, not the motion to dismiss stage.

to train its officers …"  *Id.*  By contrast, Buehner's alleges "*no* 'ongoing in-service training'" and "*little* formal training"—not for the proposition that one type of training is preferable to another—but rather to demonstrate that officers received virtually no training at all in *any* form.  (Doc. No. 1 at PageID #24) (emphasis added).  The present case is thus distinguishable.

Finally, the Court rejects the City's deliberate indifference arguments for the same reasons as discussed above with respect to ratification by "failing to meaningfully investigate and punish allegations of unconstitutional conduct."[110]  *Wright*, 962 F.3d at 882.  The Court finds that Buehner has sufficiently alleged that police regularly used the unconstitutional methods at issue in this case to attempt to secure convictions, thereby "demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it."  *Howell*, 67 F.4th at 319.

Accordingly, the Court finds that Buehner has plausibly alleged inadequate training or supervision under the third theory of *Monell* liability.

### d.  Custom of Tolerence or Acquiescence

Finally, the Court turns to whether Buehner has alleged a custom of tolerance of acquiescence under the fourth *Monell* theory.

In its Motion, the City first argues that Buehner fails to allege a clear and persistent pattern of conduct.  (Doc. No. 26-1 at PageID #222.)  Next, the City contends that even if there was a pattern, there are no allegations that it knew about this pattern and failed to act.  (*Id.* at PageID #223.)  The

---

[110] The Court also finds *Sanders v. Cuyahoga County*, 2022 WL 17821347 (N.D. Ohio Dec. 20, 2022), to be distinguishable.  There, the plaintiff brought a *Monell* claim in relation to the use of excessive force by a deputy sheriff, and the court declined to find a pattern of similar incidents.  In doing so, however, the court noted that although the plaintiff referenced numerous examples attempting to demonstrate a pattern of similar incidents, "[n]one of the incidents involved deputy sheriffs …"  *Id.* at *6.

City also reiterates that Buehner fails to allege deliberate indifference.  (*Id.* at PageID #224.)  Finally, the City asserts that Buehner fails to allege causation.  (*Id.* at PageID #224–25.)

In his Opposition, Buehner maintains that he has sufficiently alleged a custom of tolerance to civil rights violations leading to wrongful convictions.  (Doc. No. 31 at PageID #358.)  Buehner contends that he "describe[s] in detail how the City's decades long-history of similar misconduct accumulated to cause his wrongful conviction and persisted even afterward."  (*Id.*)  Buehner also asserts that the Sixth Circuit nor any court has determined that there is a "numeric threshold of prior similar conduct under which a *Monell* custom claim falls short of Rule 12."  (*Id.*)

In its Reply, the City reiterates its position that Buehner fails to allege custom, notice, deliberate indifference, or causation.[111]  (*See* Doc. No. 35 at PageID #381–82.)

"To sustain a *Monell* claim and hold a municipal entity liable for a custom of tolerance or acquiescence, a plaintiff must show: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation."  *Wallace*, 852 Fed. App'x. at 876; *see also D'Ambrosio*, 747 F.3d at 387–88.

---

[111] The City also addresses Buehner's reference to misconduct persisting even after his conviction, and argues that "[s]ubsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates."  (Doc. No. 35 at PageID #382.)  The Court agrees with the City on this point, and gives no weight to any misconduct alleged to have occurred following Buehner's wrongful conviction for purposes of placing the City on notice.

The Court finds that Buehner has sufficiently pled this theory.  First, the Court concludes that Buehner's has alleged a clear and persistent pattern of illegal activity including, but not limited to, examples of "years of repeated misconduct by … officers" and cases demonstrating a practice of "[d]on't ask, don't tell" regarding the disclosure of exculpatory evidence.  (*See generally* Doc. No. 1 at PageID #17–30.)  Moreover, the Court rejects the City's arguments as to a required numeric threshold required of incidents or recency thereof.[112]  At this stage in the proceedings, Buehner "enjoys the benefit of an inference that the custom of tolerating of the acquiescence in violations of constitutional rights was so firmly entrenched that it persisted well after the dates of the specific allegations to which the City points."  *Jackson*, 622 F. Supp.3d at 644 (finding custom *Monell* claim plausible based on similar allegations).  The Court also concludes that Buehner has sufficiently pled notice, deliberate indifference, and causation for the same reasons already discussed.  *See supra* Sections IV.D.2.a–c.

The Court therefore concludes that Buehner has plausibly alleged a custom of tolerance or acquiescence under the fourth theory of *Monell* liability.

---

[112] Additionally, the Court pauses to address the City's references to case law.  For example, in their Motion, the City cites to *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 (6th Cir. 2006), for the proposition that as a matter of law, "[t]en complaints over two years is not a pattern."  (Doc. No. 26-1 at PageID #222.)  Yet this plainly misstates the holding in *Ellis*.  There, the plaintiff had offered ten reports into evidence in an attempt to demonstrate the custom of a school district.  *Ellis*, 455 F.3d at 701.  The Sixth Circuit, however, concluded that only two of those ten reports were relevant incidents.  *Id.*  Thus, the court indicated that the school district "had notice of only *two* incidents of possible constitutional violations."  *Id.* (emphasis added).  The court then explicitly concluded that the plaintiff "ha[d] not shown how *two incidents, over a two-year period*, could put the school district on notice of a problem …"  *Id.*  Accordingly, contrary to the City's assertion, the court did not find, as a matter of law, that "[t]en complaints over two years is not a pattern" because it only considered two of the complaints to be relevant potential constitutional violations.  *Id.*; (Doc. No. 26-1 at PageID #222.)  The Court reminds counsel of their obligation to accurately represent the law before a tribunal.  *See* Ohio Prof. Cond. Rule 3.3.  In any event, the Court nevertheless finds *Ellis* distinguishable, in that the incidents were evaluated within the context of the school district "operat[ing] 127 schools with over 69,000 students"— a far wider purview than seen in the present case.

For the foregoing reasons, the Court finds that Buehner has plausibly alleged his *Monell* claim against the City on each of the theories available under *Monell*.  Accordingly, the City's Motion is denied.[113]

### E.     Buehner's Request for Leave to Amend

Finally, the Court turns to Buehner's request for leave to amend.

In his Opposition, Buehner requests that if the Court finds any pleading deficiencies, it should permit Buehner leave to amend his Complaint in lieu of dismissal.  (Doc. No. 31 at PageID #359.) Buehner asserts that doing so would not cause delay or undue prejudice.  (*Id.* at PageID #359–60.)

In its Reply, the City contends that Buehner's request should be denied.  (Doc. No. 35 at PageID #383.)  Specifically, the City argues that an "incorporated request for leave to amend is not a proper motion," and that Buehner has failed to demonstrate "good cause" to amend.  (*Id.*)

The Sixth Circuit has held that "a bare request in an opposition to a motion to dismiss— without any indication of the particular grounds on which amendment is sought … does not constitute a motion within the contemplation of Rule 15(a)."  *Louisiana School Employees' Retirement System v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010); *see also Alexander v. Eagle Manufacturing Company, LLC*, 714 Fed. App'x. 504, 511 (6th Cir. 2017).

---

[113] One final note.  During the course of discovery, the Court was made aware of a recorded phone message in which the City's counsel represented to a witness that they had filed a "motion to dismiss" requiring an evaluation of the Complaint while "tak[ing] the facts in the light most favorable to Michael Buehner."  The City's counsel then indicated that "the Complaint itself is like a hundred pages, so they have sort of met that burden."  Notwithstanding this apparent admission that Buehner had met his burden, the City's counsel indicated that they filed their motion to dismiss to "go through the motions … because it slows things down."  (*See* Doc. No. 45, Ex. Z, Recorded Call dated February 28, 2025, 0:36-1:17.) The Court issues a stern reminder to counsel of their obligation not to abuse legal procedure.  *See* Ohio Prof. Cond. Rule 3.1, Comment [1].

The Court rejects Buehner's request to amend for two reasons.  First, Buehner has not properly made a motion for leave to amend accompanied by a proposed amended complaint that indicates "the particular grounds on which amendment is sought."  *See id.*  Second, even if Buehner had done so, the Court would decline to permit amendments at this late stage.  The City and Officer Defendants filed their Motions on January 13, 2025.  It has since been over six months since then, and at any point Buehner could have filed a motion to amend and proposed amended complaint but did not.  *See, e.g.*, *Detrick v. KCS International Inc*, 2025 WL 1697482, at *5 (N.D. Ohio June 17, 2025) (Barker, J.) (declining request to amend where plaintiff waited over six months to formally request leave to amend and instead "made the strategic decision to wait for the Court to rule on Defendants' Motion to dismiss").  Allowing such an amendment at this stage would be prejudicial considering ongoing discovery.[114]  Accordingly, the Court declines to permit Buehner to amend his Complaint at this juncture.[115]

## V.    Conclusion

For the foregoing reasons, the Court orders as follows.

Buehner's Motion for Surreply is **GRANTED**.

---

[114] The Court notes that while *Monell* discovery has been stayed pursuant to this Court's Case Management Conference Order, the claims that would require amendment primarily involve claims against Officer Defendants and Prosecutor Defendants in their individual capacities which have already commenced discovery.  (*See* Doc. No. 18 at PageID #141.)

[115] In any event, the Court notes that any such amendments would likely be futile.  For example, the abuse of process claim does not appear to be salvageable by amendment because securing a criminal conviction is not an "ulterior purpose" as a matter of law, and Buehner's Complaint and Opposition make clear that Officer Defendants were not using the proceedings to "achieve a collateral advantage as against [Buehner]."  *See supra* Section IV.C.9.  Nor could any amendments salvage the majority of the allegations against Prosecutor Defendants that the Court has concluded are protected by absolute immunity.  *See supra* Section IV.A.1.b.  And the Court declines to permit amendment as to the supervisory liability claim against Petkac, as Buehner's filings do not suggest that Petkac's involvement extended beyond "approv[ing] and sign[ing] each of [Hasan and Beaman's] reports," which this Court has already found insufficient to establish supervisory liability.  (Doc. No. 31 at PageID #349.)  Notwithstanding these points, the Court independently rejects Buehner's request to amend for the other reasons stated above.

150

The County and Prosecutors' Motion is **GRANTED IN PART AND DENIED IN PART**. The Motion is granted with respect to: (i) Count Three against Prosecutor Defendants; (ii) the specific allegations against Prosecutor Defendants taken in their advocative capacity as set forth in this Opinion; and (iii) Buehner's claim under the third *Monell* theory of inadequate training or supervision. The Motion is denied in all other respects.

The Officers' Motion is **GRANTED IN PART AND DENIED IN PART**.  The Motion is granted with respect to Count Eight against Officer Defendants and Count Eleven against Defendant Petkac.  The Motion is denied in all other respects.

The City's Motion is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 24, 2025                          *s/ Pamela A. Barker*
                                              PAMELA A. BARKER
                                              UNITED STATES DISTRICT JUDGE